IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BANCO CENTRAL DE VENEZUELA, a Venezuelan government organization, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| DOLARTODAY, LLC, a Delaware limited liability company; GUSTAVO DÍAZ VIVAS, an Alabama resident; IVAN DARIO LOZADA-SALAS, a Washington resident; and JOSÉ ENRIQUE ALTUVE LOZADA, a Florida resident, | ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff BANCO CENTRAL DE VENEZUELA (in English, the Central Bank of Venezuela) (the "Central Bank") alleges as follows.

### THE GRAVAMEN OF THIS ACTION

1.      How far will some go to enrich themselves (and their friends) and to regain the political power they crave to enrich themselves further?  Would they go so far as to hurt their own countrymen by making their already challenging lives even harder?  Defendants would.  And they have.

2.      La República Boliviariana de Venezuela ("Venezuela" or the "Republic") is one of the oldest democracies in the Americas.  Like many nations, the Republic faced a long struggle for independence.  And like many nations, the Republic currently faces some economic challenges that impose hardships on its people.  Defendants are Venezuelan exiles living in the United States who virulently oppose the Republic's elected leaders, but not out of concern for their countrymen.  To the contrary, Defendants

seek only to grab riches and power for themselves and their friends, willingly increasing the hardships of ordinary Venezuelans in the process.  And in a ruthless exercise of realpolitik, Defendants seek to trick the Venezuelan populace that elected the Republic's current government, hoping that voters will turn on their leaders, and blame them for the harm caused by Defendants.  Indeed, Defendants hope that the discontent arising from their own misconduct will usher in a new government that will enable Defendants and their allies to get even richer, again at the expense of the Central Bank and ordinary citizens of Venezuela.

3.       The facts chronicled below disclose an illegal conspiracy by Defendants to manipulate the value of the Republic's currency by deliberately misrepresenting and falsifying it on a massive scale, enriching themselves and their supporters.  Doing so has harmed the Venezuelan people.  It has also harmed the Central Bank by violating (I) the Racketeer Influenced and Corrupt Organizations Act ("RICO" or the "Act"), Pub. L. No. 91-452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1962, (II) Section 43(a) of the Lanham Act (15 U.S.C. §1125(a)), (III) article 1185 of the Venezuelan Civil Code, and (IV) Delaware common law prohibiting unjust enrichment.  Through this Complaint, the Central Bank seeks redress for these violations by Defendants who must answer for their false statements and self-dealing.

### INTRODUCTION

4.       Since 1998, the Venezuelan government has focused its policies on the Republic's Bolivarian roots to improve the circumstances of the country's more disadvantaged people, and on clamping down on corrupt individuals and organizations that had enriched themselves at the expense of the Venezuelan people.  Some of those individuals greatly resented the clampdown.  Defendant Gustavo Díaz Vivas ("Díaz"), for example, played a key role in a short-lived 2002 coup against the democratically elected government.  And some of those individuals – and the Central Bank is informed and believes and therefore alleges that defendants Díaz, Ivan Dario Lozada-Salas

("Lozada") and José Enrique Altuve Lozada ("Altuve") (collectively the "Individual Defendants") were among them – ultimately fled to the United States.

5.      In the United States, the Individual Defendants have been seeking new ways to feed their greed, and in the process return Venezuela back to the way it was before December 1998.  One way in which the Individual Defendants, with the active participation of as yet unknown co-conspirators, have sought to achieve this objective is through their creation and continuous operation of a website ([www.dolartoday.com](www.dolartoday.com), the "DT Site").  They intended the DT Site to be the authoritative source of a daily exchange rate for the Republic's currency, the bolívar fuerte (commonly known simply as the "bolívar"), against the United States dollar (the "DT Rate"), from which they could, on information and belief, reap personal financial gains.  They also created (or commissioned the creation of) an application for Android and iOS users (collectively the "DT App").  Like the DT Site, the DT App displays the "current" DT Rate.

6.      The Individual Defendants formed defendant DolarToday, LLC, a limited liability company organized in Delaware ("DT LLC").  The Central Bank is informed and believes and therefore alleges that DT LLC is now the putative "owner" of the website and related domain, the DT App and U.S. trademark application serial no. 86507179 for "$ DOLARTODAY."

7.      In taking these steps, Defendants conspired to use a form of cyber-terrorism to wreak, and in fact they have wreaked, economic and reputational harm on the Central Bank by impeding its ability to manage the Republic's economy and foreign exchange system.  Among other things, Defendants' actions are:

- Exacerbating inflationary pressures that diminish the purchasing power of the Venezuelan people and the Central Bank;

- Diminishing the value of the Central Bank's seigniorage[1] for the new currency it prints (or the coins it mints) or that it newly puts into circulation;

- Depriving the Central Bank of the higher real returns that it would otherwise receive on monies it lends to other financial institutions and entities;

- Causing trade to be withheld from the Central Bank, as capital that it would otherwise retain or attract instead leaves, with investors seeking returns from other world economies; and

- Creating the false impression that the Central Bank and the Republic are incapable of managing Venezuela's economy.

The economic and reputational damage that Defendants have caused the Central Bank are independent of the hardships that Defendants have imposed on the Venezuelan people.

## THE PARTIES

8.      Plaintiff Central Bank is an autonomous government entity, the functions of which are set forth in the Republic's Constitution and laws, with its headquarters located at Avenida Urdaneta, Esquina Las Carmelitas, Torre Financiera del Banco Central de Venezuela, Caracas 1010, Venezuela.  One of the Central Bank's most important functions is developing the Republic's currency exchange policy, which it does with the Ministry of Economy and Finances.  The Central Bank, however, is solely responsible for developing the Republic's monetary policy and for implementing both that policy and the Republic's currency exchange policy (which includes setting foreign exchange rates and international reserves).

9.      Defendant DT LLC is a Delaware limited liability company with a place of business at 5695 Colony Lane, Hoover, Alabama, 35226.  The Central Bank is informed and believes and therefore alleges that defendant DT LLC owns and operates (through at least some of the Defendants) the DT Site.

---

[1] Seigniorage is the profit calculated as the difference between the value of money issued and the cost incurred to produce and distribute it.  *See* Webster's New Collegiate Dict. at 1039 (1981).

10.     Defendant Gustavo Díaz Vivas ("Díaz") is a director of DT LLC.  Díaz formerly was a colonel in the Venezuelan Army.  He was made the acting Deputy Chief of the Casa Militar (literally "Military House"), the Venezuelan equivalent of the U.S. Secret Service, by those who launched a 2002 coup against the Republic's democratically elected government.  In this position, Díaz headed the security detail for Pedro Carmona, self-proclaimed as the new president for the 47-hour coup.  After the coup was put down, Díaz became a committed and visibly vocal opponent



Col. Díaz (right) behind Pedro Carmona during 2002's 47-hour coup

of the elected government.  Díaz was later granted political asylum in the U.S. in October 2005, settling in Alabama.[2]  Díaz's residence is 5695 Colony Lane, Hoover, Alabama, 35226 – the address also listed for DT LLC.

11.     Defendant Ivan Dario Lozada-Salas ("Lozada") resides at 1512 220th Place NE, Sammamish, Washington 98074-6835.  A Venezuelan native, Lozada worked at CANTV, Venezuela's largest telecommunications company until 2005, when he immigrated to the United States.  The Central Bank is informed and believes and therefore alleges that Lozada is a principal of DT LLC and helps support the DT Site.

12.     Defendant José Enrique Altuve Lozada ("Altuve") is a native Venezuelan (and cousin of Lozada) who immigrated to Miami, Florida in early 2002.  His current residence is at 11001 NW 83rd Street, Apt. 203, Doral, Florida 33178.  The Central Bank is informed and believes and therefore alleges that Altuve is a principal of DT LLC.  In that capacity, Altuve posts the DT Rate on the DT Site daily (sometimes "updating" it multiple times in a day), and directs or helps direct the DT Site's movement to mirror sites to evade the Republic's efforts to block the website in Venezuela.

---

[2] See http://www.tuscaloosanews.com/article/20060123/news/601230338 (last accessed Oct. 8, 2015).

13.     The Individual Defendants know each other, agreed to and work cooperatively to operate both the legitimate and illegal operations of the DT Site and thus conspired to engage in the conduct giving rise to each claim of relief below.

## JURISDICTION AND VENUE

14.     The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 18 U.S.C. § 1964(c).  The Court may also exercise diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states (and nations) and the amount in controversy, net of interest and attorneys' fees, exceeds $75,000.  The Court additionally enjoys subject matter jurisdiction over the state law claim because it arises from the same nucleus of operative facts underlying the federal questions presented, and 28 U.S.C. § 1367 authorizes the Court to exercise supplemental jurisdiction over such a related claim.

15.     The Court has personal jurisdiction over defendant DT LLC because as a Delaware entity it is a resident of Delaware, and over defendants DT LLC and Díaz because they either transact business in Delaware as alleged in this Complaint or meet the requirements for the exercise of personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2).  The Court may exercise personal jurisdiction over the remaining defendants pursuant to 18 U.S.C. § 1965(b), § 1965(d) or both.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the acts giving rise to the Central Bank's claims have taken place, in whole or in part, here, because defendant DT LLC was formed, and therefore resides, in Delaware , and because defendants Díaz, Lozada and Altuve all participate in its operation.

## BACKGROUND FACTS

### *The Republic's Foreign Currency Exchange System*

17.     The Central Bank is the Venezuelan analog of the United States Federal Reserve Bank.  Like other central banks, the Venezuelan Central Bank works sometimes independent of and sometimes alongside a finance ministry or treasury department – in

 the Republic, the Ministry of the Economy and Finances – to establish monetary and fiscal policies. The Central Bank participates in desinging and implementing foreign exchange policy, currency regulation, credit and interest rates. The Central Bank is charged with carrying out such agreed policies, and is empowered to do so by using a variety of tools common to central banks worldwide, including the setting of interest rates, the development of credit controls, the ability to lend to domestic financial institutions, the fixing of reserve requirements, and the establishment of foreign exchange rates, among other things.

18.     Like other central banks, certain of the Central Bank's activities benefit both it and the Republic. One such form of "revenue a government gets from its monopoly control over the creation of money" is seigniorage.[3]

19.     The activities of central banks, particularly in the United States, are often shrouded in mystery, and are simultaneously the objects of adulation and awe as well as targets of conspiracy theories.[4] Although the United States has been almost single-mindedly concerned with fighting inflation in recent decades, the financial challenges presented in different world economies, and at different circumstances and times, sometimes call for management that prioritizes other objectives over management of inflation.[5] Of course, "no single currency system is optimal for all countries for all

---

[3] R.W. Click, *Seigniorage in a Cross-Section of Countries*, Journal of Money, Credit and Banking, 30(2):154-171 (May 1998); *see also supra* note 1.

[4] *See generally, e.g.,* W. Greider, Secrets of the Temple: How the Federal Reserve Runs the Country (1989).

[5] *See, e.g.,* J.C. Williams, *Inflation Targeting and the Global Financial Crisis: Successes and Challenges*, Essay presentation to the South African Reserve Bank Conference on Fourteen Years of Inflation Targeting in South Africa and the Challenge of a Changing Mandate, Pretoria, South Africa (2014); A.S. Blinder, *Financial Crises and Central Bank Independence*, Business Economics 48: 163-165 (2013).

times."[6]  Much of the world, including numerous members of the International Monetary Fund ("IMF"), engage in something that is both literally and figuratively quite foreign to the United States: the multiple exchange rate system.  These systems have long been implemented to achieve equalizing quasi-fiscal measures, financial stability in the form of macroeconomic shock absorption, and trade balance adjustments, among other things.[7]

20.     In many countries for which foreign trade comprises a large percentage of their gross domestic product ("GDP"), the government sets an official currency exchange rate that is typically fixed (or "pegged") to a very stable foreign currency.  Venezuela pegs the bolívar to the U.S. dollar.

21.     An exchange rate peg provides a useful and credible nominal anchor for monetary policy by tying a local currency to a known reserve currency – the U.S. dollar being the most widely used across the globe.[8]  The Central Bank manages the bolívar-to-dollar rate according to a multi-layered system that offers different exchange rates for different purposes based on the nature of the transactions.

22.     One of these rates, "CENCOEX,"[9] is reserved for the importation of goods deemed to be vital, such as food and medicine.  That rate is currently 6.3 ($1.00 = VEF 6.30).

---

[6] O. Holtemöller & S. Mallick, "Exchange Rate Regime, Real Misalignment and Currency Crises," Economic Modeling (2013).

[7] See, e.g., R. Dornbusch, "Multiple Exchange Rates for Commercial Transactions," *chapter in* Economic Adjustment and Exchange Rates in Developing Countries (1986).

[8] M. Mussa, P. Masson, A. Swoboda, E. Jadresic, P. Mauro & A. Berg, Exchange Rate Regimes in an Increasingly Integrated World Economy, Int'l Monetary Fund Occasional Paper 193 at 13-14 (2000).

[9] "CENCOEX" is the acronym for the Venezuelan government's Centro Nacional de Comercio Exterior, or National Foreign Trade Center, which is charged with administering the CENCOEX and SICAD I currency exchanges in the country.

23.     A second foreign exchange rate recognized by the Central Bank is known as SICAD I,[10] and it applies to other imported goods.  The SICAD I rate is determined by government auctions; the rate from the most recent auction was about 12.8 ($1.00 = VEF 12.80).

24.     March 2014 saw the establishment of a new third tier of the Republic's foreign exchange system.  Originally known as SICAD II, it applied to securities obtained through banks and brokerages as well as currency needs of incoming tourists. In early 2015, this tier of the Republic's foreign exchange system was replaced with a new system known as SIMADI (the Spanish acronym for Marginal Currency System). SIMADI is a free market currency exchange system that allows individuals and entities to buy and sell foreign currency.  For example, now individuals – not just financial institutions – can now bid in bolívares to purchase dollars and vice-versa.  Potential sellers can accept these offers or make counteroffers for different amounts.  The average of such transactions establishes the SIMADI exchange rate.  The current SIMADI rate is about 199 ($1.00 = VEF 199).

25.     The inflation rate in Venezuela is higher, on a relative basis, than rates in the most industrialized economies over the past few decades.  However unwelcome such inflation would be in the United States, it is an expected consequence of the Republic's policies to promote social inclusion of the poor and economic growth.  Indeed, in an economy that exports little else besides petroleum and imports nearly all other goods (including foodstuffs and equipment necessary for the healthcare of its citizenry), the tiered exchange rates are critical to the Central Bank's management of the Republic's economy.

---

[10] "SICAD" is the acronym for Sistema Complimentario de Adminstración de Divisas, or Ancillary Foreign Currency Administration System.

### The "Parallel" or "Black" Market for Dollars in Venezuela

26.     Under the official, three-tiered exchange system that it developed, the Central Bank should serve as the major supplier of dollars and as the sole exchange house for foreign transactions.  But Venezuelans also trade dollars through private exchange houses or with individuals with dollars to sell.  Such transactions are said to be made through a "parallel" or "black" market.

### Rise of the DT Site

27.     The Individual Defendants created the DT Site in 2010.[11]  Ostensibly a platform for articles and editorials opposing the Republic's current administration, the DT Site's principal purpose since inception, as its domain name implies, has been to post daily an unofficial U.S. dollar to bolívar exchange rate – the value of the "dollar today" in bolívars (the "DT Rate").[12]

28.     A June 23, 2015 online article about the DT Site and its operators reports that "[f]or the past five years, the [DT Site] has been posting the daily black market exchange rate online, and updating it several times a day, providing Venezuelans who can't buy dollars from the government with an estimate of how much greenbacks are trading for in the street."[13]  The article also features an interview with one of the Defendants, identified in the article under the pseudonym "Benjamin"[14] but whom the Central Bank is informed and believes is Defendant Altuve.  "Benjamin" describes in the article how the DT Rate – purportedly the dollar's "street value" in bolívares – is calculated as follows:

---

[11] Rueda, M., "Meet the Venezuelan Rebel Whose Crime is Publishing Exchange Rates" (http://fusion.net/story/15 5182/meet-the-venezuelan-rebel-armed- with-unofficial-exchange-rates-and-an-untraceable-ip/) (last retrieved July 22, 2015) ("Rueda").

[12] *Id.*

[13] *Id.*

[14] *Id.*

> Benjamin says the exchange rates he publishes are based on daily calls to several currency traders in Cucuta, a Colombian border city where bolivares [*sic*] are openly traded for Colombian pesos.
>
> Benjamin gets the bolivar to peso exchange rate, then converts that to dollars.  He says his method is so reliable that even financial news wires like Reuters have quoted his exchange rate.
>
> "The formula I use is very simple," Benjamin said.  "I don't tell the trading houses that I'm calling from Dolar Today, in order to prevent speculation; I just pretend to be a regular businessman trying to trade money."[15]

29.     Through such statements, as well as through the overall design of the DT Site and its inclusion of a purported explanation about how the DT Rate is calculated,[16] Defendants portray the DT Rate as simply the "true" bolívar-to-dollar exchange rate.

30.     Defendants' portrayal has been largely successful.  The Central Bank is informed and believes and therefore alleges that the DT Rate has been the most widely read and followed exchange rate reference in Venezuela since 2013.  News outlets – including respected ones such as CNN,[17] CNBC,[18] Reuters,[19] and the well-known blog

---

[15] Rueda, *supra* note 11.

[16] *See* https://dolartoday.com/precio.

[17] "Venezuela's Currency Isn't Worth A Penny,"
http://money.cnn.com/2015/06/03/investing/venezuela-bolivar-currency-imploding/
(June 3, 2015) ("The country's currency has lost nearly half its value since the beginning of May, according to dolartoday.com, a website that tracks the unofficial exchange rate.").

[18] "Venezuelan Currency Tanks; Inflation Seen Near 100%,"
http://www.cnbc.com/2015/05/14/venezuelan-currency-tanks-inflation-seen-near-100.html (May 14, 2015) ("The unofficial exchange rate for the bolivar has fallen sharply in recent weeks, so that on Thursday, one dollar would get you 300.72 bolivars, according to widely used rate-tracking website dolartoday.com.").

[19] "Venezuela Unofficial Exchange Rate Weakens To 400 Bolivars Per Dollar,"
http://www.reuters.com/article/2015/05/22/us-venezuela-forex-idUSKBN0O701R20150522
(May 21, 2015) ("The unofficial rate reached 402 bolivars per dollar on Thursday evening, according to the website DolarToday, a week after crossing 300 bolivars for the first time.").

Venezuela Live Economic Data[20] – have embraced the DT Rate as the authoritative "parallel" or "black market" exchange rate in Venezuela.

31.     The large number of Venezuelan daily visitors to the DT Site, users of the DT App and DT Twitter followers demonstrates that many Venezuelans have likewise been led to believe that the DT Rate represents the "true" dollar-to-bolívar exchange rate. Indeed, the Central Bank is informed and believes that at least one million people – mostly in Venezuela – visit the DT Site (or one of its "mirror" sites) daily, making it one of the most visited websites in Venezuela.  (In contrast, Venezuela's three newspapers with the widest circulation *cumulatively* average 150,000 fewer visitors per day.) DolarToday's Android and iOS apps are also among the most downloaded by mobile users in Venezuela; and DolarToday's Twitter feed provides the DT Rate to more than 1.5 million Twitter followers.

### *Defendants' Manipulation of the DT Rate on the DT Site*

32.     At one time, the DT Rate roughly paralleled an exchange value implied by the amount of the Central Bank's hard currency reserves in dollars.  But beginning in or about May 2013, the DT Rate began an artificial climb untethered to genuine market forces.[21]  The DT Rate continued to climb.  And climb.

33.     Concerned about the widespread dissemination of Defendants' fraudulent representations about the purported "true" exchange rate, on November 9, 2013, the Republic began blocking access to the DT Site in Venezuela.  But the Republic's efforts to block the DT Site have been largely futile.  With funding from unnamed co-conspirators, Defendants have been playing "a cyber cat-and-mouse game" – employing

---

[20] http://venecon.girish-gupta.com/ (citing www.dolartoday.com as the source for "Black Market Rate").

[21] An increase in the DT Rate – or any official exchange rate – signals a decline in the bolívar's value.

"a staff of 18 'well paid' writers and web programmers in Venezuela," and "geniuses" who have found ways to "automatically create a new mirror site every 20 minutes."[22]

34.     Meanwhile, the DT Rate continued to climb.  According to analysts at Barclays,[23] the difference between the official exchange rate and the "[n]on-official exchange rate" reported by the DT Site between May 2013 and the end of 2014 in real terms – that is, adjusted for inflation by using a constant value for the bolívar – is striking, as the graph below demonstrates visually.  (Note that Barclays, like the other mainstream sources cited in paragraph 30, above, cites "Dollar Today" as one of its sources for making the comparison.)



**Widening FX spreads (VEBUSD, constant 2015 VEB)**

Non-official exchange rate at constant VEB — Official exchange rate at constant VEB

Source: BCV, Dollar Today, Barclays Research

35.     The DT Rate's ascent became even steeper beginning in or about February 2015.  The DT Rate's nominal increase from February through September 2015 is depicted in the chart below (taken from the DT Site itself), which contrasts the DT Rate with a more realistic calculation based upon the available money supply and the Central Bank's international reserves.

---

[22] Rueda, *supra* note 11.
[23] A. Arreaza and A. Grisanti, "Venezuela: FX Disorder," Barclays Emerging Markets Research (Mar. 13, 2015).



36.    At the end of September 2015 and as of the filing of this Complaint, the DT Site reported a DT Rate that exceeded an astounding 800 bolívares to the dollar – more than four times the Republic's official SIMADI rate:



37.    The bloated DT Rate does not reflect any genuine and dramatic structural shift in the Venezuelan economy.  Instead, the Central Bank is informed and believes that in or about May 2013 – after Defendants had established the daily DT Rate as "the" authoritative unofficial bolívar-dollar exchange rate – they agreed and conspired to

deliberately manipulate the DT Rate while at least some of the Defendants began trading in black markets for currency futures for their personal financial gain and at the expense of the Central Bank – as well as the Venezuelan public.  Indeed, even the DolarToday Facebook site has solicited users to sell dollars to Defendants[24]:



Armed with advance knowledge of what the DT Rate would be (because they were setting it through the DT Site), the Central Bank is informed and believes that the Individual Defendants have enriched themselves and/or their unnamed co-conspirators. Put another way, Defendants are not **reporting** on a market.  Rather, by posting an artificial DT Rate daily, Defendants are deliberately **misrepresenting** and effectively **manufacturing** a market – a phony, distorted market for the exchange of bolívares into dollars and vice-versa, with the aim of lining their pockets with ill-gotten gains.

38.      "Benjamin"/Altuve and the DT Site notably claim to calculate the "parallel dollar" rate by averaging the daily bolívar-to-peso exchange rate charged by exchange houses in Cúcuta and then converting the pesos into dollars.  These representations are literally false, misleading or both.  The Central Bank is informed and believes and therefore alleges that on any given day, the average exchange rate charged by Cúcuta exchange houses is magnitudes less than what Defendants report as the DT Rate.

39.      With the stamp of media approval and wide acceptance (even if accompanied by resentment) by millions of Venezuelans, Defendants' fabrication of the DT Rate since at least May 2013 has created the façade that the bolívar has been radically devalued by true market failures.

---

[24] https://m.facebook.com/DolarToday/posts/652739878076214 (translated from Spanish).

40.     The Central Bank is informed and believes and therefore alleges that Defendants' scheme to use the DT Site and its DT Rate to manipulate the unofficial bolívar-dollar exchange rate for personal gain is only one of the goals of the scheme. Another goal is to destabilize the Venezuelan economy as alleged above – by impeding the Central Bank's implementation of its currency exchange policies, creating the appearance of hyperinflation, and harming the Venezuelan people through the apparent evisceration of their purchasing power.  This Complaint by the Central Bank seeks to end Defendants' illegal conspiracy and economic cyber-terrorism.[25]

### Defendants' False and/or Misleading Representations About the Bolívar-Dollar Exchange Rate Create Excessive Inflationary Pressures

41.     Defendants' publication of phony black market rates sabotages Venezuela's tiered currency exchange rates, distorting and biasing expectations and exacerbating existing inflationary pressures.  The DT Site and DT Rate are often consulted by those who want to sell currencies and by some business sectors to calculate the replacement costs of their goods and set their selling prices.  As Defendants' actions accelerate inflation, the inclination of those holding bolívares to exchange them – even at rates less favorable than the Central Bank presently offers – drives them to exchange their currency either for goods or for alternate currencies on the black market.

42.     Moreover, importers of priority goods get access to dollars for the preferential price of 6.3 bolívares, and turn to the black market to sell the dollars for a huge markup. The devalued rate of currency on the black market with Defendants' manipulated and false rates serves to further exacerbate price inflation in the domestic

---

[25] This Complaint does *not* seek to shut down the DT Site or prevent it from publishing its anti-government articles and opinions; those who operate the DT Site are entitled to their freedom of speech.  That freedom of speech, however, does *not* provide Defendants with a license to publish knowingly the false and/or misleading DT Rate to the detriment of the Central Bank and the Venezuelan people.

economy.[26]  This inflationary pressure directly harms the Central Bank, including but not limited to a diminution of its seigniorage. As inflationary pressures drive down the value of bolívares, the Central Bank loses this profit, as well as revenue needed to otherwise finance a portion of the Republic's expenditures and serve the Venezuelan people.

43.     As alleged above, the Central Bank has orchestrated a system in which it should serve as the major supplier of dollars.  Given the Central Bank's limited quantity of dollars available for foreign exchange, and given pressures to exchange bolívares for dollars in light of falsely reported devaluations, Venezuelans trade dollars through parallel black market exchange houses and other sources instead of using government sanctioned procedures – or even black market transactions free from Defendants' distortions.  The behavior encouraged by Defendants' misconduct therefore undermines the entire purpose of the Central Bank's currency exchange system.

### FIRST CLAIM FOR RELIEF
### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") (18 U.S.C. § 1962, ET SEQ.) AGAINST ALL DEFENDANTS

44.     The Central Bank incorporates by reference paragraphs 1 through 43 as though set forth here in full.

45.     Defendants have engaged in wire fraud as a component of a racketeering enterprise to effectuate a fraudulent scheme by setting the DT Rate, thereby misrepresenting the unofficial exchange rate, and publishing that exchange rate on the DT Site, as well as on Facebook, Twitter, and through other social media.  Defendants then used this manipulation to unjustly enrich themselves and to harm the Venezuelan people and the Republic.

---

[26] *See, e.g.,* H.P. Huizinga, *Law Enforcement and the Black Market Exchange Rate*, J. Int'l Money & Finance, 10:527-540 (1991).

### The RICO Persons

46.     The Individual Defendants, together with the active participation of as yet unknown co-conspirators (collectively the "RICO Persons") formed the DT Site and since 2013 have managed it to manipulate the unofficial bolívar-dollar exchange rate for both personal gain and to destabilize the Venezuelan economy.

47.     As alleged above, the Central Bank is informed and believes and therefore alleges that defendant Díaz manages the DT Site through defendant DT LLC as a (if not the) key principal and member of it.  For example, at least Díaz of the Individual Defendants is a member of DT LLC, the entity that owns the DT Site and its Internet domain.  When DT LLC applied to register "DOLARTODAY" as a U.S. trademark, Díaz listed himself as the contact.

48.     As also alleged above, the Central Bank is informed and believes and therefore alleges that Altuve is a key principal of DT LLC, co-managing of the DT Site, posting the DT Rate daily and directing or helping direct a group of eighteen or so engineers in evading the Republic's efforts to block the DT Site in Venezuela.  And as also alleged above, the Central Bank is informed and believes and therefore alleges that Lozada is a key principal of DT LLC and co-manages the DT Site.

### The RICO Enterprise

49.     The Central Bank is informed and believes and therefore alleges that the RICO Persons, together with defendant DT LLC, comprise an ongoing association-in-fact enterprise – the "RICO Enterprise."  Each member of the RICO Enterprise performs a role that is consistent with the RICO Enterprise's organizational structure, and that furthers the previously mentioned activities of the RICO Enterprise.

50.     The RICO Enterprise is an ongoing organization that exists to advance the interests of the RICO Persons, who comprise its membership.  The RICO Enterprise exists for the ostensibly legitimate purpose of operating and maintaining the DT Site, which again purportedly is used to oppose the government elected to serve the Republic.

51.     At all relevant times, and at least since May 2013, DT LLC has owned and operated the DT Site and its domain.  During the same period, the Individual Defendants, with the cooperation and/or financial backing of other RICO Persons, have operated and continue to operate the DT Site and its activities in concert.  No indication exists that this operation and manipulation will cease at any time without the intervention of this Court.

52.     The Individual Defendants, together with DT LLC, operate the DT Site with the shared goals of manipulating the interest rate, enriching themselves, frustrating the Central Bank's mission, diminishing the value of its seigniorage, and wrecking the Venezuelan economy.  The Individual Defendants do so while operating what otherwise appears to be a legitimate website opposed to the Republic's current government.

53.     The RICO Enterprise thus exhibits (i) common purposes and shared control among its members or principals, (ii) a continuous structure and continuity among its personnel, and (iii) an ascertainable structure distinct from that inherent in the pattern of racketeering (as alleged below).

### The RICO Persons Conduct the RICO Enterprise's Affairs

54.     The Central Bank is informed and believes and therefore alleges that Defendants had the authority to and did direct and control the operation and management of the affairs of the RICO Enterprise with respect to the creation, operation, maintenance, and update of the DT Site, and the dissemination through other means of the contents of the DT Site.

### The RICO Enterprise Is Separate from the Pattern of Racketeering Activity

55.     The pattern of racketeering and the RICO Enterprise are separate. The RICO Enterprise engages in the legitimate functions of operating, maintaining, and updating the DT Site.  The pattern of racketeering activities involves unlawfully manipulating the exchange rate by publishing false and misleading exchange rates, and widely disseminating that false and misleading information on Facebook, Twitter, and other social media avenues.

*Interstate and International Commerce*

56.     The Central Bank is informed and believes and therefore alleges that Defendants operate the DT Site from Alabama and Florida, and perhaps the state of Washington, too.  While directed and operated from those locations, Defendants intend that the DT Site affect – and in fact it does affect – commerce in Venezuela.  Defendants' operation of the RICO Enterprise thus affects both interstate and international commerce.

*Pattern of Racketeering Activity*

57.     The Defendants' racketeering activity consists of multiple acts unlawful under 18 U.S.C. § 1343.

58.     The racketeering activities and instances of wire fraud (detailed below) have been carried out repeatedly and continuously from at least 2013 and continuing through to the present.  The racketeering acts are related—they had and have a common goal (to manipulate the exchange rate, unjustly enrich the Defendants, and harm the Venezuelan people and economy), used and use similar means, and had and have common victims (the Venezuelan people and the Central Bank).

59.     The predicate acts described below also relate to each other because they were all performed in the same manner, and are part of a common scheme to improperly manipulate the exchange, by overstating that exchange rate, and promoting that false and misleading rate.

60.     As alleged above, no indication exists that such racketeering activity will cease without this Court's intervention because the racketeering activities are part of the Defendants' regular system of posting and updating the exchange rates listed on the DT Site.

61.     Since at least May 2013, Defendants have directly and indirectly through other unknown RICO Persons, employed manipulative and deceptive methods to unlawfully control and manipulate the unofficial exchange, and to misrepresent the exchange rate on the DT Site and through other social media channels.

62.     Defendants have engaged in such actions by means and instrumentalities of interstate commerce, including interstate wires, such as the Internet, telephone networks and emails.

63.     The specific racketeering activities and predicate acts include:

a.     Deliberately misrepresenting the bolívar-dollar exchange rate through their daily posting of the DT Rate on the DT Site and through DT App and DT Twitter feed;

b.     Making daily postings on the DT Site, on which the Defendants repeatedly – yet falsely – promote the DT Rate as the "true" bolívar-dollar exchange rate, despite knowing that it is not;

c.     Misrepresenting the basis for calculating the unofficial exchange rate; and

d.     Disseminating via interstate wires, and specifically over the Internet, through email, Facebook, Twitter, and other social media, the false and misleading statements and exchange rates set forth above.

64.     One of the ways in which Defendants promote the DT Rate as the true bolívar-dollar exchange rate is through their detailed explanation of how the rate is purportedly calculated.  See, for example, the explanation from "Benjamin"/Altuve in paragraph 29 above and the explanation included in the DT Site itself at https://dolartoday.com/precio:

> data reporting **DolarToday** are based on publicly available information and that can be corroborated by anyone! [*sic*] our job is simply [to] **SPREAD** this information.  Unfortunately, there are still people who think that the dollar's value is determined in Venezuela Internet pages as **DolarToday** or late **LechugaVerde**.  The reality is that the price of the parallel dollar is determined according to supply / demand + the economic stability of a country, so the next time someone tells you that **DolarToday** [is] speculation . . . visit this site and so [w]e help you to educate the population.

[Capitalization and emphasis in original; translated from Spanish.]

65.    But the DT Rate does not reflect any actual exchange market, and in particular grossly distorts the average rates actually charged by currency exchange houses in Cúcuta, the purported source of Defendants' calculation of the DT Rate.  Rather, the DT Rate that Defendants publish and promote is arbitrary and untethered to genuine market forces – as evidenced by its artificial ascent beginning in at least May 2013.

66.    Defendants know that the DT Rate is false and misleading.  Indeed, the false and misleading nature of the DT Rate is essential to the very purpose of the RICO Enterprise.  The deliberately false DT Rate allows the RICO Persons to enrich themselves by trading in currency futures – given their advance knowledge of the future rates they are manipulating.  It wreaks economic havoc on the Central Bank and the citizens of Venezuela as detailed above.  And it creates the false impression that the Central Bank and the Republic are incapable of managing Venezuela's economy.  Defendants hope such harm will stoke the fires of discontent and sweep the opposition into power through upcoming parliamentary elections on December 6, 2015.

67.    By promoting the DT Rate over the Internet on the DT Site as chronicled above, Defendants daily send fraudulent communications by wire to viewers of the DT Site, users of the DT App, and followers of the DT Twitter Feed.  Doing so constitutes wire fraud in violation of 18 U.S.C. § 1343.

68.    Defendants have fraudulently published the DT Rate on the DT Site and through the DT App daily and continuously since May 2013.

69.    Defendants have given no express or implicit signal that they plan to cease their unlawful activity.

70.    Defendants' continuous, daily posting of the DT Rate through the DT Site and DT App, along with the absence of any signal that such conduct will cease, evidences that Defendants will continue their racketeering activity absent the injunctive relief sought through this action.

### *The Central Bank's Injuries Caused by Defendants' Activities*

71.     The Central Bank is informed and believes, and therefore alleges, that millions of Venezuelans have viewed and relied on the false and misleading exchange rate posted on the DT Site.

72.     The facts above chronicle how Defendants' racketeering activity

- Exacerbates inflationary pressures that diminish the purchasing power of Venezuelan citizens and the Central Bank;

- Diminishes the value of the Central Bank's seigniorage that it would otherwise earn for the new currency that it prints (or the coins it mints) or puts into circulation;

- Robs the Central Bank of the higher real returns it would otherwise receive on monies it lends to other financial institutions and entities;

- Causes trade to be withheld from the Central Bank, as capital that it would otherwise retain or attract instead leaves, with investors seeking returns from other world economies; and

- Creates the false impression that the Central Bank and the Republic are incapable of managing Venezuela's economy.

### *Violation of 18 U.S.C. § 1962(c)*

73.     The RICO Enterprise is an enterprise engaged in, and whose activities affect, interstate and foreign commerce.  The Individual Defendants direct or co-direct and are associated with the RICO Enterprise.

74.     The Individual Defendants and defendant DT LLC agreed to and did conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, for the unlawful purpose of defrauding the Central Bank and the people of Venezuela.

75.    Pursuant to and in furtherance of their fraudulent scheme, Defendants engaged – and continue to engage – in the wire fraud detailed above.  Such acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

76.    Defendants conducted and participated in the conduct of the RICO Enterprise's affairs directly and indirectly through the pattern of racketeering activity alleged above in violation of 18 U.S.C. § 1962(c).

77.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Central Bank has been injured as set forth above.

### *Violation of 18 U.S.C. § 1962(d)*

78.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, in or about May 2013, having established the daily DT Rate as "the" authoritative bolívar-dollar exchange rate, Defendants agreed and conspired to deliberately manipulate the DT Rate while at least some of the Defendants began trading in currency market futures for their personal financial gain and at the expense of the Central Bank – as well as the Venezuelan public.

79.    Defendants intentionally agreed and conspired to conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity. Defendants knew that their predicate acts – namely, their daily posting of the fraudulent DT Rate on the DT Site, through the DT App and through the DT Twitter feed – were part of a pattern of racketeering activity, and they agreed to the commission of such acts to further their schemes detailed above.  Such conduct comprises a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

80.    As a direct and proximate result of Defendants' conspiracy, the overt acts that they committed in furtherance of that conspiracy, and violation of 18 U.S.C. § 1962(d), the Central Bank has been injured as set forth above.

*Relief Sought for Defendants' RICO Violations*

81.   The Central Bank is accordingly entitled to judgment against Defendants in an amount to be established at trial but including actual damages, treble damages, attorneys' fees and a permanent injunction prohibiting Defendants, and those in active concert with them, from continuing to publish the false and fraudulent DT Rate, whether through the DT Site, DT App, Dt Twitter feed, DT Facebook, or any other means.

## SECOND CLAIM FOR RELIEF
### FALSE AND/OR MISLEADING ADVERTISING IN VIOLATION OF LANHAM ACT SECTION 43(a) (15 U.S.C. § 1125(a) AGAINST ALL DEFENDANTS

82.   The Central Bank incorporates by reference paragraphs 1 through 81 as though set forth here in full.

83.   Defendants have made and continue to make literally false and/or misleading representations of fact in their promotion of the DT Rate.  The Central Bank is informed and believes and therefore alleges that Defendants have acted in concert in carrying out their scheme to falsely and misleadingly promote the DT Rate as "the" authoritative unofficial bolívar-dollar exchange rate.  This promotion enables Defendants to continue their deliberate manipulation of the DT Rate while, on information and belief, trading in currency market futures for their personal financial gain. By doing so, Defendants have individually and collectively assisted in, supported, consented, participated, ratified and adopted the false promotion of the bolívar-dollar exchange rate in a deliberate and reckless manner, and with the anticipation and knowledge that such promotional efforts misrepresent the foreign exchange market at issue.

84.   As detailed above, Defendants have been deliberately misrepresenting the bolívar-dollar exchange rate since at least May 2013 through the daily posting of the DT Rate on the DT Site.  Through these daily postings, Defendants have repeatedly and consistently promoted the DT Rate as "the" official bolívar-dollar exchange rate despite their deliberate manipulation of the DT Rate for their personal financial gain.

85.     Defendants have repeatedly promoted the DT Rate as "the" official bolívar-dollar exchange rate. This promotion is literally false and misleading because Defendants do not report on any actual exchange market. Instead, the DT Rate published and promoted by Defendants is speculative and untethered to genuine market forces, as evidenced by its artificial ascent beginning in at least May 2013, and since that time the DT Rate is nothing short of a deliberate misrepresentation of the actual bolívar-dollar exchange rate.

86.     Defendants have engaged in the false promotion detailed above with the knowledge or in reckless disregard of the fact that such claims are literally false or misleading.  These acts have caused and are now causing reputational injury to the Central Bank that flows directly from the deception wrought by Defendants' misrepresentations about the exchange rate for bolívares.  By exacerbating inflationary pressures on the bolívar, the Central Bank appears less capable of managing the Venezuelan economy, and this in turn causes trade to be withheld from the Central Bank, as capital that it would otherwise retain or attract instead leaves, with returns sought from other world economies.

87.     Defendants' acts have also caused and are now causing economic injury to the Central Bank that flows directly from the deception wrought by Defendants' misrepresentations about the exchange rate for bolívares.  Among other things, Defendants' misconduct has diminished the Central Bank's seigniorage that it would otherwise receive for the new currency it prints (or the coins it mints) or that it newly puts into circulation.  The bolívar's devaluation wrought by Defendants' wrongful conduct damages the Central Bank (and the Venezuelan people) by increasing the cost of goods and services for which they must pay and leaving them all poorer as a result. These acts likewise deprive the Central Bank of the higher real returns it would otherwise receive on monies it lends to other financial institutions and entities, and robs the Central Bank of the additional revenues it would otherwise receive, such as the fees it could have

charged on foreign exchange transactions lost to the black market.  And it creates the false impression that the Central Bank and the Republic are incapable of managing Venezuela's economy.

88.     Defendants' literally false and/or misleading representations of fact violate Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).  Defendants have made and are making these false and/or misleading representations of fact in interstate commerce.

89.     As a result of the foregoing, the Central Bank has been or is likely to be damaged in an amount that will be ascertained according to proof.  For their part, Defendants have unfairly realized, retained or gained through their unlawful conduct profits from their manipulation of the unofficial bolívar-dollar exchange rate that should be disgorged as ill-gotten gains.

90.     Because Defendants have made and continue to make literally false and/or misleading representations of fact about the bolívar-dollar exchange rate in – at best reckless and at worst intentional – disregard of their falsity and/or misleading nature, the Central Bank is entitled to an award of enhanced damages under Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)).  Moreover, this is an exceptional case for which the Court should award the Central Bank its reasonable attorneys' fees and other expenses.

91.     Defendants' activities have caused and will cause irreparable harm to the Central Bank for which no adequate remedy at law exists.  In particular, Defendants' past and continuing false and/or misleading representations of fact, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.  The Central Bank will continue to suffer irreparable injury to its goodwill, rights and trade unless and until Defendants and any others in active concert with them are enjoined from continuing their wrongful acts.

## THIRD CLAIM FOR RELIEF
### VIOLATION OF ARTICLE 1185 OF THE VENEZUELAN CIVIL CODE
### AGAINST ALL DEFENDANTS

92.     The Central Bank incorporates by reference paragraphs 1 through 91 as though set forth here in full.

93.     This is a cause of action for violation of Venezuelan law.  Pursuant to Federal Rule of Civil Procedure 44.1, Defendants are hereby given notice of that fact.

94.     Article 1185 of the Venezuelan Civil Code provides that

> Anyone who intentionally, negligently or imprudently causes harm to another is obliged to repair it.

> Reparation is also owed by anyone who has caused a harm to another by exceeding, in the exercise of his/her right, the limits set forth by good faith or by the purpose in light of which that right was conferred to him/her.[27]

95.     Venezuela recognizes the right to freedom of speech and affords it broad protection in its Constitution, specifically under Articles 57 and 58.  That protection extends to speech made through any means, including the internet, whose use and importance has been specifically recognized in Venezuela through Presidential Decree No. 825 of May 10, 2000.

96.     Under Venezuelan law, as is the case generally in civilized nations, the irresponsible, abusive, and/or harmful exercise of a right can give raise to liability.  And Article 1185 of the Venezuelan Civil Code so provides.  As reflected in the translation above, Article 1185 imposes a duty to exercise a right in good faith and solely within the legitimate limits of the right's intended purpose.  When that duty is breached, the article

---

[27] Article 1185 of the Venezuelan Civil Code (emphasis and English translation provided) provides in Spanish as follows:

> *El que con intención, o por negligencia o por imprudencia, ha causado un daño a otro, está obligado a repararlo.*

> *Debe igualmente reparación quien haya causado un daño a otro, excediendo, en el ejercicio de su derecho, los límites fijados por la buena fe o por el objeto en vista del cual le ha sido conferido ese derecho.*

allows a cause of action for what is commonly known in Venezuela as "*abuso de derecho*" (literally, "abuse of right").

97.     Defendants' actions described above are the paradigmatic example of an abusive exercise of a right in direct violation of the second paragraph of Article 1185 of the Venezuelan Civil Code.

98.     Defendants have breached their duty under Article 1185 of the Venezuelan Civil Code by, among other things, publishing false information about the bolívar-dollar exchange rate and misrepresenting the bolívar-dollar exchange rate through the daily posting of the DT Rate on the DT Site and through the DT App, as detailed above.

99.     Defendants' promotion of the DT Rate as the "true" official bolívar-dollar exchange rate is literally false and misleading because Defendants do not report on any actual exchange market.  As explained above, the DT Rate published and promoted by Defendants is arbitrary and untethered to genuine market forces.

100.    Defendants' reprehensible conduct exceeds the legitimate exercise of their right to free speech because, among other things, it is contrary to good faith *and* exceeds the right's intended purpose.  Indeed, Defendants have engaged in the false promotion detailed above with the knowledge of or in reckless disregard of the fact that such claims are literally false or misleading.

101.    These acts have caused and are now causing economic and reputational injury to the Central Bank, as described above, that flow directly from the deception wrought by Defendants' misrepresentations about the exchange rate for bolívares.

102.    As a result of the foregoing, the Central Bank has been or is likely to be damaged in an amount that will be ascertained according to proof in this Court.  For their part, Defendants have unfairly realized, retained or gained through their unlawful conduct profits from their manipulation of the bolívar-dollar exchange rate that should be disgorged as ill-gotten gains.

103.    Defendants' activities have caused and will continue to cause irreparable harm to the Central Bank for which there is no adequate remedy at law.  In particular, Defendants' past and continuing false and/or misleading representations of fact and illegitimate, abusive exercise of a right, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.  The Central Bank will continue to suffer irreparable injury to its goodwill, rights and businesses unless and until Defendants and any others in active concert with them are enjoined from continuing their wrongful acts.

## FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

104.    The Central Bank incorporates by reference paragraphs 1 through 103 as though set forth here in full.

105.    Defendants, and each of them, accepted benefits conferred upon them under circumstances, as set forth above, that make Defendants' retention of those benefits (without paying the Central Bank the value of those benefits) unjust, inequitable and unfair.  Among other things, it would be inequitable for Defendants to be permitted to retain the personal financial gains which Defendants obtained from their manipulative acts at the expense of the Central Bank – as well as the Venezuelan people.

106.    The Central Bank is entitled to the establishment of a constructive trust impressed on the benefits obtained by Defendants from their unjust enrichment and inequitable conduct.

107.    Alternatively or additionally, each Defendant should pay restitution or his/its own unjust enrichment to the Central Bank.

## PRAYER

The Central Bank respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

    i.     Awarding damages for all harm suffered as a result of Defendants' conduct;

    ii.    Awarding treble damages for Defendants' RICO violations pursuant to 18 U.S.C. § 1964(c);

    iii.   Awarding exemplary damages in an amount to be determined at trial;

    iv.   Awarding treble damages for Defendants' false and/or misleading advertising in accordance with 15 U.S.C. §1117 because their acts were done intentionally and therefore warrant enhanced damages and/or punitive damages as the Court may find appropriate;

    v.     Awarding the Central Bank its attorneys' fees, expenses, and costs under 15 U.S.C. § 1117;

    vi.    Awarding prejudgment interest on any judgment amount;

    vii.   Awarding post-judgment interest on the foregoing sums at the maximum rate permitted by law from the date judgment is entered until paid;

    viii.  Entering a permanent injunction prohibiting Defendants, and those in active concert with them, from continuing to publish the false and fraudulent DT Rate, whether through the DT Site, DT App, DT Twitter feed, DT Facebook page or by any other means now known or later developed;

    ix.    Awarding the Central Bank its costs of this action as the prevailing party; and

    x.     For such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

The Central Bank respectfully demands a jury trial on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com

OF COUNSEL:

David S. Elkins
Rafael M. Langer-Osuna
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, CA  94304
(650) 856-6500

Adam R. Fox
Marisol C. Mork
SQUIRE PATTON BOGGS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA  90071
(213) 624-2500

October 23, 2015
9577835

*Attorneys for Plaintiff*