IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BANCO CENTRAL DE VENEZUELA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-965 (GMS) |
| | ) | |
| DOLARTODAY, LLC, GUSTAVO DÍAZ | ) | |
| VIVAS, IVAN DARIO LOZADA-SALAS, | ) | |
| JOSÉ ENRIQUE ALTUVE LOZADA, | ) | |
| | ) | |
| Defendants. | ) | |

**ANSWERING BRIEF OF PLAINTIFF BANCO CENTRAL DE VENEZUELA
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE COMPLAINT WITH PREJUDICE**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
skraftschik@mnat.com

OF COUNSEL:

David S. Elkins
Rafael M. Langer-Osuna
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, CA 94304
(650) 856-6500

Adam R. Fox
Marisol C. Mork
SQUIRE PATTON BOGGS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071
(213) 624-2500

*Attorneys for Banco Central de Venezuela*

January 20, 2016

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

II.     THE NATURE AND STAGE OF PROCEEDINGS ....................................... 2

III.    CONCISE STATEMENT OF FACTS ............................................................ 3

IV.     LEGAL ARGUMENT .................................................................................... 4

        A.      The Standards Governing This Motion ............................................... 4

                1.      The Standards Governing Defendants' Challenge To The Central
                        Bank's Standing Under Article III ........................................... 4

                2.      The Standards Governing Defendants' Challenge To
                        The Sufficiency Of The Central Bank's Complaint ................. 4

        B.      The Central Bank Has Article III Standing ......................................... 5

                1.      The Central Bank Alleges An Injury-in-Fact ........................... 7

                2.      The Central Bank's Injuries Are Traceable to Defendants' Acts ............ 9

                3.      The Central Bank Pleads The Redressability Of Its Injuries ................. 11

        C.      The Central Bank Alleges A Viable Claim Under Venezuelan Law .................. 11

        D.      The Central Bank Pleads A Cognizable Rico Claim ........................... 12

                1.      The Central Bank's RICO Claim Satisfies Rule 9(b) ............. 13

                        a.      The Complaint Details Defendants' Continuous Operation
                                Of The DT Site And Its Daily Publications Of The DT Rate ...... 13

                        b.      The Complaint Details How Defendants' Misconduct Has
                                Deprived the Central Bank of Recognized Property Rights ........ 15

                2.      The RICO Claim Pleads The Requisite Proximate Cause ....................... 16

        E.      The Complaint Pleads A Cognizable Lanham Act Claim ................................. 18

                1.      The Central Bank Enjoys Standing As A Lanham Act Plaintiff ............ 18

                2.      Publication Of The DT Rate Is A Commercial Promotion ..................... 21

                3.      Defendants Waive All Other Challenges To The Central Bank's
                        Lanham Act Claim ................................................................... 22

        F.      The Complaint Pleads A Cognizable Claim for Unjust Enrichment. ................. 23

        G.      Defendants Have Failed To Demonstrate That Any Pleading Deficiency
                Cannot Be Cured By Amendment ...................................................... 23

V.      CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Global Servs. v. Guidewire Software, Inc.*,
  581 F. Supp. 2d 654 (D. Del. 2008).................................................................20

*U.S. v. Ali*,
  620 F.3d 1062 (9th Cir. 2010) .....................................................................16

*Amato v. Wilentz*,
  952 F.2d 742 (3d Cir. 1991).........................................................................8

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)................................................................................16, 18

*Arias v. Dyncorp*,
  738 F. Supp. 2d 46 (D.D.C. 2010) ..............................................................8, 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................19

*Askew v. Church of the Lord Jesus Christ*,
  684 F.3d 413 (3d Cir. 2012).........................................................................6

*Ballentine v. U.S.*,
  486 F.3d 806 (3d Cir. 2007).........................................................................7

*Bolden v. Culture Farms, Inc.*,
  No. 85-4297, 1989 U.S. Dist. LEXIS 15816 (D. Kan. Nov. 21, 1989) ...................14

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983)....................................................................................21

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008)...................................................................................17

*Briscoe v. Klaus*,
  538 F.3d 252 (3d Cir. 2008).........................................................................23

*Browning v. Clinton*,
  292 F. 3d 235 (D.C. Cir. 2002) ...................................................................10

*Christidis v. First Penn. Mortg. Trust*,
  717 F.2d 96 (3d Cir. 1983)..........................................................................15

*Clinton v. City of New York*,
524 U.S. 417 (1998)................................................................................................8

*Commer. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*,
271 F.3d 374 (2d Cir. 2001)..................................................................................16

*Constitution Party v. Aichele*,
757 F.3d 347 (3d Cir. 2014).................................................................................6, 9

*Dominican Rep. v. AES Corp.*,
466 F. Supp. 2d 680 (E.D. Va. 2006) ...................................................................12

*U.S. v. Duffus*,
174 F.3d 333 (3d Cir. 1999)..................................................................................24

*Eastman Kodak Co. v. Kavlin*,
978 F. Supp. 1078 (S.D. Fla. 1997) ......................................................................12

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013).................................................................................10

*Massachusetts v. EPA*,
549 U.S. 497 (2007)..............................................................................................11

*Facenda v. N.F.L. Films, Inc.*,
542 F.3d 1007 (3d Cir. 2008)...............................................................................21

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..............................................................................................11

*Gould Elecs., Inc. v. U.S.*,
220 F.3d 169 (3d Cir. 2000)...................................................................................6

*Higgins v. SPX Corp.*,
No. 1:05-CV-127, 2006 U.S. Dist. LEXIS 90280 (W.D. Mich. Dec. 14, 2006)....................12

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258 (1992)..............................................................................................16

*LaSala v. Bordier et Cie*,
519 F.3d 121 (3d Cir. 2008)..................................................................................12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. ___, 134 S. Ct. 1377 (2014)........................................................19, 20, 22

*Los Angeles v. Lyons*,
461 U.S. 95 (1983)..................................................................................................9

*Lozano v. City of Hazleton*,
620 F.3d 170 (3d Cir. 2010) ...................................................................................8

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...................................................................................6, 7, 8

*Lum v. Bank of Am.*,
361 F.3d 217 (3d Cir. 2004)................................................................................13

*NCAA v. Governor of N.J.*,
730 F.3d 208 (3d Cir. 2013)................................................................................10

*In re Nortel Networks, Inc.*,
469 B.R. 478 (Bankr. D. Del. 2012) ...................................................................12

*Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.*,
202 F. Supp. 2d 431 (M.D.N.C. 2002) ...............................................................19

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
193 F.3d 781 (3d Cir. 1999)...........................................................................21, 22

*Pellman v. Cinerama, Inc.*,
503 F. Supp. 107 (S.D.N.Y. 1980) ......................................................................14

*In re Petrobas Sec. Litig.*,
No. 14-cv-9662 (JSR), 2015 U.S. Dist. LEXIS 99322 (S.D.N.Y. July 30, 2015)...................12

*Poulis v. State Farm Fire and Cas. Co.*,
747 F.2d 863 (3d Cir. 1984)................................................................................23

*U.S. v. Rawlins*,
606 F.3d 73 (3d Cir. 2010)..................................................................................23

*Republic of Iraq v. ABB AG*,
920 F. Supp. 2d 517 (S.D.N.Y. 2013)..............................................................8, 10

*Resnik v. Woertz*,
774 F. Supp. 2d 614 (D. Del. 2011) .............................................................4, 5, 6

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
902 F.2d 222 (3d Cir. 1990).................................................................................20

*Spain v. Gallegos*,
26 F.3d 439 (3d Cir. 1994)....................................................................................24

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
171 F.3d 912 (3d Cir. 1999)..................................................................................23

*U.S. v. Students Challenging Reg. Agency Procedures*,
    412 U.S. 669 (1973)...............................................................................7

*Temple v. Haft*,
    73 F.R.D. 49 (D. Del. 1976) .................................................................10

*Toll Bros., Inc. v. Twp. of Readington*,
    555 F.3d 131 (3d Cir. 2009)..................................................................11

*U.S. Bank Nat'l Ass'n v. Gunn*,
    No. 11-cv-01155-RGA, 2015 U.S. Dist. LEXIS 102350 (D. Del. Aug. 5, 2015) ..................23

*Victaulic Co. v. Tieman*,
    499 F.3d 227 (3d Cir. 2007)...............................................................6, 21

*Virginia State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)...............................................................................2

*Zieger v. Advance Am.*,
    C.A. No. 13-1614-GMS, 2014 U.S. Dist. LEXIS 177524 (D. Del. Dec. 29, 2014).........4, 5, 6

**Statutes**

15 U.S.C. Trademark Act of 1946, Lanham Act, 15 U.S.C. Section 1125(a) ..................... *passim*

18 U.S.C.
    Racketeer Influenced and Corrupt Organizations Act (RICO)...................................... *passim*
    Section 1343............................................................................12, 15
    Section 1961(1)(B)........................................................................12
    Section 1961(5)...........................................................................12

28 U.S.C.
    Section 1332.................................................................................11

**Other Authorities**

Federal Rule of Civil Procedure
Rule 8 ....................................................................................10, 19
Rule 9(b) ................................................................................. *passim*
Rule 12 ..........................................................................................5
Rule 12(b)(1) ...................................................................................4
Rule 12(b)(6) ...................................................................................4

I.       **INTRODUCTION AND SUMMARY OF ARGUMENT**

This action seeks to end Defendants' illegal conspiracy to manipulate the value of Venezuela's currency by widely publicizing false and misleading information about it. Individual defendants Gustavo Díaz Vivas ("Díaz"), Ivan Dario Lozada-Salas ("Lozada"), José Enrique Altuve Lozada ("Altuve") (collectively the "Individual Defendants") are Venezuelan nationals living in the United States and opponents of the government of Venezuela's President Nicolas Maduro.  Through a Delaware limited liability company, Defendant DolarToday, LLC ("DT, LLC"), the Individual Defendants operate the "DolarToday" website, distribute a DolarToday application for iOS and Android operating systems, and maintain a DolarToday Twitter Feed and Facebook page (collectively the "DT Site").  Although these communications ostensibly comprise a social media forum for anti-government "news" and commentary, their main purpose is posting what Defendants represent as "the" authoritative daily exchange rate for Venezuela's currency, the bolívar fuerte ("bolívar"), against the U.S. dollar (the "DT Rate").

Although Defendants' efforts have succeeded in making the DT Rate the authoritative source for the bolívar-dollar exchange rate in Venezuela on the parallel or "black" market, the DT Rate is not what Defendants purport it to be.  The DT Rate does not reflect an actual, existing bolívar-dollar exchange rate; it is a daily misrepresentation, the aim of which is to influence the genuine exchange rate for Defendants' purposes, which include both of the following: (i) providing the means for the Individual Defendants and their unidentified, unnamed coconspirators to enrich themselves through arbitrage – by virtue of a phony market for the exchange of bolívares into dollars and vice-versa at rates that Defendants have manufactured, and (ii) exaggerating the devaluation of the bolívar to reflect negatively on the Maduro Administration.  Defendants' manipulation of the bolívar-dollar exchange rate directly harms the ability of plaintiff Banco Central de Venezuela (the "Central Bank").  In particular, Defendants' scheme is diminishing a type of profit unique to central banks and the real returns on monies the Central Bank lends to financial institutions and entities.

The Central Bank brought this action to stop Defendants' misrepresentations regarding the bolívar-dollar exchange rate on the parallel market, alleging their violation of (i) the Racketeer Influenced and Corrupt Organizations Act ("RICO" or the "Act"), (ii) Section 43(a) of the Lanham Act (15 U.S.C. §1125(a)), prohibiting false advertising, (iii) Article 1185 of the Venezuelan Civil Code, and (iv) Delaware common law prohibiting unjust enrichment. Defendants' motion to dismiss ("the Motion") mischaracterizes these claims –and more generally the Central Bank's Complaint – as nothing more than an attempt to stifle dissent and free speech.  But like the DT Rate, the picture Defendants paint is demonstrably false.  As the Central Bank expressly states in its Complaint:

> This Complaint does *not* seek to shut down the DT Site or prevent it from publishing its anti-government articles and opinions; those who operate the DT Site are entitled to their freedom of speech. That freedom of speech, however, does *not* provide Defendants with a license to publish knowingly the false and/or misleading DT Rate to the detriment of the Central Bank and the Venezuelan people.

(D.I. 1 ¶40 n.25 (emphases in original)).  By ignoring this reality, Defendants never come to grips with the teaching of the United States Supreme Court that "[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake." *Virginia State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976).  Moreover, as explained below, the Complaint is replete with facts establishing both the Central Bank's standing to sue and its well-documented, viable claims.  The Court should deny Defendants' Motion in its entirety.

## II.   THE NATURE AND STAGE OF PROCEEDINGS

The Central Bank commenced this action on October 23, 2015.  Following service, Defendants requested – and the Central Bank and the Court agreed – that they have an extension of time up to December 21 within which to respond to the Complaint.  Defendants filed their Motion on December 21, 2015.  The Court has not yet scheduled a Rule 16 Conference or required the parties to engage in a Rule 26(f) conference.

## III.     CONCISE STATEMENT OF FACTS

The Individual Defendants are principals of and operate defendant DT, LLC, operating the DT Site through that entity.  (D.I. 1 ¶¶ 9-13.)  The DT Site features the daily DT Rate, and also includes a variety of commentary and web articles, most of which are anti-government.  *Id.* ¶ 27.  The DT Rate has been the most widely read and followed exchange rate reference in Venezuela since 2013.  *Id.* ¶ 30.  But the DT Rate does not reflect an actual exchange value of bolívares for dollars.  *Id.* ¶¶ 34-40.  Rather, it is manufactured by Defendants untethered to any genuine market for this exchange.  *Id.* ¶¶ 37-38.  This contrivance allows Defendants and their coconspirators to profit through arbitrage – and to exaggerate the negative light Defendants already cast on the Venezuelan government, which Defendants fiercely oppose.  *Id.* ¶ 2.

The DT Site and DT Rate are often consulted by those who want to sell currencies and by some business sectors to calculate the replacement costs of their goods and set their selling prices.  *Id.* ¶ 41.  Widespread acceptance of the fraudulent DT Rate creates the appearance of an exaggerated level of hyperinflation.  *Id.* ¶¶ 41-42.  This falsehood directly harms the Central Bank, including but not limited to a diminution of its seigniorage.[1]  *Id.*  Because inflation immediately devalues bolívares, the Central Bank loses profit.  *Id.* ¶ 42.  Inflation also automatically decreases real returns on investments; Defendants' daily publication of the DT Rate thus deprives the Central Bank of the higher real returns it would otherwise receive on monies it lends to financial institutions and entities.  *Id.* ¶ 87.  Defendants' publication of the DT Rate likewise robs the Central Bank of additional revenues it would otherwise receive, such as fees that it could otherwise charge on foreign exchange transactions lost to the "black" market.  *Id.*

---

[1] Seigniorage is profit calculated as the difference between the value of currency a central bank issues and the costs incurred to produce and distribute it.  *Id.* ¶ 7 n.1.

## IV.    LEGAL ARGUMENT

### A.    THE STANDARDS GOVERNING THIS MOTION

#### 1.    THE STANDARDS GOVERNING DEFENDANTS' CHALLENGE TO THE CENTRAL BANK'S STANDING UNDER ARTICLE III

Federal Rule of Civil Procedure 12(b)(1) authorizes motions to dismiss for lack of subject matter jurisdiction arising from the absence of standing.  *Zieger v. Advance Am.*, C.A. No. 13-1614-GMS, 2014 U.S. Dist. LEXIS 177524, at *5 (D. Del. Dec. 29, 2014) (Sleet, J.).  "Such a motion may challenge the court's jurisdiction facially, based on the legal sufficiency of the claim, or factually, based on the sufficiency of jurisdictional fact."  *Resnik v. Woertz*, 774 F. Supp. 2d 614, 627 (D. Del. 2011) (Sleet, J.) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

"Where the movant presents a facial challenge, the court must accept all factual allegations in the complaint as true and may only consider the complaint and documents referenced therein or attached thereto."  *Id.* (citing *Samsung Elecs. Co., Ltd. v. ON Semiconductor Corp.*, 541 F. Supp. 2d 645, 648 (D. Del. 2008) (in turn citing *Gould Elecs., Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000))).  "Where the movant presents a factual challenge, however, the court need not confine its consideration to the allegations of the complaint nor accept those allegations as true."  *Id.* (citing *Mortensen*, 549 F.2d at 891).

#### 2.    THE STANDARDS GOVERNING DEFENDANTS' CHALLENGE TO THE SUFFICIENCY OF THE CENTRAL BANK'S COMPLAINT

Federal Rule of Civil Procedure 12(b)(6) authorizes a motion to dismiss if the plaintiff has failed to state a claim upon which relief can be granted.  "In considering a motion to dismiss, the court follows the Third Circuit's two-part analysis."  *Zieger*, 2014 U.S. Dist. LEXIS 177524, at *6 (citing *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).  "First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions."  *Id.* (citing *Fowler*, 578 F.3d at 210-11)  "Second, a court should determine whether the remaining

well-pled facts sufficiently show that the plaintiff 'has a "plausible claim for relief."'" *Id.* (quoting *Fowler,* 578 F.3d at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009))).

"As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Id.* at *6 (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)). "In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994)).

"The court's determination is not whether the non-moving party 'will ultimately prevail' but whether that party is 'entitled to offer evidence to support the claims.'" *Id.* at *6-7 (quoting *U.S. ex rel. Wilkins v. United Health Grp., Inc*., 659 F.3d 295, 302 (3d Cir. 2011)). "The court's analysis is a context-specific task requiring the court 'to draw on its judicial experience and common sense.'" *Id.* at *7 (quoting *Iqbal*, 556 U.S. at 663-64).

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *Resnik*, 774 F. Supp. 2d at 627 (citing *UD Tech. Corp. v. Phenomenex, Inc.*, C.A. No. 05-842, 2007 U.S. Dist. LEXIS 642, at *3 (D. Del. Jan. 4, 2007)).

### B. THE CENTRAL BANK HAS ARTICLE III STANDING

Defendants claim to make both "facial" and "factual" attacks on the Central Bank's Article III standing.  (D.I. 16 at 6.)  They challenge that:

    i.    The Complaint fails to plead "an injury sufficiently 'particularized' to the Central Bank" (*id.* at 8);

    ii.    "Plaintiff's alleged injuries are neither 'concrete' nor 'actual or imminent'" (*id.* at 9);

     iii.    "Plaintiff fails to plead the requisite 'causal link' between its alleged 'injury' and the publication of the DT Rate by Defendants" (*id.* at 10);

     iv.    Plaintiff makes "unsupported 'information and belief' allegations" (*id.* at 13); and

     v.    "Plaintiff fails to plead that a 'favorable' decision in this case is 'likely' to redress its alleged injury" (*id.*).

On its face, each of these attacks only "challenges the sufficiency of the complaint itself as opposed to challenging the facts underlying the jurisdictional basis of the complaint." *Resnik*, 774 F. Supp. 2d at 627. Put simply, Defendants make only facial challenges to standing.

Moreover, because Defendants have neither answered nor presented – through *competent* evidence – facts supporting a competing narrative,[2] and because discovery has not yet commenced, the *only* type of jurisdictional challenge that Defendants may mount is a facial one. *See Constitution Party v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (holding that trial court commits "error" in treating a jurisdictional challenge as "factual" where the party mustering that challenge "filed the attack before it filed any answer to the Complaint or otherwise presented competing facts. Its motion was therefore, by definition, a facial attack."); *see also, e.g., Askew v. Church of the Lord Jesus Christ*, 684 F.3d 413, 417 (3d Cir. 2012) ("As the defendants had not answered and the parties had not engaged in discovery, the first motion to dismiss was facial."). Accordingly, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc.*, 220 F.3d at 176 (citations omitted).

The Complaint establishes the Central Bank's Article III standing no matter how Defendants try to frame their assault on it. A party establishes standing under Article III by pleading the three elements set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992):

---

[2] Defendants proffer through counsel – not via their own declarations – certain self-serving translations of content from the DT Site, unauthenticated printouts of third-party websites, and articles not referenced in the Complaint (Exhs. D, E & F). None of this "evidence" is admissible, and none bolsters Defendants' arguments about the sufficiency of the Complaint. *See Victaulic Co. v. Tieman,* 499 F.3d 227, 236-37 (3d Cir. 2007).

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560-61 (citations omitted). The Central Bank has done just that.

## 1. THE CENTRAL BANK ALLEGES AN INJURY-IN-FACT

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," because it is appropriate to "'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)); *see Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007). Defendants nevertheless posit that the Complaint "asserts generalized injury to the Venezuelan people, and not to Plaintiff specifically." (D.I. 16 at 9.) Knowing that such a statement is untenable in light of the most cursory review of the Complaint, Defendants also contend the Central Bank pleads injuries that are not sufficiently "concrete." *Id.* For example, Defendants pick on the Central Bank's allegations of diminished seigniorage, arguing that "nowhere in the Complaint does it affirmatively plead any facts to support that conclusion, including whether its *seignoriage* [*sic*] has, in fact, been diminished, and, if it has, the value of any such diminution." *Id.* This argument ignores well-pleaded factual allegations (recited above and summarized again here) that (1) widespread acceptance of the fraudulent DT Rate exaggerates the appearance of hyperinflation, (2) such inflation immediately devalues bolívares, and (3) automatically diminishes the Central Bank's seigniorage. (D.I. 1 ¶¶ 41-42.)

The Supreme Court explained in *U.S. v. Students Challenging Reg. Agency Procedures*, 412 U.S. 669 (1973) that "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread . . . actions could be questioned by nobody. We cannot accept that conclusion." *Id.* at 688. "The question of particularity turns on the nature of the harm, not on the total number of persons affected."

*Lozano v. City of Hazleton*, 620 F.3d 170, 186 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. __, 180 L. Ed. 2d 243 (2011).  Thus, the Central Bank's injury must simply "affect the plaintiff in a personal and individual way" to be sufficiently "particularized" for purposes of conferring standing under Article III.  *Lujan*, 504 U.S. at 560 n.1.[3]

The Complaint plainly pleads this very point, explaining (first in general terms) that the "economic and reputational damage that Defendants have caused the Central Bank are independent of the hardships that Defendants have imposed on the Venezuelan people." (D.I. 1 ¶ 7.)  The Complaint then details the particularized harms it has suffered:

- Diminished "seigniorage for the new currency it prints (or the coins it mints) or that it newly puts into circulation";

- Deprivation of "the higher real returns that it would otherwise receive on monies it lends to other financial institutions and entities";

- The loss of "trade . . . as capital that it would otherwise retain or attract instead leaves, with investors seeking returns from other world economies"; and

- Reputational harm as Defendants' acts "creat[e] the false impression that the Central Bank and the Republic are incapable of managing Venezuela's economy."

(*Id.* ¶¶ 7, 42, 72, 86 & 87) (footnote omitted).  Such injuries satisfy the particularized injury in fact requirement for Article III standing.  *See, e.g.*, *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 532 (S.D.N.Y. 2013) ("Wrongful depletion of the UN escrow account could cause both particular and personal harm to Iraq . . . [a]s compared to individual Iraqi citizens"), *aff'd*, 768 F.3d 145 (2d Cir. 2014).[4]

---

[3] The requirement of the pleading of a particularized (*i.e.* individualized) harm to confer standing upon a plaintiff should not be confused with the requirement for heightened pleading imposed by Federal Rule of Civil Procedure 9(b), which is inapplicable here.  *See Lujan*, 504 U.S. at 561 (holding only "general factual allegations of injury" can confer standing at the pleading stage).

[4] Both the Supreme Court and the Third Circuit have likewise deemed such injuries to governmental bodies sufficiently distinct from those felt by others to be particularized for purposes of Article III.  *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 430-31 (1998) (holding injury to city sufficient to confer standing because of its direct impact on the City's borrowing power, financial strength, and fiscal planning); *Amato v. Wilentz*, 952 F.2d 742, 747 n.5 (3d Cir. 1991) (holding alleged injury to county sufficient because it caused the county to

Defendants nevertheless persist in their argument, labeling the Central Bank's allegations of injuries "conjectural or hypothetical." (D.I. 16 at 9.) But their repetitive assertions are belied by the Central Bank's actual pleading. The Complaint details the rise of the DT Site, its departure from other measures of the Venezuelan currency in international exchange transactions, and the actual impact on the Central Bank of the increasing number of transactions encouraged by the falsified DT Rate. (D.I. 1 ¶¶ 26-43.) These factual details of concrete, "real and immediate" – and continuing – injury distinguish the Central Bank's Complaint from those that aver only "abstract" notions about "the prospect of future injury," and about which courts are dubious. *Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

### 2. THE CENTRAL BANK'S INJURIES ARE TRACEABLE TO DEFENDANTS' ACTS

Defendants alternatively contend that the Central Bank has not adequately pled requisite Article III causation because its theory involves "unknown and unidentifiable third parties," and "independent intervening causes." (D.I. 16 at 10-12.) Importantly, "[c]ausation in the context of standing is not the same as proximate causation from tort law, and the Supreme Court has cautioned against 'wrongly equat[ing] . . . injury "fairly traceable" to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.'" *Constitution Party*, 757 F.3d at 366 (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). Also important is that "there is room for concurrent causation in the analysis of standing, and indeed, an indirect causal relationship will suffice, so long as there is a fairly traceable connection." *Id.* (internal citations and quotations omitted).

Defendants argue that such causation, however framed, is absent because their conduct – the daily electronic publication of falsehoods about the value of the bolívar – is "passive," and

---

lose $250,000 in revenue). Defendants' reliance on *Arias v. Dyncorp*, 738 F. Supp. 2d 46 (D.D.C. 2010) is off point because the plaintiff in that case relied on third-party, derivative injuries. *See id.* at 53 (rejecting standing to Ecuadorian provinces, in part, because many of its "claims – particularly the claims related to the depleted health conditions of the citizens – are exactly the type of third-party, derivative claims that the Article III standing inquiry was designed to avoid").

the harm to the Central Bank requires others to act.  (D.I. 16 at 10.)  Defendants' argument mischaracterizes the Complaint.  As discussed above, the Complaint pleads facts alleging that Defendants' conduct contributes to inflation and the immediate devaluation of the bolívar, directly causing the injuries chronicled on pages 7-8, *supra*.

Defendants' argument also betrays a misapprehension of law:  "That a third party's action may be necessary to complete the complained-of harm does not negate the existence of an injury in fact  . . . or negate causation and redressability."  *NCAA v. Governor of N.J.*, 730 F.3d 208, 222 (3d Cir. 2013); *see id* ("It is impossible to maintain . . . that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons.  If that principle were true, it is difficult to see how libel actions or suits for inducing breach of contract could be brought in federal court."); *see also, e.g., Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013) ("[T]he traceability requirement [may be] met even where the conduct in question might not have been a proximate cause of the harm, due to intervening events.") (citation omitted).

Moreover, Defendants' challenge to the causal component of standing improperly reaches the merits of the Central Bank's claims.  They characterize as "unfounded" such pleaded facts as Defendants having misrepresented the actually prevailing exchange rates, the popularity of the DT Site as an information provider to currency traders, and the like.  (D.I. 16 at 11.) Construed in the light most favorable to the Central Bank, as required, the Complaint's allegations cannot be challenged in this way and at this juncture.  *See, e.g., Republic of Iraq*, 920 F. Supp. 2d at 532 (finding Article III standing despite "defendants' dissection of the causal chain – for example, noting its complexity and the Hussein Regime's prominent role in the sequence" – because such argument simply "amounts to an analysis of the merits," which is improper on a motion to dismiss).[5]

---

[5] Defendants complain that certain facts in paragraph 37 of the Complaint are pled on "information and belief," implying, without citation, that such allegations should be rejected or disregarded.  (D.I. 16 at 12.)  Allegations on information and belief are permissible under Rule 8 (*see Browning v. Clinton*, 292 F. 3d 235, 243 (D.C. Cir. 2002)), and Rule 9(b) does not state or

### 3. THE CENTRAL BANK PLEADS THE REDRESSABILITY OF ITS INJURIES

In establishing causation, the Central Bank also established redressability. *See Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 143 (3d Cir. 2009) (finding that redressability is "closely related to traceability, and the two prongs often overlap"). A favorable decision in this case and entry of the injunction sought will slow or diminish the ongoing harm to the Central Bank, and that is all that is required. *See Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) ("While it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warning, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* or it.") (emphases in original); *cf. Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (explaining that "all civil penalties have some deterrent effect," and therefore "it can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates the conduct and prevents its recurrence provides a form of redress").

### C. THE CENTRAL BANK ALLEGES A VIABLE CLAIM UNDER VENEZUELAN LAW

Defendants challenge the Central Bank's Venezuelan law claim based on the notion that Delaware substantive law governs this controversy and Delaware has never recognized the legitimacy of a claim premised on a violation of Article 1185 of the Venezuelan Civil Code. (D.I. 16 at 13-14.) This argument is directly at odds with the congressional mandate set forth in 28 U.S.C. § 1332. As the Third Circuit explained while approving of a party's assertion of claims anchored in the laws of Switzerland,

> *Congress*, through 28 U.S.C. § 1332, *has instructed United States district courts to entertain "all civil actions"* (provided the matter in controversy is of sufficient value), as long as there is complete

---

imply otherwise. Indeed, Rule 9(b)'s "requirement of particularity . . . does not entail an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated . . . and reasonably believes that a wrong has occurred." *Temple v. Haft*, 73 F.R.D. 49, 53 (D. Del. 1976) (citations omitted). The DT Facebook graphic featured in Paragraph 37 of the Complaint discloses Defendants' efforts to solicit viewers' use of the DT Site for foreign exchange transactions, and amply apprises Defendants of facts supporting the Central Bank's allegations pleaded on information and belief.

> diversity of citizenship.  To be sure, Congress has the authority to counter-instruct district courts not to entertain particular categories of civil actions arising under foreign law, but we do not believe that we should readily imply such a result from statutory text that appears to direct otherwise.

*LaSala v. Bordier et Cie*, 519 F.3d 121, 139 (3d Cir. 2008) (emphasis added).  Defendants fail to identify any act by Congress instructing district courts not to entertain claims such as that arising under the Venezuelan law advanced in the Complaint.  That law must consequently be treated no differently than the countless other foreign laws that have given rise to claims cognizable in district courts sitting in diversity.  *See*, *e.g.*, *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1088 (S.D. Fla. 1997) (denying motion to dismiss, finding "Kodak has stated a claim under Article 984 of the Bolivian Civil Code"); *Dominican Rep. v. AES Corp.*, 466 F. Supp. 2d 680, 693-94 (E.D. Va. 2006) (denying motion to dismiss "claims for nuisance, conspiracy, and aiding and abetting under the law of the Dominican Republic"); *Higgins v. SPX Corp.*, No. 1:05-CV-127, 2006 U.S. Dist. LEXIS 90280, at *15 (W.D. Mich. Dec. 14, 2006) (denying motion to dismiss "claim for moral damages under Brazilian law"); *see also, e.g., In re Petrobas Sec. Litig.*, No. 14-cv-9662 (JSR), 2015 U.S. Dist. LEXIS 99322, at *45-46 (S.D.N.Y. July 30, 2015) (noting in the context of a motion to compel arbitration that plaintiffs brought "Brazilian Law Claims"); *In re Nortel Networks, Inc.*, 469 B.R. 478, 498 (Bankr. D. Del. 2012) (observing that "[t]he majority of the claims that the Claimants assert arise under foreign law, i.e., English, Irish and French law.").

Because Defendants raise no other basis for challenging the Central Bank's claim based on Venezuelan law, their challenge fails.

### D.   THE CENTRAL BANK PLEADS A COGNIZABLE RICO CLAIM

The Central Bank alleges that by daily posting the DT Rate electronically on the DT Site (which includes the DT application, the DT Twitter feed and the DT Facebook page) since at least 2013, Defendants have committed wire fraud.  (D.I. 1 ¶¶ 45, 46, 58 & 61-70.)  Wire fraud (18 U.S.C. § 1343) is a predicate act of racketeering activity for purposes of RICO.  18 U.S.C. § 1961(1)(B).  By committing wire fraud daily, over a sustained period of time, Defendants'

conduct constitutes a pattern of racketeering activity.  18 U.S.C. § 1961(5).  Defendants nevertheless contend that the Central Bank fails to allege wire fraud with the particularity required by Federal Rule of Civil Procedure 9(b), and further fails to allege proximate cause sufficient to state a claim.  As explained below, both arguments fail.

### 1. THE CENTRAL BANK'S RICO CLAIM SATISFIES RULE 9(b)

Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake."  No dispute exists that the federal wire fraud statute, as a predicate for a RICO violation, triggers such heightened pleading.  Indeed, the Central Bank recognized that requirement in its Complaint, alleging with particularity the "date, time or place" of the fraud, as well as other "means of injecting precision and some measure of substantiation into [its] allegations of fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004).  The Complaint first chronicles the identity and timing of the statements that constitute Defendants' wire fraud – *i.e.,* the DT Rate that Defendants publish daily through several electronic outlets – and then explains how and why those statements are fraudulent.

### a. The Complaint Details Defendants' Continuous Operation Of The DT Site And Its Daily Publications Of The DT Rate

The Complaint plainly alleges that Defendants created and have continuously operated the DT Site at www.dolartoday.com.  (D.I. 1 ¶ 5.)  It explains that the DT Site has been in operation since 2010 and that its "principal purpose since inception, as its domain name implies, has been to post daily an unofficial U.S. dollar to bolívar exchange rate – the value of the 'dollar today' in bolívars (the 'DT Rate')."  (*Id.* ¶ 27.)  Defendants likewise publish the DT Rate daily through the other forms of media comprising the DT Site – the DT application for iOS and Android users, the DT Twitter feed, the DT Facebook page and other social media.  (*Id.* ¶¶ 5, 28, 31, 45, 55, 63, 67.)  The Complaint even includes graphic illustrations of Defendants' publication of the daily DT Rate, and solicitations for users to engage in currency transactions induced by Defendants' publication of the DT Rate.  (*Id.* ¶¶ 36-37.)

Moreover, the Complaint alleges how Defendants purport to calculate the DT Rate and portray it as the "true" bolívar-to-dollar exchange to an enormous audience, and how and why the DT Rate is false.  (D.I. 1 ¶¶ 28-31, 34-38 & 64.)  It further details that although "[a]t one time, the DT Rate roughly paralleled an exchange value implied by the amount of the Central Bank's hard currency reserves in dollars," "beginning in or about May 2013, the DT Rate began an artificial climb untethered to genuine market forces."  (*Id.* ¶ 32.)  With charts and graphs based on data compiled by Barclays and Defendants themselves, the Complaint demonstrates how the DT Rate began rising even more steeply beginning in February 2015, completely unmoored from the available money supply and the Central Bank's international reserves.  (*Id.* ¶¶ 34-35.)  Most important, the Complaint avers that "on any given day, the average exchange rate charged by Cúcuta exchange houses is magnitudes less than what Defendants report as the DT Rate."  (*Id.* ¶ 38.)  "Defendants are not reporting on a market.  Rather, by posting an artificial DT Rate daily, Defendants are deliberately misrepresenting and effectively manufacturing a market – a phony, distorted market for the exchange of bolívares into dollars and vice-versa."  (*Id.* ¶ 37.)  The foregoing demonstrates that the Complaint alleges both Defendants' predicate act of wire fraud with particularity as to the "date, time or place" of the fraud, and other means of injecting precision and some measure of substantiation into their allegations of fraud.

Unable to identify a genuine deficiency in the pleading that somehow deprives them of notice about the fraudulent conduct in question, Defendants briefly suggest that these allegations remain insufficient under Rule 9(b) because they fail to specify precisely who among the Defendants made the fraudulent statements.  (D.I. 16 at 15-16.)  Although Rule 9(b) can operate to prevent lumping together defendants when pleading their misconduct, "[a]n 'exception' to this rule has been developed when a group of defendants is responsible for a document or statement containing fraudulent misrepresentations," as in this case.  *Bolden v. Culture Farms, Inc.*, No. 85-4297, 1989 U.S. Dist. LEXIS 15816, at *10-11 (D. Kan. Nov. 21, 1989) (collecting cases); *see also, e.g.*, *Pellman v. Cinerama, Inc.*, 503 F. Supp. 107, 111 (S.D.N.Y. 1980) ("Defendants also protest that plaintiffs fail to attribute the acts complained of to individual defendants with

sufficient specificity.  The defendants here are all insiders, however, and numerous courts have held that the conduct of such individuals need not be specified if the complaint sufficiently describes the fraudulent acts and provides the individuals with sufficient information to answer.") (collecting cases).

The Complaint in this case unambiguously alleges that defendant DT, LLC owns and operates the DT Site, and that the DT Site posts the DT Rate on a daily basis.  (D.I. 1 ¶ 9.)  It alleges that defendant Díaz is a director and key principal of DT, LLC, and thus directs its activities, including management of the DT Site.  *Id.* ¶¶ 10, 47.  Defendants Lozada and Altuve are also alleged to be principals of DT, LLC who likewise participate in directing its activities, including Altuve "post[ing] the DT Rate to the DT Site daily (sometimes 'updating' it several times in a day)." *Id.* ¶¶10-12, 48.  Díaz, Lozada and Altuve (with as of yet unknown co-conspirators) are the "RICO Persons" who "formed the DT Site and since 2013 have managed it to manipulate the unofficial bolívar-dollar exchange rate for both personal gain and to destabilize the Venezuelan economy."  *Id.* ¶ 48; *see id.,* ¶ 52.  In short, "who" makes the false statements underlying wire fraud is clear and satisfies Rule 9(b).  *Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96, 100 (3d Cir. 1983) (cautioning against "focusing exclusively on [Rule 9(b)'s] 'particularity' language," calling it "'too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules'") (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure, ¶ 1298 at 407 (1969)).

### b.   The Complaint Details How Defendants' Misconduct Has Deprived the Central Bank of Recognized Property Rights

Defendants also assail the RICO claim by complaining that the Central Bank "does not allege it was deprived of any recognized property right."  (D.I. 16 at 16.)  In making this argument, Defendants fail to acknowledge that the RICO statute protects against schemes to defraud another of "money *or* property."  18 U.S.C. § 1343 (emphasis added).  The Complaint plainly alleges just such harms, noting how Defendants' unlawful scheme has diverted trade from and diminished the value of profits otherwise earned by the Central Bank.  (D.I. 1 ¶¶ 7 n.1,

- 15 -

41-43 & 72.)  These losses in earnings from seignoriage and transaction fees from diverted or foregone loans or trade constitute damages to "money or property" under the wire fraud statute. *See, e.g., U.S. v. Ali*, 620 F.3d 1062, 1067 (9th Cir. 2010) (holding that lost revenue qualifies as "money or property" under the mail and wire fraud statute).  Defendants' efforts to recast the Central Bank's claim or its premise for a wire fraud violation as somehow not a recognized interest protected by statute is supported by neither the cases they cite nor the concrete, economic harms that are detailed in the Complaint.

### 2.     THE RICO CLAIM PLEADS THE REQUISITE PROXIMATE CAUSE

The Complaint alleges that Defendants' RICO violation was the proximate cause of the Central Bank's injury, as the law demands.  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  Because Defendants have succeeded in making the fraudulent DT Rate the authoritative statement of the "black" market bolívar-dollar exchange rate, they have caused the bolívar to lose value.  (D.I. 1 ¶ 42.) As noted above, among other actual injuries to the Central Bank, Defendants' conduct has proximately caused a diminution in the Central Bank's seigniorage.  *Supra* at 7-8.

In contending that the RICO claim fails to plead proximate cause, Defendants complain that such harms were not "directly caused by Defendants' alleged RICO acts," and instead required intervening conduct by "unknown and unidentifiable individuals."  (D.I. 16 at 18-19.) Defendants thus argue that the Central Bank was not a direct victim of the alleged fraud.  This argument fails.  As discussed above in the section on Article III standing, the Central Bank has sufficiently pled that it is a proper plaintiff with injuries separate and distinct from those that could be claimed by intervening consumers misled by the DT Rate.  *Supra* at 7-9.  That a defendant's illegal acts may have caused direct injury to more than one category of plaintiffs does not bar the Central Bank's RICO claim or result in a lack of proximate causation.  *See Commer. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 383-84 (2d Cir. 2001) (In a RICO action, "[i]f a defendant's illegal acts caused direct injury to more than one category of plaintiffs, the defendant may well be obligated to compensate different plaintiffs for different

injuries."). More important, the Central Bank alleges facts demonstrating that it is directly injured by Plaintiff's scheme. (D.I. 1 ¶¶40, 72; *see supra* at 9-10).

By proving the diversion of its revenues and profits as a result of the DT Rate, the Central Bank will have proven proximate cause for RICO purposes. That certain of the diverted revenues and profits may result from consumers misled by the DT Rate is of no moment. The Supreme Court has explained that "first-party reliance" is not necessary "to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in *Holmes* and *Anza*." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657-58 (2008). Under common law principles, a plaintiff can be directly injured by a misrepresentation where "a third party, and not the plaintiff . . . relied on" it. *Id.* at 656.

Defendants' second proximate cause argument likewise fails. They argue that "as described previously in connection with the causation requirement for Article III standing, Plaintiff's claim of direct causation is insufficient because it rests on multiple intervening acts of multiple third parties, each making independent choices and taking intervening actions to produce the alleged injuries to Plaintiff." (D.I. 16 at 19.) But Defendants identify no such intervening acts with respect to the diminution of the Central Bank's seigniorage, or with respect to the lost real returns that the Central Bank would otherwise receive on monies it lends to other financial institutions and entities. (D.I. 1 ¶72.)

Defendants' third and fourth proximate cause arguments fare no better. They fail to advance any argument why the Central Bank's alleged injuries present the "almost impossible task of attempting to separate the effect, if any of the alleged RICO acts of Defendants from other independent factors." (D.I. 16 at 19.) The injuries alleged in this case are not beyond the capacity of expert analysis and discovery. Even the most basic of injuries – transaction fee revenues that have been diverted from the Central Bank to the DT Site – may be substantiated through discovery and expert analysis. And the mere fact that Defendants' wire fraud has also injured others does not lead to the conclusion that others "more directly harmed by the alleged

- 17 -

RICO acts could easily vindicate their claims." (D.I. 16 at 19-20.)  Contrary to Defendants' cited authorities, no indication exists that others will come to this country to sue in vindication of their claims.  But even if that happened, such actions would do nothing to compensate the Central Bank for the injuries detailed in the Complaint.

The central question facing the Court in determining the existence of proximate cause is "whether the alleged violation led directly to the plaintiff's injuries."  The facts and discussion above demonstrate that the answer is unequivocally yes.  *See Anza*, 547 U.S. at 461.  Defendants' proximate cause challenge fails in its entirety.

### E.    THE COMPLAINT PLEADS A COGNIZABLE LANHAM ACT CLAIM

#### 1.    THE CENTRAL BANK ENJOYS STANDING AS A LANHAM ACT PLAINTIFF

Defendants contend that the Central Bank lacks standing to pursue a Lanham Act claim because it pleads no "injury to a 'commercial interest in sales or reputation' which 'flow[s] directly' from Defendants' alleged deception of consumers, such that consumers have 'withheld trade from the Plaintiff.'"  (D.I. 16 at 26-27 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. ___, 134 S. Ct. 1377, 1391 (2014)).)  The contention is demonstrably false.  The Complaint specifically alleges "economic and reputational damage that Defendants have caused the Central Bank . . . independent of the hardships that Defendants have imposed on the Venezuelan people."  (D.I. 1 ¶ 7.)  That harm is alleged to be the direct result of Defendants' publication of the fraudulent DT Rate as though it represented the actual value of the currency produced by the Central Bank:

- "Defendants' misconduct has diminished the Central Bank's seigniorage that it would otherwise receive for the new currency it prints (or the coins it mints) or that it newly puts into circulation."

- "These acts . . . deprive the Central Bank of the higher real returns it would otherwise receive on monies it lends to other financial institutions and entities, and robs the Central Bank of the additional revenues it would otherwise receive, such as the fees it could have charged on foreign exchange transactions lost to the black market."

- "By exacerbating inflationary pressures on the bolívar, the Central Bank appears less capable of managing the Venezuelan economy, and this in turn causes trade

to be withheld from the Central Bank, as capital that it would otherwise retain or attract instead leaves, with returns sought from other world economies."

(D.I. 1 ¶¶ 85-87.)

These details track the requirements set forth by the Supreme Court in the very case on which Defendants purport to rely. *See Lexmark*, 134 S. Ct. at 1391 (holding that "a plaintiff suing under §1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff"). Reluctantly acknowledging this truth, Defendants concede that at least allegations that the "DT Rate has caused [the Central Bank] to lose trade and 'robbed' it of revenues it could have charged on foreign exchange transactions . . . conceivably . . . relate to the Central Bank's 'commercial interests in sales and reputation.'" (D.I. 16 at 21.) But in the same breath, Defendants dispute the plausibility of such allegations based on their contention that the Complaint is "devoid of any facts regarding by whom, where, when, or how any 'trade' or revenues have been withheld from the Central Bank by any consumer who purportedly was deceived by the DT Rate." *Id.*

Defendants' demand for particularized pleading of such details is itself devoid of authority – because none exists. Even Rule 9(b) requires only particularity in pleading "the circumstances constituting fraud or mistake" sufficient to put the Defendants on notice of their purported misconduct – and not proximate cause, the manner or amount of harm, or anything else. Fed. R. Civ. P. 9(b).[6] Moreover, the requirement that a claim be plausible as pleaded likewise imposes no such requirement. *See Ashcroft v. Iqbal*, 556 U.S. 662, 687 (characterizing the plausibility test as governed by "the less rigid – though still operative – strictures of Rule 8," rather than Rule 9(b)).

Defendants fare no better in challenging whether the Complaint satisfies the Lanham Act's "proximate cause" requirement. Their concession   that "the causal chain in false

---

[6] In any event, neither the Third Circuit nor any other federal court of appeals has held that Federal Rule of Civil Procedure 9(b) applies to Lanham Act claims. *See Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.*, 202 F. Supp. 2d 431, 434 (M.D.N.C. 2002).

advertising claims often is not 'direct'" (D.I. 16 at 21) is a material understatement, as "all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising." *Lexmark*, 134 S. Ct. at 1391. Because "the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute." *Id.*

Notwithstanding this light burden, the Complaint alleges facts supporting widespread consumer deception by which millions of Venezuelans accept Defendants' fabricated exchange rate and are pressured to engage in foreign exchange transactions. (D.I. 1 ¶¶ 39, 41-43.) Such allegations further immunize the Central Bank's false advertising claim from Defendants' Motion. *See, e.g., Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228-29 (3d Cir. 1990) (instructing that on a motion to dismiss, to make plausible the contention that the relevant public was misled, a plaintiff "must allege how consumers 'actually do react' to the allegedly misleading statement, not how they 'could react'").

The Court's decision in *Accenture Global Servs. v. Guidewire Software, Inc.*, 581 F. Supp. 2d 654 (D. Del. 2008) provides yet another, illustrative counterpoint. The counterclaimant in that case failed to allege that "any of its customers or potential customers actually were misled by [the] sentiments" at issue. *Id.* at 667. In sharp contrast, the Central Bank alleges in the Complaint precisely how consumers react to the ongoing publication of the artificial DT Rate:

- "As Defendants' actions accelerate inflation, the inclination of those holding bolívares to exchange them – even at rates less favorable than the Central Bank presently offers – ***drives them to exchange their currency either for goods or for alternate currencies on the black market***."

- "Importers of priority goods get access to dollars for the preferential price of 6.3 bolívares, ***and turn to the black market to sell the dollars for a huge markup***."

- "Given the Central Bank's limited quantity of dollars available for foreign exchange, and given pressures to exchange bolívares for dollars in light of falsely reported devaluation, ***Venezuelans trade dollars through parallel black market exchange houses and other sources*** instead of using government sanctioned procedures."

(D.I. 1 ¶¶ 41-43) (emphases added).  The Complaint thus adequately alleges that Defendants' fraudulent DT Rate pressures consumers to withhold trade from the Central Bank, turning to the black market instead of the Central Bank for foreign exchange transactions, or by seeking returns from other world economies entirely.  *Id.* ¶¶ 41-43 & 86.  The Complaint thus sufficiently alleges proximate causation.

### 2.   PUBLICATION OF THE DT RATE IS A COMMERCIAL PROMOTION

Defendants next seek to immunize their false and misleading publication of the DT Rate by contending that their doing so "does not propose a commercial transaction, it is not an advertisement, and it does not refer to a specific product or service for sale by the Defendants." (D.I. 16 at 23.)  They also disclaim having any "purpose of influencing consumers to purchase DT's products or services or to divert customers away from the Central Bank."  *Id.* at 24.  But instead of parsing the actual allegations in the Complaint to support their assertions, Defendants ask the Court to credit their own self-serving disclaimers from the DT Site or other social media they operate.  *Id.* at 23 & n.45.  This is improper.  *See Victaulic Co.,* 499 F.3d at 236 (explaining that "private corporate websites, particularly when describing their own business, generally are not the sorts of sources whose accuracy cannot reasonably be questioned," particularly "at the pleadings stage") (internal quotations & citations omitted).

Moreover, although Defendants identify factors that may serve as relevant guides in determining the commercial nature of speech, this Court "must be mindful of the 'difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.'"  *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 793 (3d Cir. 1999) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993)).  Far from requiring any formulaic test, determining whether speech is commercial in nature necessitates a "commonsense" approach.  *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008). That commercial speech extends far beyond traditional advertising for any particular transaction affecting the sale of a particular product or service is well settled.  *See e.g.*, *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 & n.13 (1983) (discerning commercial speech in an

- 21 -

otherwise "informational pamphlet" concerning venereal disease because "at the very bottom of the last page" it "identified . . . [a] distributor of Trojan-brand prophylactics").

An appropriate examination of the Complaint under the flexible, governing legal principles discloses specific allegations that amply support the commercial nature of Defendants' publication of the DT Rate. The Complaint alleges that Defendants "deliberately manipulate" the actual, market-driven exchange rate, and their promotion of that falsehood is for – among other reasons – Defendants' "personal financial gain." (D.I. 1 ¶¶ 37, 41-43, 73, 83-85.) Publishing the DT Rate facilitates and encourages consumers to enter transactions exchanging their bolívares by bypassing government sanctioned procedures and turning to parallel "black" market exchange houses, including the DT Site itself, based on false information. The Facebook posting reproduced in paragraph 37 of the Complaint even explicitly calls on consumers to "[b]uy and sell [their] dollars . . . through [the DT] website!" *Id.* ¶ 37. This causes harm to the Central Bank in a variety of ways documented in the Complaint. *Id.* ¶¶ 7 & 87.

The Court may not simply choose to disregard these allegations of fact and instead embrace Defendants' contrary narrative that "the DT Rate is constitutionally-protected expression that seeks to inform and educate the public." (D.I. 16 at 23); *see also, e.g., In re Orthopedic*, 193 F.3d at 793-94 (affirming denial of motion to dismiss when presented with a "factual dispute" about the nature of the speech at issue).[7]

### 3. DEFENDANTS WAIVE ALL OTHER CHALLENGES TO THE CENTRAL BANK'S LANHAM ACT CLAIM

In a footnote, Defendants suggest that the Complaint somehow "fails to establish each of the elements to state a claim under Section 43(a)" of the Lanham Act, 15 U.S.C. § 1125(a). (D.I. 16 at 20 n.40.) But they never explain why or how the Court should arrive at this conclusion,

---

[7] Defendants cite pre-*Lexmark* authority for the notion that a false representation made for any purpose "other than competition is not actionable under [the] Lanham Act." (D.I. 16 at 24 & n.47.) That recitation misstates governing law. *See Lexmark*, 134 S. Ct. at 1393 ("[A]lthough diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under §1125(a)."); *id.* at 1394 ("[W]hen a party claims reputational injury from disparagement, competition is not required for proximate cause; and that is true even if the . . . plaintiff merely suffered collateral damage.").

boasting that "the Court need not reach nor consider the elements" other than "standing and 'commercial advertising and promotion,'" addressed above. *Id.* The Central Bank agrees. By failing to advance any argument to support their position that any other element of the Central Bank's Lanham Act claim is unsatisfied, Defendants waive that contention. *See U.S. v. Rawlins*, 606 F.3d 73, 82 n.11 (3d Cir. 2010) (holding that a challenge was waived when suggested in a brief's statement of issues but not developed in the brief's argument).

### F. THE COMPLAINT PLEADS A COGNIZABLE CLAIM FOR UNJUST ENRICHMENT.

Defendants argue that the Central Bank's unjust enrichment claim cannot stand alone because it is founded in tort rather than contract. (D.I. 16 at 24.) They purport to support this point by asserting that "[i]n *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999), the Third Circuit dismissed the plaintiff's unjust enrichment claim under Delaware law." (D.I. 16 at 23.) Unfortunately for Defendants, this statement is wrong: Pennsylvania provided the source of state law in that controversy. *Steamfitters,* 171 F.3d at 928 n.9, 935 & n.21, 936 & 937 n.23. Indeed, the Third Circuit's decision did not cite a single case from either state or federal courts in Delaware. *See generally id.* The omission of such cases from the decision is unsurprising. Delaware law differs from Pennsylvania law in this area, allowing independent unjust enrichment claims based in tort. *U.S. Bank Nat'l Ass'n v. Gunn*, No. 11-cv-01155-RGA, 2015 U.S. Dist. LEXIS 102350, at *13 (D. Del. Aug. 5, 2015) ("In other jurisdictions, it is disfavored to pursue an unjust enrichment claim where plaintiffs are claiming damages for torts . . . In Delaware, there is limited case law applying unjust enrichment in torts contexts . . . . ") (citing *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 Del. Ch. LEXIS 15, at *28 n.303 (Del. Ch. Jan. 29, 2010)). Advancing no other argument to contest the unjust enrichment claim, Defendants forfeit their challenge. *See Rawlins*, 606 F.3d at 82 n.11.

- 23 -

### G. DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT ANY PLEADING DEFICIENCY CANNOT BE CURED BY AMENDMENT

Dismissals with prejudice are drastic sanctions of last resort. *Briscoe v. Klaus*, 538 F.3d 252, 258 (3d Cir. 2008); *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 869 (3d Cir. 1984). Accordingly, such dismissal should be reserved for only the most extreme cases, as "the policy of the law is to favor the hearing of a litigant's claim on the merits." *Spain v. Gallegos*, 26 F.3d 439, 454 (3d Cir. 1994) (citing *Marshall v. Sielaff*, 492 F.2d 917, 918 (3d Cir. 1974)). Defendants provide no basis for characterizing the Complaint in this manner. Accordingly, in the event that the Court determines that any aspect of the Complaint is not sufficiently pled, "leave to amend should be freely given." *U.S. v. Duffus*, 174 F.3d 333, 337 (3d Cir. 1999).

## V. CONCLUSION

For each of the foregoing reasons, Defendants' Motion should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*

_____
Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
skraftschik@mnat.com

*Attorneys for Banco Central de Venezuela*

OF COUNSEL:

David S. Elkins
Rafael M. Langer-Osuna
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, CA 94304
(650) 856-6500

Adam R. Fox
Marisol C. Mork
SQUIRE PATTON BOGGS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071
(213) 624-2500

January 20, 2016
9787135