IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BANCO CENTRAL DE VENEZUELA, )
)
Plaintiff, )
)
v. )  C.A. No. 15-965 (GMS)
)
DOLARTODAY, LLC, GUSTAVO DÍAZ )  **JURY TRIAL DEMANDED**
VIVAS, IVAN DARIO LOZADA-SALAS, )
JOSÉ ENRIQUE ALTUVE LOZADA, )
)
Defendants. )

## AMENDED COMPLAINT

Plaintiff BANCO CENTRAL DE VENEZUELA (in English, the Central Bank of
Venezuela) (the "Central Bank") alleges as follows.

### THE GRAVAMEN OF THIS ACTION

1.     This action seeks redress in the form of money damages and a permanent
injunction against Defendants' illegal conspiracy to manipulate the value of Venezuela's
currency by widely publicizing false and misleading information about it.  Individual
defendants Gustavo Díaz Vivas ("Díaz"), Ivan Dario Lozada-Salas ("Lozada"), Jesus
Enrique Altuve Lozada ("Altuve") are Venezuelan nationals living in the United States.
Through a Delaware limited liability company, Defendant DolarToday, LLC ("DT,
LLC"), the Individual Defendants operate the "DolarToday" website
(www.dolartoday.com), distribute a DolarToday application for iOS and Android
operating systems, and maintain a DolarToday Twitter Feed and Facebook page
(collectively the "DT Site").  The DT Site ostensibly comprises a social media forum for
anti-Venezuelan government "news" and commentary.  But the primary purpose of the

DT Site – and the only conduct of Defendants that is the target of this action – is the posting of what Defendants represent as "the" authoritative daily exchange rate for Venezuela's currency, the bolívar ("bolívar"), against the U.S. dollar (the "DT Rate").  In fact, the DT Rate is not the real exchange rate and the publication of this contrived rate has directly harmed the Central Bank, both reputationally and monetarily, as explained further below.

2.     Defendants have succeeded in making the DT Rate the authoritative source for the bolívar-dollar exchange rate in Venezuela on the parallel or "black" market.  But the DT Rate is not what Defendants purport it to be.  It does not reflect an actual, existing bolívar-dollar exchange rate; it is a daily misrepresentation, the aim of which is to manipulate the exchange rate for Defendants' own purposes:  (a) providing the means for the Individual Defendants and their unidentified, unnamed coconspirators to enrich themselves through arbitrage – by virtue of a phony market for the exchange of bolívares into dollars and vice-versa at rates that Defendants manufacture, and (b) exaggerating the devaluation of the bolívar to reflect negatively on the administration of Venezuelan President Nicolás Maduro.

3.     Defendants' manipulation of the bolívar-dollar exchange rate directly harms plaintiff Banco Central de Venezuela (the "Central Bank"), wreaking both reputational and economic injuries that endow the Central Bank with a personal stake in seeking to vindicate its rights with this lawsuit.  Although some of the harms that Defendants have caused are widely felt, the actual monetary and reputational injuries that they have caused

to the Central Bank are particularized and manifested in a variety of concrete, ongoing ways.  In particular, Defendants' scheme has:

a.    Diminished the marginal earnings that the Central Bank alone can – and actually does – obtain from printing Venezuela's official currency, minting its coinage and putting both into circulation (which economists call seigniorage[1]);

b.    Caused the Central Bank reputational harm, entirely independent of the actual economic harm identified above, because Defendants' acts create the *false impression* in the public that the Central Bank's monetary policies are ineffectual and that it cannot manage the Venezuelan economy; and

c.    Deprived the Central Bank of capital that it would attract and retain, by having caused numerous entities and persons to invest their capital elsewhere than Venezuela.

4.    The facts chronicled below disclose an illegal conspiracy by Defendants to manipulate the value of the Republic's currency by deliberately misrepresenting and falsifying it on a massive scale, enriching themselves and their supporters to the detriment of the Central Bank's revenues and reputation.  Doing so has directly and concretely harmed the Central Bank in violation of (I) the Racketeer Influenced and Corrupt Organizations Act ("RICO" or the "Act"), Pub. L. No. 91-452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1962, (II) Section 43(a) of the Lanham Act (15 U.S.C. §1125(a)), (III) article 1185 of the Venezuelan Civil Code, and (IV) Delaware common

---

[1]    Seigniorage is the "profit" calculated as the difference between the value of money issued and the cost incurred to produce and distribute it.  Webster's New Collegiate Dict. at 1039 (1981).

law prohibiting unjust enrichment.  Through this Amended Complaint, the Central Bank

seeks redress for these violations by Defendants who must answer for their false

statements and self-dealing.

### THE PARTIES

5.      Plaintiff Central Bank is an autonomous government entity, the functions of

which are set forth in the Constitution and laws of La República Boliviariana de

Venezuela ("Venezuela" or the "Republic").  The Central Bank's headquarters are

located at Avenida Urdaneta, Esquina Las Carmelitas, Torre Financiera del Banco

Central de Venezuela, Caracas 1010, Venezuela.  One of the Central Bank's most

important functions is to participate in the design of the foreign exchange policy (which

includes setting foreign exchange rates) and to put those in place.  The Central Bank also

monitors and regulates the official foreign exchange market in the terms set forth in

Venezuela's currency exchange regulatory framework.  The Central Bank is also solely

responsible for and constitutionally mandated to develop the Republic's monetary policy

and the implementation of that policy.

6.      Defendant DT LLC is a Delaware limited liability company with a place of

business at 5695 Colony Lane, Hoover, Alabama, 35226.  The Central Bank is informed

and believes and therefore alleges that defendant DT LLC owns and operates (through at

least some of the Defendants) the DT Site.

7.      Defendant Díaz is a director of DT LLC.

Formerly a colonel in the Venezuelan Army, he was made



Col. Díaz (right) behind
Pedro Carmona during the
47-hour coup.

the acting Deputy Chief of the Casa Militar (literally "Military House"), the Venezuelan equivalent of the U.S. Secret Service, by those who launched a coup against Chávez in 2002.  In this position, Díaz headed the security detail for Pedro Carmona, proclaimed as the new president for the 47-hour coup.  The coup failed, and Díaz became a committed and visibly vocal Chávez opponent.  He was later granted political asylum in the U.S. in October 2005, settling in Alabama.[2]  Díaz's residence is 5695 Colony Lane, Hoover, Alabama, 35226 – the address also listed for DT LLC.

8.      Defendant Lozada resides at 1512 220th Place NE, Sammamish, Washington.  A Venezuelan native, Lozada worked at CANTV, Venezuela's largest telecommunications company until 2005, when he immigrated to the United States.  The Central Bank is informed and believes and therefore alleges that Lozada is a principal of DT LLC and helps support the DT Site.

9.      Defendant Altuve[3] is a native Venezuelan (and Lozada's cousin) who immigrated to Miami, Florida in early 2002.  His current residence is at 11001 NW 83rd Street, Apt. 203, Doral, Florida 33178.  The Central Bank is informed and believes and therefore alleges that Altuve is a principal of DT LLC.  In that capacity, Altuve posts the DT Rate on the DT Site daily (sometimes "updating" it multiple times in a day), and directs or helps direct the DT Site's movement to mirror sites to evade the Republic's efforts to block the website in Venezuela.

---

[2]      See http://www.tuscaloosanews.com/article/20060123/news/601230338 (last accessed Oct. 8, 2015).

[3]      The initial Complaint inadvertently identified Altuve as José Enrique Altuve Lozada; his first name is Jesus.

10.     The Individual Defendants know each other, agreed to and work cooperatively to operate both the legitimate and illegal operations of the DT Site and thus conspired to engage in the conduct giving rise to each claim of relief below.

## JURISDICTION AND VENUE

11.     The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 18 U.S.C. § 1964(c).  The Court may also exercise diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states (and nations) and the amount in controversy, net of interest and attorneys' fees, exceeds $75,000.  The Court additionally enjoys subject matter jurisdiction over the state law claim because it arises from the same nucleus of operative facts underlying the federal questions presented, and 28 U.S.C. § 1367 authorizes the Court to exercise supplemental jurisdiction over such a related claim.

12.     The Court has personal jurisdiction over defendant DT LLC because as a Delaware entity it is a resident of Delaware, and over defendants DT LLC and Díaz because they either transact business in Delaware as alleged in this Complaint or meet the requirements for the exercise of personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2).  The Court may exercise personal jurisdiction over the remaining defendants pursuant to 18 U.S.C. § 1965(b), § 1965(d) or both.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the acts giving rise to the Central Bank's claims have taken place, in whole or in part, here, because defendant DT LLC was formed, and therefore resides, in Delaware , and because defendants Díaz, Lozada and Altuve all participate in its operation.

## <u>THE CENTRAL BANK ENJOYS ARTICLE III STANDING</u>

14.    Article III of the U.S. Constitution requires that a plaintiff plead the

following three standing elements:

      (i)     An "injury in fact";

      (ii)    A causal connection between the injury and the wrongful conduct

              alleged; and

      (iii)   The likelihood that plaintiff's injury will be redressed by a favorable

              decision.[4]

The Central Bank meets each element.

### *The Central Bank Has Suffered Injuries-in-Fact*

15.    As previewed above, the Central Bank has suffered at least four discrete

injuries-in-fact, each of which is particularized, concrete and either actual or imminent:

- Diminished seigniorage;

- Reputational harm because Defendants' reporting of manufactured exchange rates have created the ***false impression*** in the public that the Central Bank's monetary policies are ineffectual and that it cannot manage the Venezuelan economy; and

- Deprived the Central Bank of capital that it would attract and retain, by having caused numerous entities and persons to invest their capital elsewhere than Venezuela.

16.    Defendants' wrongdoing has diminished and continues to diminish the

Central Bank's seigniorage for the new currency it prints, the coinage it mints, and/or that

it newly puts into circulation.  Seigniorage is a form of earnings unique to central banks.

---

[4]    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)

Because Defendants have caused and continued to cause the direct devaluation of the bolívar, they have reduced the margin that the Central Bank would otherwise enjoy between (a) the cost of printing currency, minting coinage and putting both into circulation, and (b) the value of such currency and coinage when put into circulation. Although Defendants' devaluation of the bolívar also harms others, the nature of this harm here demonstrates its concrete, particularized effect on the Central Bank, regardless of how others may be affected, evidencing the Central Bank's personal stake in seeking judicial relief to halt that misconduct.

17.     Defendants have also caused the Central Bank reputational harm that increases with each passing day and is independent of the economic harm for which Defendants are responsible.  Indeed, separate from the actual economic harm inflicted upon the Central Bank by Defendants' false representations about the bolívar-to-dollar exchange rate that has adversely affected the real and nominal value of the currency printed by the Central Bank, Defendants' continuous, daily publication has caused the Central Bank to suffer from reputational injury by having created and continuing to perpetuate the *false impression* in the public that the Central Bank's monetary policies are ineffectual and that it cannot manage the Venezuelan economy.

18.     Finally, because of Defendants' misconduct, the Central Bank is deprived of capital that it would attract and retain, as numerous entities and persons to invest their capital elsewhere than Venezuela.

19.     In taking these steps, Defendants conspired to use a form of cyber-terrorism to wreak, and in fact they have wreaked, economic and reputational harm on the Central

Bank by impeding its ability to manage the Republic's economy and foreign exchange system.

### *The Central Bank's Injuries Can be Traced To Defendants' Wrongdoing*

20.     Each of the injuries above results directly from Defendants' wrongdoing. The facts alleged further below show that Defendants have succeeded in establishing the DT Rate as the "real" bolívar-dollar exchange rate.  As also chronicled below, Defendants' representations that they are merely reporting on the prevailing exchange rate are intentionally false.  In reality the daily artificial DT Rate establishes a phony market for the exchange of bolívares into dollars and vice-versa.

21.     Defendants' wrongdoing creates both the common misperception that the DT Rate represents the prevailing bolívar-dollar exchange rate – phony as it actually is – and distorted economic realities.  By fabricating the DT Rate, Defendants directly have devalued and continue to devalue the bolívar.  Each time Defendants falsely represent an increased number of bolívars to the dollar – thus devaluing the bolívar – they increase Central Bank's economic injuries suffered.  In particular, each phony increase in the DT Rate (a) diminishes the Central Bank's margin from seigniorage, (b) increases the Central Bank's reputational harm; and (c) decreases the amount of capital that the Central Bank would otherwise attract and retain.

### *A Favorable Decision Will Likely Redress The Central Bank's Injuries*

22.     The Central Bank seeks a permanent injunction against Defendants, and those in active concert with them, from continuing to publish the false and fraudulent DT

Rate. A favorable decision in this case and entry of the permanent injunction sought will remedy or at least diminish the harm that Defendants are inflicting on the Central Bank.

**BACKGROUND FACTS**

23. The Individual Defendants developed the DT Site to be the authoritative source in Venezuela for the DT Rate from which they could, on information and belief, reap personal financial gains. They also created (or commissioned the creation of) a DolarToday application for Android and iOS users (collectively the "DT App"), a DolarToday Facebook page and a DolarToday Twitter account. Each of these components of the DT Site displays the "current" DT Rate.

24. The Individual Defendants also organized DT, LLC. The Central Bank is informed and believes and therefore alleges that DT LLC is the putative "owner" of the DT Site and of U.S. trademark application serial no. 86507179 for "$ DOLARTODAY."

***The Republic's Foreign Currency Exchange System***

25. The Central Bank is the Venezuelan analog of the United States Federal Reserve Bank. The Central Bank participates in designing the country's foreign exchange and monetary policies, and is solely responsible for  their implementation. The Central Bank is charged with carrying out such agreed policies, and is empowered to do so by using a variety of tools common to central banks worldwide, including the setting of interest rates, the development of credit controls, the

ability to lend to domestic financial institutions, the fixing of reserve requirements, and the establishment of foreign exchange rates, among other things.

26.     Like other central banks, certain of the Central Bank's activities benefit both it and the Republic.  One such form of "revenue a government gets from its monopoly control over the creation of money" is seigniorage.[5]

27.     The activities of central banks, particularly in the United States, are often shrouded in mystery, and are simultaneously the objects of adulation and awe as well as targets of conspiracy theories.[6]  Although the United States has been almost single-mindedly concerned with fighting inflation in recent decades, the financial challenges presented in different world economies, and at different circumstances and times, sometimes call for management that prioritizes objectives other than management of inflationary goals.[7]  Of course, "no single currency system is optimal for all countries for all times."[8]  Much of the world, including numerous members of the International Monetary Fund ("IMF"), engage in something that is both literally and figuratively quite foreign to the United States:  the multiple exchange rate system.  These systems have

---

[5]      R.W. Click, *Seigniorage in a Cross-Section of Countries*, Journal of Money, Credit and Banking, 30(2):154-171 (May 1998).

[6]      *See generally, e.g.,* W. Greider, Secrets of the Temple: How the Federal Reserve Runs the Country (1989).

[7]      *See, e.g.,* J.C. Williams, *Inflation Targeting and the Global Financial Crisis: Successes and Challenges*, Essay presentation to the South African Reserve Bank Conference on Fourteen Years of Inflation Targeting in South Africa and the Challenge of a Changing Mandate, Pretoria, South Africa (2014); A.S. Blinder, *Financial Crises and Central Bank Independence*, Business Economics 48: 163-165 (2013).

[8]      O. Holtemöller & S. Mallick, "Exchange Rate Regime, Real Misalignment and Currency Crises," Economic Modeling (2013)

long been implemented by the Central Bank to achieve equalizing quasi-fiscal measures, financial stability in the form of macroeconomic shock absorption, price stability and predictability, and trade balance adjustments, among other things.[9]

28.     In many countries for which foreign trade comprises a large percentage of their gross domestic product ("GDP"), the government sets an official currency exchange rate that is typically fixed (or "pegged") to a very stable foreign currency.  Venezuela pegs its national currency, the bolívar, to the U.S. dollar.

29.     An exchange rate peg provides a useful and credible nominal anchor for monetary policy by tying a local currency to a known reserve currency – the U.S. dollar being the most widely used across the globe.[10]  The Central Bank manages the bolívar-to-dollar rate according to a multi-layered system that offers different exchange rates for different purposes based on the nature of the transactions.

30.     One of these rates, "CENCOEX,"[11] is mainly reserved for the importation of goods deemed to be vital, such as food and medicine.  That rate is currently 6.3 ($1.00 = VEF 6.30).

31.     A second foreign exchange rate recognized by the Central Bank is known as SICAD I,[12] and it applies to other imported goods.  The SICAD I rate is determined by

---

[9]     *See, e.g.,* R. Dornbusch, "Multiple Exchange Rates for Commercial Transactions," *chapter in* Economic Adjustment and Exchange Rates in Developing Countries (1986).

[10]    M. Mussa, P. Masson, A. Swoboda, E. Jadresic, P. Mauro & A. Berg, Exchange Rate Regimes in an Increasingly Integrated World Economy, Int'l Monetary Fund Occasional Paper 193 at 13-14 (2000).

[11]    "CENCOEX" is the acronym for the Venezuelan government's Centro Nacional de Comercio Exterior, or National Foreign Trade Center, which is charged with administering the CENCOEX and SICAD I currency exchanges in the country.

government auctions; the rate from the most recent auction was about 13.5 ($1.00 = VEF 13.50).

32.     March 2014 saw the establishment of a new third tier of the Republic's foreign exchange system.  Originally known as SICAD II, it applied to securities obtained through banks and brokerages as well as other currency needs.  In early 2015, a new system known as SIMADI (the Spanish acronym for Marginal Currency System) was created.  SIMADI is a free market currency exchange system that allows individuals and entities to buy and sell foreign currency for any particular need.  For example, now individuals – not just financial institutions – can now bid in bolívares to purchase dollars and vice-versa.  The average of such transactions establishes the SIMADI exchange rate. The current SIMADI rate is about 200 ($1.00 = VEF 200).

33.     The inflation rate in Venezuela is higher, on a relative basis, than rates in the most industrialized economies over the past few decades.  However unwelcome such inflation would be in the United States, it is an expected consequence of President Hugo Chávez's and President Maduro's administrations' policies to promote social inclusion of the poor and economic growth.  Indeed, in an economy that exports little else besides petroleum and imports nearly all other goods (including foodstuffs and equipment necessary for the healthcare of its citizenry), the tiered exchange rates are critical to the Central Bank's management of the Republic's economy.

---

[12]     "SICAD" is the acronym for *Sistema Complementario de Administración de Divisas*, or Ancillary Foreign Currency Administration System.

### The "Parallel" or "Black" Market for Dollars in Venezuela

34.     When measured cumulatively, the Central Bank should serve as the major supplier of dollars and as the sole exchange house for foreign transactions in the official, tiered exchange system that is has developed.  But Venezuelans also trade dollars through private exchange houses or with individuals with dollars to sell.  Such transactions are said to be made through a "parallel" or "black" market.

### Rise of the DT Site

35.     The Individual Defendants created the DT Site in 2010.[13]  Ostensibly a platform for anti-Chávez and now anti-Maduro articles and editorials, the DT Site's principal purpose since inception, as its domain name implies, has been to post daily an unofficial U.S. dollar to bolívar exchange rate – the value of the "dollar today" in bolívars (the "DT Rate").[14]

36.     A June 23, 2015 online article about the DT Site and its operators reports that "[f]or the past five years, the [DT Site] has been posting the daily black market exchange rate online, and updating it several times a day, providing Venezuelans who can't buy dollars from the government with an estimate of how much greenbacks are trading for in the street."[15]  The article also features an interview with one of the Defendants, identified in the article under the pseudonym "Benjamin"[16] but whom the

---

[13]     Rueda, M., "Meet the Venezuelan Rebel Whose Crime is Publishing Exchange Rates" (http://fusion.net/story/15 5182/meet-the-venezuelan-rebel-armed- with-unofficial-exchange-rates-and-an-untraceable-ip/) (last retrieved July 22, 2015) ("Rueda").

[14]     *Id.*
[15]     Rueda.

[16]     *Id.*

Central Bank is informed and believes is Defendant Altuve.  "Benjamin" describes in the article how the DT Rate – purportedly the dollar's "street value" in bolívares – is calculated as follows:

> Benjamin says the exchange rates he publishes are based on daily calls to several currency traders in Cucuta, a Colombian border city where bolivares [*sic*] are openly traded for Colombian pesos.
>
> Benjamin gets the bolivar to peso exchange rate, then converts that to dollars.  He says his method is so reliable that even financial news wires like Reuters have quoted his exchange rate.
>
> "The formula I use is very simple," Benjamin said.  "I don't tell the trading houses that I'm calling from Dolar Today, in order to prevent speculation; I just pretend to be a regular businessman trying to trade money."[17]

37.     Through such statements, as well as through the overall design of the DT Site and its inclusion of a purported explanation about how the DT Rate is calculated,[18] Defendants portray the DT Rate as simply the "true" bolívar-to-dollar exchange rate.

38.     Defendants' portrayal has been largely successful.  The Central Bank is informed and believes and therefore alleges that the DT Rate has been the most widely read and followed exchange rate reference in Venezuela since 2013.  News outlets – including respected ones such as CNN,[19] CNBC,[20] Reuters,[21] and the well-known blog

---

[17]     *Id.*

[18]     *See* https://dolartoday.com/precio.

[19]     "Venezuela's Currency Isn't Worth A Penny," http://money.cnn.com/2015/06/03/investing/venezuela-bolivar-currency-imploding/ (June 3, 2015) ("The country's currency has lost nearly half its value since the beginning of May, according to dolartoday.com, a website that tracks the unofficial exchange rate.").

Venezuela Live Economic Data[22] – have embraced the DT Rate as the authoritative "parallel" or "black market" exchange rate in Venezuela.

39.     The large number of Venezuelan daily visitors to the DT Site, users of the DT App and DT Twitter followers demonstrates that many Venezuelans have likewise been led to believe that the DT Rate represents the "true" dollar-to-bolívar exchange rate. Indeed, the Central Bank is informed and believes that at least one million people – mostly in Venezuela – visit the DT Site (or one of its "mirror" sites) daily, making it one of the most visited websites in Venezuela.  (In contrast, Venezuela's three newspapers with the widest circulation *cumulatively* average 150,000 fewer visitors per day.) DolarToday's Android and iOS apps are also among the most downloaded by mobile users in Venezuela; and DolarToday's Twitter feed provides the DT Rate to more than 1.5 million Twitter followers.

### *Defendants' Manipulation of the DT Rate on the DT Site*

40.     At its inception, the DT Rate roughly paralleled an exchange value implied by the amount of the Central Bank's hard currency reserves in dollars.  But beginning in

---

[20]     "Venezuelan Currency Tanks; Inflation Seen Near 100%," http://www.cnbc.com/2015/05/14/venezuelan-currency-tanks-inflation-seen-near-100.html (May 14, 2015) ("The unofficial exchange rate for the bolivar has fallen sharply in recent weeks, so that on Thursday, one dollar would get you 300.72 bolivars, according to widely used rate-tracking website dolartoday.com.").

[21]     "Venezuela Unofficial Exchange Rate Weakens To 400 Bolivars Per Dollar," http://www.reuters.com/article/2015/05/22/us-venezuela-forex-idUSKBN0O701R20150522 (May 21, 2015) ("The unofficial rate reached 402 bolivars per dollar on Thursday evening, according to the website DolarToday, a week after crossing 300 bolivars for the first time.").

[22]     http://venecon.girish-gupta.com/ (citing www.dolartoday.com as the source for "Black Market Rate").

or about May 2013, the DT Rate began an artificial climb untethered to genuine market forces.[23]  The DT Rate continued to climb.  And climb.

41.     Concerned about the widespread dissemination of Defendants' fraudulent representations about the purported "true" exchange rate, on November 9, 2013, the Republic began blocking access to the DT Site in Venezuela.  But the Republic's efforts to block the DT Site have been largely futile.  With funding from unnamed co-conspirators, Defendants have been playing "a cyber cat-and-mouse game" – employing "a staff of 18 'well paid' writers and web programmers in Venezuela," and "geniuses" who have found ways to "automatically create a new mirror site every 20 minutes."[24]

42.     Meanwhile, the DT Rate continued to climb.  According to analysts at Barclays,[25] the difference between the official exchange rate and the "[n]on-official exchange rate" reported by the DT Site between May 2013 and the end of 2014 in real terms – that is, adjusted for inflation by using a constant value for the bolívar – is striking, as the graph below demonstrates visually.  (Note that Barclays, like the other mainstream sources cited in paragraph 38, above, cites "Dollar Today" as one of its sources for making the comparison.)

---

[23]     In increase in the DT Rate – or any official exchange rate – signals a decline in the bolívar's value.

[24]     Rueda.

[25]     A. Arreaza and A. Grisanti, "Venezuela: FX Disorder," Barclays Emerging Markets Research (Mar. 13, 2015).



43.     The DT Rate's ascent became even steeper beginning in or about

February 2015.  The DT Rate's nominal increase from February through September 2015

is depicted in the chart below (taken from the DT Site itself), which contrasts the

DT Rate with a more realistic calculation based upon the available money supply and the

Central Bank's international reserves (which the DT Site labels as the "Implicit rate").





44.     At the end of September 2015, the DT Site reported a DT Rate that

exceeded an astounding 800 bolívares to the dollar – more than four times the Republic's

official SIMADI rate:



Since then, Defendants have continued to push up the DT Rate.  It is now 5.5 times

greater than the Simadi rate and 3.5 times the Implicit rate:



45.     The bloated DT Rate does not reflect any genuine and dramatic structural

shift in the Venezuelan economy.  Instead, the Central Bank is informed and believes that

in or about May 2013 – after Defendants had established the daily DT Rate as "the"

authoritative unofficial bolívar-dollar exchange rate – they agreed and conspired to

deliberately fabricate the DT Rate while at least some of the Defendants began trading in

black markets for currency futures for their personal financial gain and at the expense of the Central Bank – as well as the Venezuelan public. Indeed, even the DolarToday Facebook site has solicited users to sell dollars to Defendants[26]:



Armed with advance knowledge of what the DT Rate would be (because they were setting it through the DT Site), the Central Bank is informed and believes that the Individual Defendants have enriched themselves and/or their unnamed co-conspirators. Put another way, Defendants are not *reporting* on a market.  Rather, by posting an artificial DT Rate daily, Defendants are deliberately *misrepresenting* and effectively *manufacturing* a market – a phony market for the exchange of bolívares into dollars and vice-versa, with the aim of lining their pockets with ill-gotten gains by distorting economic realities.

46.     "Benjamin"/Altuve and the DT Site notably claim to calculate the "parallel dollar" rate by averaging the daily bolívar-to-peso exchange rate charged by exchange houses in Cúcuta and then converting the pesos into dollars.  These representations are literally false, misleading or both.  The Central Bank is informed and believes and therefore alleges that on any given day, the average exchange rate charged by Cúcuta exchange houses is magnitudes less than what Defendants report as the DT Rate.

---

[26]     https://m.facebook.com/DolarToday/posts/652739878076214 (translated from Spanish).

47.     With the stamp of media approval and wide acceptance (even if accompanied by resentment) by millions of Venezuelans, Defendants' fabrication of the DT Rate since at least May 2013 has created the façade that the bolívar has been radically devalued by true market failures.

48.     The Central Bank is informed and believes and therefore alleges that Defendants' scheme to use the DT Site and its DT Rate to fabricate an unofficial bolívar-dollar exchange rate for personal gain is only one of the goals of the scheme.  Another goal is to destabilize the Venezuelan economy as alleged above – by impeding the Central Bank's implementation of its currency exchange and monetary policies, diminishing its marginal seigniorage and other sources of revenues, and staining its reputation.  This Complaint seeks to end Defendants' illegal conspiracy and economic cyber-terrorism.

### Defendants' False and/or Misleading Representations About the Bolívar-Dollar Exchange Rate Directly Diminishes The Central Bank's Revenue

49.     Defendants' publication of phony black market rates sabotages Venezuela's tiered currency exchange rates, distorting and biasing expectations and directly diminishing the Central Bank's marginal seigniorage.  One direct result of Defendants' misconduct is the bolívar's devaluation.  The impact of this devaluation is broadly felt, but also particularized in its effect on the Central Bank in such a way as to endow it with a personal stake to seek redress here, namely through actual losses through its diminished seigniorage and the deprivation of capital that the Central Bank would otherwise receive.

50.     As alleged above, the Central Bank has designed a system in which it should serve as the major supplier of dollars.  Given the Central Bank's limited quantity of dollars available for foreign exchange, and given pressures to exchange bolívares for dollars in light of falsely reported losses of the bolívar's value, Venezuelans trade dollars through black market exchange houses instead of using government sanctioned procedures or even black market transactions free from Defendants' distortions.  The behavior encouraged by Defendants' misconduct therefore has undermined the entire purpose of the Central Bank's currency exchange system and monetary policies, and has harmed its reputation on the world stage and domestically as a central bank and an engine of economic growth and stability.

### FIRST CLAIM FOR RELIEF
#### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") (18 U.S.C. § 1962, ET SEQ.) AGAINST ALL DEFENDANTS

51.     The Central Bank incorporates by reference paragraphs 1 through 50 as though set forth here in full.

52.     Defendants have engaged in wire fraud as a component of a racketeering enterprise to effectuate a fraudulent scheme by setting the DT Rate, thereby misrepresenting the unofficial exchange rate, and publishing that exchange rate on the DT Site, as well as on Facebook, Twitter, and through other social media.  Defendants then used this fabrication of the exchange rate to unjustly enrich themselves and to harm the Venezuelan people and the Republic.

### *The RICO Persons*

53.     The Individual Defendants, together with the active participation of as yet unknown co-conspirators (collectively the "RICO Persons") formed the DT Site and since 2013 have managed it to fabricate an unofficial bolívar-dollar exchange rate for both personal gain and to destabilize the Venezuelan economy.

54.     As alleged above, the Central Bank is informed and believes and therefore alleges that defendant Díaz manages the DT Site through defendant DT LLC as a (if not the) key principal and member of it.  For example, at least Díaz of the Individual Defendants is a member of DT LLC, the entity that owns the DT Site and its Internet domain.  When DT LLC applied to register "DOLARTODAY" as a U.S. trademark, Díaz listed himself as the contact.

55.     As also alleged above, the Central Bank is informed and believes and therefore alleges that Altuve is a key principal of DT LLC, co-managing of the DT Site, posting the DT Rate daily and directing or helping direct a group of eighteen or so engineers in evading the Republic's efforts to block the DT Site in Venezuela.  And as also alleged above, the Central Bank is informed and believes and therefore alleges that Lozada is a key principal of DT LLC and co-manages the DT Site.

### *The RICO Enterprise*

56.     The Central Bank is informed and believes and therefore alleges that the RICO Persons, together with defendant DT LLC, comprise an ongoing association-in-fact enterprise – the "RICO Enterprise."  Each member of the RICO Enterprise performs a

role that is consistent with the RICO Enterprise's organizational structure, and that furthers the previously mentioned activities of the RICO Enterprise.

57.     The RICO Enterprise is an ongoing organization that exists to advance the interests of the RICO Persons, who comprise its membership.  The RICO Enterprise exists for the ostensibly legitimate purpose of operating and maintaining the DT Site, which again purportedly is used to oppose the government elected to serve the Republic.

58.     At all relevant times, and at least since May 2013, DT LLC has owned and operated the DT Site and its domain.  During the same period, the Individual Defendants, with the cooperation and/or financial backing of other RICO Persons, have operated and continue to operate the DT Site and its activities in concert.  No indication exists that this operation and fabrication will cease at any time without the intervention of this Court.

59.     The Individual Defendants, together with DT LLC, operate the DT Site with the shared goals of fabricating an unofficial exchange rate, enriching themselves, frustrating the Central Bank's mission, reducing its margin on seigniorage and other revenues, and wrecking the Venezuelan economy.  The Individual Defendants do so while operating what otherwise appears to be a legitimate website opposed to the Maduro Administration.

60.     The RICO Enterprise thus exhibits (i) common purposes and shared control among its members or principals, (ii) a continuous structure and continuity among its personnel, and (iii) an ascertainable structure distinct from that inherent in the pattern of racketeering (as alleged below).

### *The RICO Persons Conduct the RICO Enterprise's Affairs*

61.     The Central Bank is informed and believes and therefore alleges that Defendants had the authority to and did direct and control the operation and management of the affairs of the RICO Enterprise with respect to the creation, operation, maintenance, and update of the DT Site, and the dissemination through other means of the contents of the DT Site.

### *The RICO Enterprise Is Separate from the Pattern of Racketeering Activity*

62.     The pattern of racketeering and the RICO Enterprise are separate. The RICO Enterprise engages in the legitimate functions of operating, maintaining, and updating the DT Site.  The pattern of racketeering activities involves unlawfully fabricating an unofficial exchange rate by publishing false and misleading exchange rates, and widely disseminating that false and misleading information on Facebook, Twitter, and other social media avenues.

### *Interstate and International Commerce*

63.     The Central Bank is informed and believes and therefore alleges that Defendants operate the DT Site from Alabama and Florida, and perhaps the state of Washington, too.  While directed and operated from those locations, Defendants intend that the DT Site affect – and in fact it does affect – commerce in Venezuela.  Defendants' operation of the RICO Enterprise thus affects both interstate and international commerce.

### *Pattern of Racketeering Activity*

64.     The Defendants' racketeering activity consists of multiple acts unlawful under 18 U.S.C. § 1343.

65.     The racketeering activities and instances of wire fraud (detailed below) have been carried out repeatedly and continuously from at least 2013 and continuing through to the present.  The racketeering acts are related—they had and have a common goal (to fabricate an unofficial exchange rate, unjustly enrich the Defendants, and harm the Venezuelan people and economy), used and use similar means, and had and have common victims (the Venezuelan people and the Central Bank).

66.     The predicate acts described below also relate to each other because they were all performed in the same manner, and are part of a common scheme to improperly fabricate an unofficial exchange rate, by overstating that exchange rate, and promoting the false and misleading rate.

67.     As alleged above, no indication exists that such racketeering activity will cease without this Court's intervention because the racketeering activities are part of the Defendants' regular system of posting and updating the exchange rates listed on the DT Site.

68.     Since at least May 2013, Defendants have directly and indirectly through other unknown RICO Persons, employed manipulative and deceptive methods to unlawfully control and fabricate an unofficial exchange rate, and to misrepresent the exchange rate on the DT Site and through other social media channels.

69.     Defendants have engaged in such actions by means and instrumentalities of interstate commerce, including interstate wires, such as the Internet, telephone networks and emails.

70.     The specific racketeering activities and predicate acts include:

    a.    Deliberately misrepresenting the bolívar-dollar exchange rate through their daily posting of the DT Rate on the DT Site and through DT App and DT Twitter feed;

    b.    Making daily postings on the DT Site, on which the Defendants repeatedly – yet falsely – promote the DT Rate as the "true" bolívar-dollar exchange rate, despite knowing that it is not;

    c.    Misrepresenting the basis for calculating the unofficial exchange rate; and

    d.    Disseminating via interstate wires, and specifically over the Internet, through email, Facebook, Twitter, and other social media, the false and misleading statements and exchange rates set forth above.

71.     One of the ways in which Defendants promote the DT Rate as the true bolívar-dollar exchange rate is through their detailed explanation of how the rate is purportedly calculated. See, for example, the explanation from "Benjamin"/Altuve in paragraph 29 above and the explanation included in the DT Site itself at

https://dolartoday.com/precio:

> data reporting **DolarToday** are based on publicly available information and that can be corroborated by anyone! [*sic*] our job is simply [to] **SPREAD** this information. Unfortunately, there are still people who think that the dollar's value is determined in Venezuela Internet pages as **DolarToday** or late **LechugaVerde**. The reality is that the price of the parallel dollar is determined according to supply / demand + the economic stability of a country, so the next time someone tells you that **DolarToday** [is] speculation . . . visit this site and so [w]e help you to educate the population. [Capitalization and emphasis in original; translated from Spanish.]

72.     But the DT Rate does not reflect any actual exchange market, and in particular grossly distorts the average rates actually charged by currency exchange houses in Cúcuta, the purported source of Defendants' calculation of the DT Rate. Rather, the

DT Rate that Defendants publish and promote is arbitrary and untethered to genuine market forces – as evidenced by its artificial ascent beginning in at least May 2013.

73.     Defendants know that the DT Rate is false and misleading.  Indeed, the false and misleading nature of the DT Rate is essential to the very purpose of the RICO Enterprise.  The deliberately false DT Rate allows the RICO Persons to enrich themselves by trading in currency futures – given their advance knowledge of the future rates they are fabricating.  And it wreaks economic havoc on the Central Bank, as detailed above.

74.     By promoting the DT Rate over the Internet on the DT Site as chronicled above, Defendants daily send fraudulent communications by wire to viewers of the DT Site, users of the DT App, and followers of the DT Twitter Feed.  Doing so constitutes wire fraud in violation of 18 U.S.C. § 1343.

75.     Defendants have fraudulently published the DT Rate on the DT Site and through the DT App daily and continuously since May 2013.

76.     Defendants have given no express or implicit signal that they plan to cease their unlawful activity.

77.     Defendants' continuous, daily posting of the DT Rate through the DT Site and DT App, along with the absence of any signal that such conduct will cease, evidences that Defendants will continue their racketeering activity absent the injunctive relief sought through this action.

### *The Central Bank's Injuries Caused by Defendants' Activities*

78.     The Central Bank is informed and believes, and therefore alleges, that millions of Venezuelans have viewed and relied on the false and misleading exchange rate posted on the DT Site.

79.     The facts above chronicle how Defendants' racketeering activity, although widely felt, have caused particularized economic and reputational injuries to the Central Bank that have already and actually manifested in imminent and ongoing concrete harms:

    e.    Diminished marginal returns that the Central Bank otherwise would have earned from printing currency and minting coinage and putting both into circulation, known as seigniorage;

    f.    Reputational harm to the Central Bank because Defendants' acts create the ***false impression*** in the public that the Central Bank's monetary policies are ineffectual and that it cannot manage the economy; and

    g.    Diminished capital that the Central Bank would otherwise receive.

### *Violation of 18 U.S.C. § 1962(c)*

80.     The RICO Enterprise is an enterprise engaged in, and whose activities affect, interstate and foreign commerce.  The Individual Defendants direct or co-direct and are associated with the RICO Enterprise.

81.     The Individual Defendants and defendant DT LLC agreed to and did conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, for the unlawful purpose of defrauding the Central Bank (and the people of Venezuela).

82.     Pursuant to and in furtherance of their fraudulent scheme, Defendants engaged – and continue to engage – in the wire fraud detailed above.  Such acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

83.     Defendants conducted and participated in the conduct of the RICO Enterprise's affairs directly and indirectly through the pattern of racketeering activity alleged above in violation of 18 U.S.C. § 1962(c).

84.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Central Bank has been injured as set forth above.

### *Violation of 18 U.S.C. § 1962(d)*

85.     As set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, in or about May 2013, having established the daily DT Rate as "the" authoritative bolívar-dollar exchange rate, Defendants agreed and conspired to deliberately fabricate the DT Rate while at least some of the Defendants began trading in currency market futures for their personal financial gain and at the expense of the Central Bank – as well as the Venezuelan public.

86.     Defendants intentionally agreed and conspired to conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity. Defendants knew that their predicate acts – namely, their daily posting of the fraudulent DT Rate on the DT Site, through the DT App and through the DT Twitter feed – were part of a pattern of racketeering activity, and they agreed to the commission of such acts to further their schemes detailed above.  Such conduct comprises a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

87.     As a direct and proximate result of Defendants' conspiracy, the overt acts

that they committed in furtherance of that conspiracy, and violation of 18 U.S.C.

§ 1962(d), the Central Bank has been injured as set forth above.

### *Relief Sought for Defendants' RICO Violations*

88.     The Central Bank is accordingly entitled to judgment against Defendants in

an amount to be established at trial but including actual damages, treble damages,

attorneys' fees and a permanent injunction prohibiting Defendants, and those in active

concert with them, from continuing to publish the false and fraudulent DT Rate.

### SECOND CLAIM FOR RELIEF
### FALSE AND/OR MISLEADING ADVERTISING IN
### VIOLATION OF LANHAM ACT SECTION 43(a) (15 U.S.C. § 1125(a))
### AGAINST ALL DEFENDANTS

89.     The Central Bank incorporates by reference paragraphs 1 through 88 as

though set forth here in full.

90.     Defendants have made and continue to make literally false and/or

misleading representations of fact in their promotion of the DT Rate.  The Central Bank

is informed and believes and therefore alleges that Defendants have acted in concert in

carrying out their scheme to falsely and misleadingly promote the DT Rate as "the"

authoritative unofficial bolívar-dollar exchange rate.  This promotion has been successful,

as countless persons and respected media sources of financial information have simply

accepted the reliability of the DT Rate despite its actual falsehood.  Defendants'

promotion of the DT rate has also enabled them to perpetuate their deliberate fabrication

of the DT Rate while, on information and belief, trading in currency for their personal

financial gain.  By doing so, Defendants have individually and collectively assisted in, supported, consented, participated, ratified and adopted the false promotion of the bolívar-dollar exchange rate in a deliberate and reckless manner, and with the anticipation and knowledge that such promotional efforts misrepresent the foreign exchange market at issue.

91.     As detailed above, Defendants have been deliberately misrepresenting the bolívar-dollar exchange rate since at least May 2013 through the daily posting of the DT Rate on the DT Site.  Through these daily postings, Defendants have repeatedly and consistently promoted the DT Rate as "the" official bolívar-dollar exchange rate despite their deliberate fabrication of the DT Rate for their personal financial gain.

92.     Defendants have repeatedly promoted the DT Rate as "the" official bolívar-dollar exchange rate. This promotion is literally false and misleading because Defendants do not report on any actual exchange market. Instead, the DT Rate published and promoted by Defendants is speculative and untethered to genuine market forces, as evidenced by its artificial ascent beginning in at least May 2013, and since that time the DT Rate is nothing short of a deliberate misrepresentation of the actual bolívar-dollar exchange rate.

93.     Defendants have engaged in the false promotion detailed above with the knowledge or in reckless disregard of the fact that such claims are literally false or misleading.  These acts have caused and are now causing reputational injury to the Central Bank that flows directly from the deception wrought by Defendants' misrepresentations about the exchange rate for bolívares.  That is, wholly apart from any

actual economic biasing or other impact on the true value of the bolívar, Defendants'

success in falsely publicizing and causing massive acceptance of their fabricated DT Rate

has caused reputational harm to the Central Bank, by giving the ***false impression*** to the

public that its monetary policies are ineffectual and that it cannot manage the economy.

This reputational harm alone has in turn caused or contributed to the economic harm that

trade has been withheld from the Central Bank, as capital that it would otherwise have

retained or attracted instead has left, with returns instead being sought from other world

economies.

94.     Defendants' acts have also caused and are now causing independent and

direct economic injury to the Central Bank that flows from the deception wrought by

Defendants' misrepresentations about the exchange rate for bolívares.  Among other

things, Defendants' misconduct has actually diminished the Central Bank's marginal

seigniorage for the new currency it prints (and the coins it mints) or that it newly puts

into circulation and that it would otherwise receive.  The bolívar's devaluation wrought

by Defendants' wrongful conduct damages the Central Bank in particular and in

meaningful ways separate from the broader havoc wrought on the Venezuelan people in

this way.  These particularized, concrete and actual harms felt by the Central Bank give it

a unique and personal stake in seeking to end Defendants' unlawful conduct by pursuing

this action.

95.     Defendants' literally false and/or misleading representations of fact violate

Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).  Defendants have made and are

making these false and/or misleading representations of fact in interstate commerce.

96.     As a result of the foregoing, the Central Bank has been or is likely to be damaged in an amount that will be ascertained according to proof.  For their part, Defendants have unfairly realized, retained or gained through their unlawful conduct profits from their fabrication of the unofficial bolívar-dollar exchange rate that should be disgorged as ill-gotten gains.

97.     Because Defendants have made and continue to make literally false and/or misleading representations of fact about the bolívar-dollar exchange rate in – at best reckless and at worst intentional – disregard of their falsity and/or misleading nature, the Central Bank is entitled to an award of enhanced damages under Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)).  Moreover, this is an exceptional case for which the Court should award the Central Bank its reasonable attorneys' fees and other expenses.

98.     Defendants' activities have caused and will cause irreparable harm to the Central Bank for which no adequate remedy at law exists.  In particular, Defendants' past and continuing false and/or misleading representations of fact, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.  The Central Bank will continue to suffer irreparable injury to its goodwill, rights and trade unless and until Defendants and any others in active concert with them are enjoined from continuing their wrongful acts.

## THIRD CLAIM FOR RELIEF
### VIOLATION OF ARTICLE 1185 OF THE VENEZUELAN CIVIL CODE
### AGAINST ALL DEFENDANTS

99.     The Central Bank incorporates by reference paragraphs 1 through 98 as though set forth here in full.

100.     This is a cause of action for violation of Venezuelan law.  Pursuant to Federal Rule of Civil Procedure 44.1, Defendants are hereby given notice of that fact.

101.     Article 1185 of the Venezuelan Civil Code provides that

> Anyone who intentionally, negligently or imprudently causes harm to another is obliged to repair it.
>
> Reparation is also owed by anyone who has caused a harm to another by exceeding, in the exercise of his/her right, the limits set forth by good faith or by the purpose in light of which that right was conferred to him/her.[27]

102.     Venezuela recognizes the right to freedom of speech and affords it broad protection in its Constitution, specifically under Articles 57 and 58.  That protection extends to speech made through any means, including the internet, whose use and importance has been specifically recognized in Venezuela through Presidential Decree No. 825 of May 10, 2000.

103.     Under Venezuelan law, as is the case generally in civilized nations, the irresponsible, abusive, and/or harmful exercise of a right can give raise to liability.  And

---

[27]     Article 1185 of the Venezuelan Civil Code (emphasis and English translation provided) provides in Spanish as follows:

*El que con intención, o por negligencia o por imprudencia, ha causado un daño a otro, está obligado a repararlo.*

*Debe igualmente reparación quien haya causado un daño a otro, excediendo, en el ejercicio de su derecho, los límites fijados por la buena fe o por el objeto en vista del cual le ha sido conferido ese derecho.*

Article 1185 of the Venezuelan Civil Code so provides.  As reflected in the translation above, Article 1185 imposes a duty to exercise a right in good faith and solely within the legitimate limits of the right's intended purpose.  When that duty is breached, the article allows a cause of action for what is commonly known in Venezuela as "*abuso de derecho*" (literally, "abuse of right").

104.    Defendants' actions described above are the paradigmatic example of an abusive exercise of a right in direct violation of the second paragraph of Article 1185 of the Venezuelan Civil Code.

105.    Defendants have breached their duty under Article 1185 of the Venezuelan Civil Code by, among other things, publishing false information about the bolívar-dollar exchange rate and misrepresenting the bolívar-dollar exchange rate through the daily posting of the DT Rate on the DT Site and through the DT App, as detailed above.

106.    Defendants' promotion of the DT Rate as the "true" official bolívar-dollar exchange rate is literally false and misleading because Defendants do not report on any actual exchange market.  As explained above, the DT Rate published and promoted by Defendants is arbitrary and untethered to genuine market forces.

107.    Defendants' reprehensible conduct exceeds the legitimate exercise of their right to free speech because, among other things, it is contrary to good faith *and* exceeds the right's intended purpose.  Indeed, Defendants have engaged in the false promotion detailed above with the knowledge of or in reckless disregard of the fact that such claims are literally false or misleading.

108.    These acts have caused and are now causing economic and reputational injury to the Central Bank, as described above, that flow directly from the deception wrought by Defendants' misrepresentations about the exchange rate for bolívares.

109.    As a result of the foregoing, the Central Bank has been or is likely to be damaged in an amount that will be ascertained according to proof in this Court.  For their part, Defendants have unfairly realized, retained or gained through their unlawful conduct profits from their fabrication of the bolívar-dollar exchange rate that should be disgorged as ill-gotten gains.

110.    Defendants' activities have caused and will continue to cause irreparable harm to the Central Bank for which there is no adequate remedy at law.  In particular, Defendants' past and continuing false and/or misleading representations of fact and illegitimate, abusive exercise of a right, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.  The Central Bank will continue to suffer irreparable injury to its goodwill, rights and businesses unless and until Defendants and any others in active concert with them are enjoined from continuing their wrongful acts.

## FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

111.    The Central Bank incorporates by reference paragraphs 1 through 110 as though set forth here in full.

112.    Defendants, and each of them, accepted benefits conferred upon them under circumstances, as set forth above, that make Defendants' retention of those benefits (without paying the Central Bank the value of those benefits) unjust, inequitable and unfair.  Among other things, it would be inequitable for Defendants to be permitted to retain the personal financial gains which Defendants obtained from their fabrications and manipulative acts at the expense of the Central Bank – as well as the Venezuelan people.

113.    The Central Bank is entitled to the establishment of a constructive trust impressed on the benefits obtained by Defendants from their unjust enrichment and inequitable conduct.

114.    Alternatively or additionally, each Defendant should pay restitution or his/its own unjust enrichment to the Central Bank.

### PRAYER

The Central Bank respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

i.    Awarding damages for all harm suffered as a result of Defendants' conduct;

ii.    Awarding treble damages for Defendants' RICO violations pursuant to 18 U.S.C. § 1964(c);

iii.    Awarding exemplary damages in an amount to be determined at trial;

iv.    Awarding treble damages for Defendants' false and/or misleading advertising in accordance with 15 U.S.C. §1117 because their acts were done intentionally and therefore warrant enhanced damages and/or punitive damages as the Court may find appropriate;

v.      Awarding the Central Bank its attorneys' fees, expenses, and costs under

15 U.S.C. § 1117;

vi.      Awarding prejudgment interest on any judgment amount;

vii.      Awarding post-judgment interest on the foregoing sums at the maximum rate

permitted by law from the date judgment is entered until paid;

viii.      Entering a permanent injunction prohibiting Defendants, and those in active

concert with them, from continuing to publish the false and fraudulent DT Rate;

ix.      Awarding the Central Bank its costs of this action as the prevailing party; and

x.      For such other and further relief as the Court deems just and appropriate.

### **JURY DEMAND**

The Central Bank respectfully demands a jury trial on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*

_____

Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
skraftschik@mnat.com

*Attorneys for Banco Central de Venezuela*

OF COUNSEL:

David S. Elkins
Rafael M. Langer-Osuna
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, CA 94304
(650) 856-6500

Adam R. Fox
Marisol C. Mork
SQUIRE PATTON BOGGS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071
(213) 624-2500

March 4, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to all registered recipients.

I also certify that on March 4, 2016, I caused to be served true and correct copies of the foregoing document on the following in the manner indicated below:

**BY E-MAIL**

Gregory E. Stuhlman
E. Chaney Hall
GREENBERG TRAURIG, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
**stuhlmang@gtlaw.com**
**hallch@gtlaw.com**

**BY EMAIL**

Ricardo A. Gonzalez
Jared E. Dwyer
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue
Suite 4400
Miami, FL 33131
**gonzalezr@gtlaw.com**
**dwyerje@gtlaw.com**

*/s/ Thomas C. Grimm*

_____
Thomas C. Grimm (#1098)