IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BANCO CENTRAL DE VENEZUELA, a Venezuelan government organization, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 15-965 (GMS) |
| DOLARTODAY, LLC, a Delaware limited liability company; GUSTAVO DÍAZ VIVAS, an Alabama resident; IVAN DARIO LOZADA-SALAS, a Washington resident; and JOSE ENRIQUE ALTUVE LOZADA, a Florida resident, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF BANCO CENTRAL DE VENEZUELA'S
ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
skraftschik@mnat.com

OF COUNSEL:

David S. Elkins (*pro hac vice*)
Rafael M. Langer-Osuna (*pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, CA 94304
(650) 856-6500

*Attorneys for Banco Central de Venezuela*

Adam R. Fox (*pro hac vice*)
Marisol C. Mork
SQUIRE PATTON BOGGS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071
(213) 624-2500

April 7, 2016

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................III

I.    INTRODUCTION ...............................................................................................1

II.   THE NATURE AND STAGE OF PROCEEDINGS ..........................................2

III.  SUMMARY OF ARGUMENT ...........................................................................2

IV.   CONCISE STATEMENT OF FACTS ...............................................................2

V.    LEGAL ARGUMENT .........................................................................................4

      A.    The Central Bank Has Article III Standing............................................4

            1.    The Standards Governing The Central Bank's Standing. ............4

            2.    The Harms Alleged in the Amended Complaint Are Not
                  Derived From An Acceleration or Exacerbation of
                  Price Inflation........................................................................6

            3.    The Amended Complaint Pleads Facts Establishing Standing. ...7

      B.    The Central Bank's Amended Complaint Alleges Well-Pled Facts
            Sufficient To Show Plausible Claims For Relief....................................12

            1.    The Standards Governing Defendants' Challenge To
                  The Sufficiency Of The Central Bank's Amended Complaint. .....12

            2.    The Central Bank Pleads a Viable RICO Claim. ......................13

      C.    The Amended Complaint Pleads A Cognizable Lanham Act Claim.....19

            1.    The Central Bank Expressly Pleads the Falsity of Defendants'
                  Statements. ...............................................................................20

            2.    The Central Bank Enjoys Standing As A Lanham Act Plaintiff. ...20

            3.    Publication Of The DT Rate Is Commercial Speech. ................21

      D.    The Central Bank Alleges A Viable Claim Under Venezuelan Law.....23

      E.    The Amended Complaint Pleads A Cognizable Claim For Unjust
            Enrichment...........................................................................................24

F.      Defendants Have Failed To Demonstrate That Any Pleading
        Deficiency Cannot Be Cured By Amendment.......................................................25

VI.    CONCLUSION.............................................................................................................25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Accenture Global Servs. v. Guidewire Software, Inc.*,
581 F. Supp. 2d 654 (D. Del. 2008)...................................................................................21

*Alliant Energy Corp. v. Bie*,
277 F.3d 916 (7th Cir. 2002) ..............................................................................................9

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)...........................................................................................................19

*Askew v. Church of the Lord Jesus Christ*,
684 F.3d 413 (3d Cir. 2012)................................................................................................4

*Atlee v. Laird*,
339 F. Supp. 1347 (E.D. Pa. 1972) .................................................................................1, 7

*Bennett v. Spear*,
520 U.S. 154 (1997)...........................................................................................................11

*Bolden v. Culture Farms, Inc.*,
No. 85-4297, 1989 U.S. Dist. LEXIS 15816 (D. Kan. Nov. 21, 1989) ............................15

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983).............................................................................................................22

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
475 F.3d 524 (3d Cir. 2007)................................................................................................7

*Bowman v. Wilson*,
672 F.2d 1145 (3d Cir. 1982)..............................................................................................9

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)...........................................................................................................19

*Briscoe v. Klaus*,
538 F.3d 252 (3d Cir. 2008)..............................................................................................25

*Browning v. Clinton*,
292 F. 3d 235 (D.C. Cir. 2002) .........................................................................................11

*Cantor Fitzgerald, L.P. v. Cantor*,
1998 Del. Ch. LEXIS 97 (Del. Ch. June 16, 1998) ..........................................................25

*Christidis v. First Penn. Mortg. Trust,*
    717 F.2d 96 (3d Cir. 1983)......................................................................................15

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993)..............................................................................................22

*Constitution Party v. Aichele,*
    757 F.3d 347 (3d Cir. 2014)..........................................................................4, 10, 11

*Danvers Motor Co. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005)........................................................................ *passim*

*Dominican Rep. v. AES Corp.,*
    466 F. Supp. 2d 680 (E.D. Va. 2006) ....................................................................23

*Eastman Kodak Co. v. Kavlin,*
    978 F. Supp. 1078 (S.D. Fla. 1997) .......................................................................23

*Edmonson v. Lincoln Nat'l Life Ins. Co.,*
    725 F.3d 406 (3d Cir. 2013)...................................................................................12

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009)...................................................................................13

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000)...............................................................................................12

*Hassan v. City of New York,*
    804 F.3d 277 (3d Cir. 2015).....................................................................................8

*Higgins v. SPX Corp.,*
    No. 1:05-CV-127, 2006 U.S. Dist. LEXIS 90280 (W.D. Mich. Dec. 14, 2006)....................23

*Holmes v. Securities Inv. Protection Corp.,*
    503 U.S. 258 (1992)..........................................................................................18, 19

*Hospital Council of W. Pa. v. Pittsburgh,*
    949 F.2d 83 (3d Cir. 1991).......................................................................................7

*In re Avandia Mktg.,*
    804 F.3d 633 (3d Cir. 2015)..........................................................................17, 18, 19

*In re Nortel Networks, Inc.,*
    469 B.R. 478 (Bankr. D. Del. 2012) .......................................................................23

*In re Orthopedic,*
    193 F.3d at 793 .....................................................................................................22

*In re Petrobas Sec. Litig.*,
    No. 14-cv-9662 (JSR), 2015 U.S. Dist. LEXIS 99322 (S.D.N.Y. July 30,
    2015) ........................................................................................................................23

*LaSala v. Bordier et Cie*,
    519 F.3d 121 (3d Cir. 2008)......................................................................................23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ..............................................................................................21

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983)........................................................................................................8

*Lozano v. City of Hazleton*,
    620 F.3d 170 (3d Cir. 2010)..........................................................................................8

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................5, 7

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004)......................................................................................14

*Maio v. Aetna, Inc.*,
    221 F. 3d 472 (3d Cir. 2000)................................................................................16, 17

*Mandelbrot v. Armstrong World Indus. Asbestos Pers. Inj. Settlement Trust*,
    2014 U.S. Dist. LEXIS 127652 (D. Del. Sept. 11, 2014) (Sleet, J.)...........................5

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)....................................................................................................12

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010)......................................................................................11

*Meese v. Keene*,
    481 U.S. 465 (1987)......................................................................................................7

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
    549 F.2d 884 (3d Cir. 1977).....................................................................................4, 5

*NCAA v. Governor of N.J.*,
    730 F.3d 208 (3d Cir. 2013)...............................................................................7, 8, 11

*Pellman v. Cinerama, Inc.*,
    503 F. Supp. 107 (S.D.N.Y. 1980) ...........................................................................15

*Poulis v. State Farm Fire and Cas. Co.*,
    747 F.2d 863 (3d Cir. 1984)......................................................................................25

*Resnik v. Woertz,*
  774 F. Supp. 2d 614 (D. Del. 2011)...................................................................5

*Schock v. Nash,*
  732 A.2d 217...................................................................................................24

*Smalls v. Jacoby & Meyers, LLP,*
  2016 U.S. Dist. LEXIS 10538 (D.N.J. Jan. 26, 2016) ............................4

*Spain v. Gallegos,*
  26 F.3d 439 (3d Cir. 1994).............................................................................25

*Temple v. Haft,*
  73 F.R.D. 49 (D. Del. 1976) ..........................................................................11

*Toll Bros., Inc. v. Twp. of Readington,*
  555 F.3d 131 (3d Cir. 2009)...........................................................................12

*Trump Hotels & Casino Resorts v. Mirage Resorts,*
  140 F.3d 478 (3d Cir. 1998)............................................................................5

*U.S. Bank Nat'l Ass'n v. Gunn,*
  No. 11-cv-01155-RGA, 2015 U.S. Dist. LEXIS 102350 (D. Del. Aug. 5,
  2015) ..............................................................................................................24

*U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.,*
  473 F.3d 506 (3d Cir. 2007)............................................................................4

*U.S. v. Duffus,*
  174 F.3d 333 (3d Cir. 1999)..........................................................................25

*U.S. v. Students Challenging Reg. Action Procs.,*
  412 U.S. 669 (1973).....................................................................................8, 9

*Victaulic Co. v. Tieman,*
  499 F.3d 227 (3d Cir. 2007).......................................................................4, 21

*Zieger v. Advance Am.,*
  C.A. No. 13-1614-GMS, 2014 WL 7388365 (D. Del. Dec. 29, 2014)....................13

**Other Authorities**

http://www.econlib.org/library/Enc/ ForeignExchange.html
  (last accessed on Mar. 28, 2016)....................................................................6

**Rules and Statutes**

18 U.S.C. § 1343 ................................................................................................................13

18 U.S.C. § 1961 ................................................................................................................13

18 U.S.C. § 1962 ................................................................................................................16

18 U.S.C. § 1964(c) ......................................................................................................16, 17

28 U.S.C. § 1332 ................................................................................................................23

Fed. R. Civ. P. 8 ................................................................................................................11

Fed. R. Civ. P. 9(b) ...................................................................................... *passim*

I.      **INTRODUCTION**

An influential analyst shorts the stock of ABC, Inc. while publishing a false report showing that ABC's stock is overvalued.  Traders react, the stock price drops, the analyst and his friends profit.  ABC's secondary offerings of stock net less money as a result.  ABC would have Article III standing to sue the analyst and the friends with whom he conspired.[1]

The facts – and existence of Article III standing – here are no different.  The Individual Defendants publish the influential but false DT Rate on the DT Site.  The exchange market reacts, the value of the bolívar drops against the U.S. dollar, Defendants and their friends profit.  Plaintiff Central Bank, which injects bolívares into the economy, nets less revenue from seigniorage and less capital investment as a result, while also suffering reputational harm.  Like the company in the hypothetical above, the Central Bank has Article III standing to sue Defendants.

Defendants argue that the Amended Complaint fails to adequately allege standing because the loss of revenue from seigniorage and capital investment is "derivative of a broader, more fundamental injury" – i.e., of price inflation – and the Court's Order dismissing the Central Bank's original Complaint found that "[p]rice inflation in a nation's economy is not an injury sufficiently particularized to the Central Bank" and not sufficiently "identifiable," but only "a hypothetical injury."  (D.I. 21 at 2 n.2.)  But the Central Bank's injuries pled in the Amended Complaint do not derive from inflation[2] and are not hypothetical; they constitute distinct, direct and concrete harms.  *Id.*  Such particularized harm comprises injuries more than sufficient to confer standing as clearly as the hypothetical stated above.

---

[1] *See Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005) (observing that "While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms").

[2] Though at least one court in this Circuit has found inflation to be sufficiently particularized to constitute an injury-in-fact.  *See Atlee v. Laird*, 339 F. Supp. 1347, 1355 (E.D. Pa. 1972) (finding allegations of "inflation" to be "economic injury" "sufficient to confer standing").

Defendants similarly rely on distortions of the Amended Complaint as the bases for their arguments that each cause of action fails to plead facts stating a claim.  The argument section below debunks each of those distortions, demonstrating that Defendants' motion should be denied in its entirety and that this case should be allowed to proceed so that the rights of the Central Bank are given their due process in this forum.

## II.    THE NATURE AND STAGE OF PROCEEDINGS

The Central Bank commenced this action on October 23, 2015.  After being served, Defendants requested – and the Central Bank and the Court agreed – that they have an extension of time up to December 21 within which to respond to the Complaint.  On February 26, 2016, the Court granted Defendants' motion to dismiss the Complaint on the ground that the Central Bank had failed to allege Article III standing, granting the Central Bank seven days' leave to amend.

The Central Bank timely filed its Amended Complaint (D.I. 28) on March 4, 2016.

## III.    SUMMARY OF ARGUMENT

1.    The Central Bank has alleged facts demonstrating that Defendants intended to and did in fact cause direct, concrete harm to the Central Bank, vesting it with Article III standing.

2.    The Central Bank has adequately alleged each of its claims for relief. Defendants' arguments to the contrary depend on improper distortions of the Amended Complaint's allegations and on purported disputes of fact, neither of which are permissible bases for Defendants' motion to dismiss.

## IV.    CONCISE STATEMENT OF FACTS

The Individual Defendants are principals of and operate defendant DT, LLC, operating the DT Site through that entity.  (D.I. 28 ¶¶ 6-9.)  The DT Site features the daily DT Rate, and also includes a variety of commentaries and web articles.  (*Id.* ¶ 35.)  Since 2013, the DT Rate

has been the most widely read and followed exchange rate reference in Venezuela.  (*Id.* ¶ 38.)
Defendants claim in the DT Site and elsewhere that in setting the DT Rate, they randomly
consult currency exchange houses in Cúcuta, Colombia, from which they obtain the bolívar-to-
Colombian peso exchange rate and the Colombian peso-to-dollar exchange rate.  From those two
rates they extrapolate the purported bolívar-to-dollar rate.  (D.I. 28 ¶ 36.)  But the DT Rate does
not reflect an actual exchange value of bolívares for dollars.  (*Id.* ¶¶ 40-48.)  After Defendants
established the daily DT Rate as "the" authoritative unofficial bolívar-dollar exchange rate, they
agreed and conspired to deliberately fabricate the DT Rate.  (*Id.* ¶ 45.)  On any given day, the
average exchange rate charged by Cúcuta exchange houses is in fact magnitudes less than what
Defendants falsely report as the DT Rate.  (*Id.* ¶ 46.)  Moreover, at least some of the Defendants
have traded in black markets for currency futures for their personal financial gain and at the
expense of the Central Bank.  (*Id.* ¶ 45.)  Indeed, even the DolarToday Facebook site has
solicited users to sell dollars to Defendants.  (*Id.*)  This contrivance allows Defendants and their
coconspirators to profit through arbitrage.  (*Id.*)

The widespread acceptance of the fraudulent, artificially high DT Rate directly harms the
Central Bank because, among other things, it diminishes the Central Bank's seigniorage – profit
calculated as the difference between the value of currency a central bank issues and the costs
incurred to produce and distribute it.  (*Id.* ¶¶ 3 n.1, 47, 49.)  The Central Bank also loses capital it
would otherwise attract and retain as a result of investments in Venezuela.  (*Id.* ¶ 18.)  And
Defendants' falsehoods directly harm the Central Bank's reputation domestically and
internationally, creating the façade that the bolívar is rapidly declining in value because of the
Central Bank's mismanagement.  (*Id*. ¶¶ 47, 93-94.)

## V.    LEGAL ARGUMENT

### A.    THE CENTRAL BANK HAS ARTICLE III STANDING.

#### 1.    THE STANDARDS GOVERNING THE CENTRAL BANK'S STANDING.

##### a.    Defendants Seek To Lead The Court To Error With Their Impermissible "Facial" Challenge.

Defendants include nineteen pieces of purported extrinsic "evidence"[3] with their motion to dismiss (Gonzalez Decl.), arguing that the Court may consider materials beyond the pleadings because they make a "factual" (and "facial") challenge to the Amended Complaint.  (D.I. 32 at 8-9).  Defendants seek to lead the Court to error, for no factual attack is permitted at this juncture.

A court commits "error" in treating a motion to dismiss as "factual" where the party mustering that challenge "filed the attack before it filed any answer to the Complaint or otherwise presented competing facts."  *Constitution Party v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) ("Its motion was therefore, by definition, a facial attack"); *Askew v. Church of the Lord Jesus Christ*, 684 F.3d 413, 417 (3d Cir. 2012) ("[a]s the defendants had not answered and the parties had not engaged in discovery, the first motion to dismiss was facial," permitting a factual inquiry only "after a period of focused discovery"); *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007) (noting that the parties "conducted extensive discovery on the jurisdictional issue" before allowing a factual challenge to the operative complaint); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891-892, n. 17 (3d Cir. 1977) ("A factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted," i.e., after "the answer has been served."); *Smalls v. Jacoby & Meyers, LLP*, 2016 U.S. Dist. LEXIS

---

[3] Defendants proffer certain self-serving translations of content from the DT Site, unauthenticated printouts of third-party websites, and articles not referenced in the Amended Complaint (D.I. 33 Exhs. A, B-1, B-2, B-3, C, D-1, D-2, D-3, D-4, D-5, D-6, D-7, D-8, D-9, D-10, D-11, D-12, D-13, D-14).  None of this "evidence" is admissible, and none bolsters Defendants' arguments about the sufficiency of the Amended Complaint.  *See Victaulic Co. v. Tieman,* 499 F.3d 227, 236-37 (3d Cir. 2007).  The Court should strike all of it.

10538 (D.N.J. Jan. 26, 2016) (denying motion to dismiss for prematurely making factual attack on jurisdiction).

Defendants have not answered the Amended Complaint, have undertaken no discovery and have presented no admissible evidence of competing facts.  The Court should reject both Defendants' factual attack and their improper "evidence."  *See Mortensen*, 549 F.2d at 891.

### b.     The Standards Governing Defendants' Facial Challenge.

"A plaintiff must establish three elements for Article III standing: (1) an 'injury in fact,' (2) that is 'fairly traceable' to Defendants' alleged misconduct; and (3) that is 'likely' to be 'redressed by []a favorable decision' in the case at hand."  (D.I. 27 at 2 n.2) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  In the context of a challenge to standing, "[a] complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."  *Trump Hotels & Casino Resorts v. Mirage Resorts*, 140 F.3d 478, 483 (3d Cir. 1998) (citation omitted); *accord*, *Resnik v. Woertz*, 774 F. Supp. 2d 614, 627 (D. Del. 2011) (Sleet, J.).  "At the motion to dismiss stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice.'" *Mandelbrot v. Armstrong World Indus. Asbestos Pers. Inj. Settlement Trust*, 2014 U.S. Dist. LEXIS 127652 (D. Del. Sept. 11, 2014) (Sleet, J.) (citing *Lujan*, 504 U.S. at 561).

The Third Circuit succinctly instructs that "to state an injury-in-fact sufficient to survive a motion to dismiss, [the Central Bank] must simply plead that [it] suffered some concrete form of harm" because of Defendants' conduct.  *Danvers Motor Co.*, 432 F.3d at 292 (citing *Lujan*, 504 U.S. at 561).  Because the Central Bank has done so, Defendants' facial attack fails.

### 2.   THE HARMS ALLEGED IN THE AMENDED COMPLAINT ARE NOT DERIVED FROM AN ACCELERATION OR EXACERBATION OF PRICE INFLATION.

The Central Bank alleges the following harms: "(1) diminished seigniorage; (2) the 'false impression' among the public that the Central Bank is incapable of managing Venezuela's economy; and (3) diminished revenue as a result of the decline in capital investments in Venezuela."  (D.I. 32 at 9.)  The principal thrust of Defendants' entire argument is that these injuries are all caused by, or derive from, price inflation that this Court previously held is insufficient.  To the contrary, none – taken separately or together – derives from price inflation:

- *Diminished Seigniorage* (D.I. 28 ¶¶ 3, 15-16, 21, 48-49, 79):  the concrete, direct loss of marginal seigniorage enjoyed by the Central Bank due to Defendants' acts.

- *Loss of Capital from Investors* (D.I. 28 ¶¶ 3, 15, 18, 21, 48-49, 79):  lost capital that entities and persons would invest with the Central Bank but for Defendants' acts.

- *Reputational Harm* (D.I. 28 ¶¶ 3, 15, 17, 21, 50, 79):  reputational damage because Defendants' acts create the false impression that the Central Bank's monetary policies are ineffectual and that it cannot manage the Venezuelan economy.

These are real, actual and particularized economic and reputational harms separately pled in the Amended Complaint.  Defendants fail to explain how they are not.  ***None*** depends on generalized price inflation,[4] a harm on which the Court's Order focused in its standing analysis. (D.I. 27 at 2, n.2.)  In the context of its injury-in-fact analysis, the Court held that price inflation is neither "sufficiently particularized" nor sufficiently concrete to constitute an injury-in-fact.

---

[4] Price inflation is not the same or even a rough equivalent of currency devaluation.  While one may influence the other, they are distinct.  *See, e.g,* J.A. Frankel, "Foreign Exchange," Concise Encyclopedia of Economics (2d ed. 2008) (http://www.econlib.org/library/Enc/ForeignExchange.html (last accessed on Mar. 28, 2016)) ("The exchange rate, as the relative price of money (domestic per foreign), can be viewed as determined by the demand for money (domestic relative to foreign), which is in turn influenced positively by the rate of growth of the real economy and negatively by the inflation rate.").

(*Id.*)[5]  The Court did not reach the sufficiency of the other harms alleged in the original Complaint or of allegations that the harms are actual or imminent, and did not reach standing requirements outside of injury-in-fact.  (*Id.*)  The Amended Complaint cures any deficiency, identifying the particular, concrete harms the Central Bank has suffered at Defendants' hands.

### 3.   THE AMENDED COMPLAINT PLEADS FACTS ESTABLISHING STANDING.

#### a.   The Central Bank Alleges An Injury-in-Fact.

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized,[6] and (b) 'actual or imminent, not "conjectural" or "hypothetical."'"  *Lujan*, 504 U.S. at 560 (citations omitted).  The Central Bank has pled such invasions.

The Central Bank's two economic harms – diminution of its seigniorage (i.e., lost earnings) and lost investment capital – are "classic form[s] of [a] qualitatively concrete injury – direct financial harm."  *Hospital Council of W. Pa. v. Pittsburgh*, 949 F.2d 83, 87 (3d Cir. 1991).  "While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms."  *Danvers Motor Co.*, 432 F.3d at 291.

The Central Bank's reputational injury is also a particularized harm recognized as a basis for Article III standing.  *See NCAA v. Governor of N.J.*, 730 F.3d 208, 220 (3d Cir. 2013) ("As a matter of law, reputational harm is a cognizable injury in fact"); *see e.g., Meese v. Keene*, 481 U.S. 465, 473-74 (1987) (holding that unwanted association with an undesirable label was reputational harm sufficient to confer standing); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475

---

[5] As mentioned above, however, the only other court in the Third Circuit to directly confront that issue held otherwise (*supra* at 1 n.1, citing *Atlee v. Laird*, 339 F. Supp. at 1355).

[6] The "particularized" requirement means that the injury must simply "affect the plaintiff in a personal and individual way" for purposes of Article III standing.  *Lujan*, 504 U.S. at 560 n.1.

F.3d 524, 542-43 (3d Cir. 2007) (holding that attorney had standing to challenge public reprimand because the sanction "affect[s] [his] reputation").[7]

The Amended Complaint pleads facts alleging "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'"  The economic harms discussed above are "paradigmatic" injuries in fact for purposes of Article III standing.  *See Danvers Motor Co.*, 432 F.3d at 291.  And reputational harm "is a cognizable injury" for the same purpose.  *See NCAA*, 730 F.3d at 220.  Both forms of injury affect the Central Bank "in a personal and individual way."  Diminished seigniorage directly decreases the margin that the Central Bank realizes on the difference between the cost of producing money and its value at the time of release into circulation.  Depriving the Central Bank of investment capital that it would attract and retain but for Defendants' wrongdoing requires that the Central Bank instead seek more expensive alternatives, increasing its cost of borrowing.  And reputational harm, caused by the false impression that the Central Bank's monetary policies are ineffectual and that it cannot manage the Venezuelan economy, affects the Central Bank in a quintessentially "personal and individual way."

The Amended Complaint's allegations detailing these concrete, "real and immediate" and continuing injuries (D.I. 28 ¶¶ 1-21, 48-50, 79) contrast with those containing only "abstract" notions about "the prospect of future injury," about which courts are rightfully dubious.  *Los*

---

[7] That Defendants' conduct may also affect other third parties is irrelevant, as the Supreme Court has made clear:  "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody.  We cannot accept that conclusion."  *U.S. v. Students Challenging Reg. Action Procs.*, 412 U.S. 669, 688 (1973); *see also Hassan v. City of New York*, 804 F.3d 277, 291 (3d Cir. 2015) ("that hundreds or thousands (or even millions) of other persons may have suffered the same injury does not change the individualized nature of the asserted rights and interests at stake"); *Lozano v. City of Hazleton*, 620 F.3d 170, 186 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. 1030 (2011) (holding that "[t]he question of particularity turns on the nature of the harm, not on the total number of persons affected.").

*Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).  Yet Defendants seek to impose a much higher

pleading standard, unsupported by case law.  (*See* D.I. 32 at 12-15.)

Article III's injury-in-fact element requires only "an identifiable trifle" of harm.  *U.S. v.*

*Students Challenging Reg. Action Procs.*, 412 U.S. at 689 n.14.  Or as then-Third Circuit Judge

Alito put it, "[i]njury-in-fact is not Mount Everest."  *Danvers Motor Co.*, 432 F.3d at 294 (citing

*Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)); *see also Alliant Energy Corp. v. Bie*,

277 F.3d 916, 920 (7th Cir. 2002) (where "it is easy to imagine facts *consistent with* [the]

complaint and affidavits that will show plaintiffs' standing . . . no more is required" to establish

standing at pleading stage) (emphasis in original).  Contrary to Defendants' insistence (D.I. 32

at 11), therefore, the Central Bank accordingly need ***not*** "identify" specific investments lost.

Nor must it allege specific facts to "support its claims that the 'public' believes or has the

'impression that the Central Bank is incapable of managing Venezuela's economy or monetary

policies as a result of the publication of the DT Rate" to plead a "distinct and palpable injury."[8]

### b.   The Central Bank's Injuries Are Traceable To Defendants' Acts.

On their face, the Central Bank's allegations trace its injuries to Defendants' wrongdoing.

The Central Bank alleges that "[i]n or about May 2013 – after Defendants had established the

daily DT Rate as 'the' authoritative unofficial bolívar-dollar exchange rate – they agreed and

conspired to deliberately fabricate the DT Rate while at least some of the Defendants began

trading in black markets for currency futures for their personal financial gain and at the expense

of the Central Bank."  (D.I. 28 ¶ 45.)  From that time, "the DT Rate began an artificial climb

---

[8] Indeed, what Defendants demand as "facts" is really *evidence*.  Evidence eventually may be required to support the Central Bank's factual allegations, but is not required now.

untethered to genuine market forces.  The DT Rate continued to climb.  And climb." (*Id.* ¶ 40.)  "The DT Rate's ascent became even steeper beginning in or about February 2015."  (*Id.* ¶ 43).  Indeed, "[a]t the end of September 2015, the DT Site reported a DT



Rate that exceeded an astounding 800 bolívares to the dollar . . .  Since then, Defendants have continued to push up the DT Rate."  (*Id.* ¶ 44.)

Consequently, "by posting an artificial DT Rate daily, Defendants are deliberately ***misrepresenting*** and effectively ***manufacturing*** a market – a phony market for the exchange of bolívares into dollars and vice-versa."  (*Id.* ¶ 45.)  Because of its vast influence, the DT Rate's false publication devalues the bolívar – just as the analyst's false report does in the hypothetical – directly diminishing the marginal seigniorage that the Central Bank obtains from printing and coining the country's bolívares.  And Defendants' "literally false" "fabrication of the DT Rate since at least May 2013 has created the façade that the bolívar has been radically devalued by true market failures" (*id.* ¶¶ 46, 47).  These acts, in turn, have caused the Central Bank's economic and reputational injuries detailed above.

Defendants challenge these allegations through proffered extrinsic evidence.  (*See* D.I. 32 at 11-15).  Section V.A.1.a. above, however, shows that consideration of such "evidence" would be error.  *See Constitution Party*, 757 F.3d at 358.  The Court should strike Defendants' attempted end-round of the well-settled rule that the Court "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately

determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint."  *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).[9]

Defendants also contend that the Central Bank's injuries "necessarily depend on the acts and decisions of millions of unknown and unidentifiable Venezuelan individuals who purportedly visit the DT Site and DT Social Media on a daily basis to set their prices."  (D.I. 32 at 14).  The contention is simply untrue.  Not only is such dependency nowhere alleged, the Amended Complaint avers just the opposite:  "Defendants have succeeded in making the DT Rate the authoritative source for the bolívar-dollar exchange rate in Venezuela on the parallel or "black" market" (D.I. 28 ¶ 2 at 2).

Moreover, Defendants' argument belies their distortion of the causation element inherent in the traceability requirement.  "Causation in the context of standing is not the same as proximate causation from tort law, and the Supreme Court has cautioned against 'wrongly equat[ing] . . . injury "fairly traceable" to the defendant with injury as to which of the defendant's actions are the very last step in the chain of causation.'"  *Constitution Party*, 757 F.3d at 366 (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)).  In any event, "an indirect causal relationship will suffice, so long as there is a fairly traceable connection."  *Id.* (internal citations and quotations omitted); *see also NCAA*, 730 F.3d at 222 (3d Cir. 2013) (holding "[t]hat a third party's action may be necessary to complete the complained-of harm does not negate the

---

[9] Defendants also complain that certain facts in paragraph 45 of the Amended Complaint are pled on "information and belief" and therefore should be rejected or disregarded.  (D.I. 32 at 13.) Allegations on information and belief are permissible under Rule 8 (*see Browning v. Clinton*, 292 F. 3d 235, 243 (D.C. Cir. 2002)); Rule 9(b) does not state or imply otherwise.  Indeed, Rule 9(b)'s "requirement of particularity . . . does not entail an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated . . . and reasonably believes that a wrong has occurred."  *Temple v. Haft,* 73 F.R.D. 49, 53 (D. Del. 1976) (citations omitted).  The detailed facts pled in the Amended Complaint disclose Defendants' efforts to solicit viewers' use of the DT Site for black market foreign exchange transactions, and amply apprises Defendants of facts supporting the Central Bank's allegations pleaded on information and belief.

existence of an injury in fact . . . or negate causation and redressability."); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013) ("[T]he traceability requirement [may be] met even where the conduct in question might not have been a proximate cause of the harm, due to intervening events.") (citation omitted).  Consequently, even if the wrongdoing here hinged on duping the Venezuelan populace and well regarded media and finance sources to achieve Defendants' intended harm to the Central Bank, that harm remains "fairly traceable" to them.

### c.     The Central Bank Pleads The Redressability Of Its Injuries.

The Amended Complaint establishes redressability.  Redressability is "closely related to traceability, and the two prongs often overlap."  *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 143 (3d Cir. 2009).  A favorable decision in this case and entry of the injunction sought will slow or diminish the ongoing harm to the Central Bank – and that is all that is required.  *See Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) ("While it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warning, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* or it") (emphases in original); *cf. Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (explaining that "all civil penalties have some deterrent effect," and therefore "it can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates the conduct and prevents its recurrence provides a form of redress").

### B.     THE CENTRAL BANK'S AMENDED COMPLAINT ALLEGES WELL-PLED FACTS SUFFICIENT TO SHOW PLAUSIBLE CLAIMS FOR RELIEF.

#### 1.     THE STANDARDS GOVERNING DEFENDANTS' CHALLENGE TO THE SUFFICIENCY OF THE CENTRAL BANK'S AMENDED COMPLAINT.

In considering a motion to dismiss, the Court should (1) "separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions" then

(2) "determine whether the remaining well-pled facts sufficiently show that the plaintiff 'has a "plausible claim for relief."'" *Zieger v. Advance Am.*, C.A. No. 13-1614-GMS, 2014 WL 7388365, at *2 (D. Del. Dec. 29, 2014) (citing, e.g., *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009)). "As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Id.* at *6 (citations omitted).

### 2. THE CENTRAL BANK PLEADS A VIABLE RICO CLAIM.

As alleged in the Amended Complaint, Defendants have committed wire fraud by posting the DT Rate electronically on the DT Site (which includes the DT application, the DT Twitter feed and the DT Facebook page) daily since at least 2013. (D.I. 28 ¶¶ 52, 65, 69-70.) Wire fraud (18 U.S.C. § 1343) is a predicate act of racketeering activity for RICO purposes. 18 U.S.C. § 1961(1)(B). Defendants' conduct constitutes a pattern of racketeering activity because they commit wire fraud daily, and have over a sustained period of time. 18 U.S.C. § 1961(5).

Defendants nonetheless contend that the Central Bank fails to plead wire fraud for two reasons. First, they contend that the wire fraud allegations lack the specificity required by Rule 9(b). And Defendants contend that, in any event, the Central Bank has failed to allege two of the three elements essential to wire fraud: a scheme or artifice to defraud for the purpose of obtaining money and Defendants' participation with the specific intent to defraud.

Second, Defendants allege that the Amended Complaint does not allege RICO's statutory preconditions of specific injury or concrete financial loss resulting from the complained-of conduct and proximate causation. Defendants' contentions fail.

### a. The Amended Complaint Adequately Pleads Wire Fraud.

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." The Amended Complaint thus alleges with particularity the "date, time or

place" of the fraud, as well as other "means of injecting precision and some measure of substantiation into [its] allegations of fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004). The Amended Complaint first chronicles the identity and timing of the statements comprising wire fraud – *i.e.,* the DT Rate that Defendants publish daily through several electronic outlets – and then explains how and why those statements are fraudulent.

> **b.    Detailing Defendants' Daily Publications Of The DT Rate, The RICO Claim Amply Satisfies Rule 9(b).**

The Amended Complaint alleges that, among other things that (i) Defendants created and operate the DT Site (D.I. 28 ¶¶ 1, 75); (ii) the DT Site has been in operation since 2010 and that its "principal purpose since inception, as its domain name implies, has been to post daily an unofficial U.S. dollar to bolívar exchange rate – the value of the 'dollar today' in bolívars (the 'DT Rate')" (*id.* ¶ 35); and (iii) Defendants also publish the DT Rate daily through the other forms of media comprising the DT Site, including the DT application for iOS and Android users, the DT Twitter feed, the DT Facebook page and other social media. (*Id.* ¶¶ 1, 23, 39, 52, 62, 70, 74, 86.) The Amended Complaint includes screenshots of Defendants' publication of the daily DT Rate, and their solicitations for currency exchange transactions. (*Id.* ¶¶ 42-45.)

The Amended Complaint further alleges how Defendants purport to calculate the DT Rate, how they advertise it as the "true" bolívar-to-dollar exchange, and how and why the DT Rate is false. (D.I. 28 ¶¶ 36-39, 47.) It details that "beginning in or about May 2013, the DT Rate began an artificial climb untethered to genuine market forces." (*Id.* ¶ 40.) The Amended Complaint also chronicles, through the use of charts and graphs based on data compiled by Barclays and Defendants themselves, how the DT Rate began rising even more steeply beginning in February 2015 (*id.* ¶¶ 43-44), such that "on any given day, the average exchange rate charged by Cúcuta exchange houses is magnitudes less than what Defendants report as the DT Rate."

(*Id.* ¶ 46.)  These factual allegations amply allege the "date, time or place" of Defendants' fraud with particularity, but go further: they also add additional facts to inject extra precision and substantiation to the "date, time or place" allegations of wire fraud.

Defendants suggest that these allegations remain insufficient because they fail to specify precisely who among the Defendants made the fraudulent statements.  (D.I. 32 at 15-16.)  Not so. While Rule 9(b) guards against lumping defendants together when pleading their misconduct, "[a]n 'exception' to this rule has been developed when a group of defendants is responsible for a document or statement containing fraudulent misrepresentations" – as here.  *Bolden v. Culture Farms, Inc.*, No. 85-4297, 1989 U.S. Dist. LEXIS 15816, at *10-11 (D. Kan. Nov. 21, 1989) (collecting cases); *e.g., Pellman v. Cinerama, Inc.*, 503 F. Supp. 107, 111 (S.D.N.Y. 1980) (holding similarly and collecting cases).

Defendant DT, LLC owns and operates the DT Site (comprising the website, apps and Facebook page) where the DT Rate is posted daily.  (D.I. 28 ¶¶ 23-24, 35.)  Defendants Díaz, Lozada and Altuve are the principals of DT, LLC, directing its activities, with Altuve "post[ing] the DT Rate to the DT Site daily."  (*Id.* ¶¶ 8-9, 53-55.)  In short, "who" makes the false statements underlying wire fraud is clear and satisfies Rule 9(b).  *See Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96, 100 (3d Cir. 1983) (cautioning against "focusing exclusively on [Rule 9(b)'s] 'particularity' language," calling it "'too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules'") (citation omitted).

### c.     The Amended Complaint Pleads all Elements of Wire Fraud.

Defendants wrongly challenge the RICO claim because "there is no allegation that the scheme was devised to deprive the Plaintiff of money or property, and that there is no allegation that Defendants' conduct was carried out with the intent to defraud."  (D.I. 32 at 16.)  In fact the Amended Complaint alleges both these elements.  As explained above, it details how Defendants

"agreed and conspired to deliberately fabricate the DT Rate while at least some of the Defendants began trading in black markets for currency futures for their personal financial gain and at the expense of the Central Bank." (D.I. 28 ¶ 45.)  They "operate the DT Site with the shared goals of fabricating an unofficial exchange rate, enriching themselves, frustrating the Central Bank's mission, reducing its margin on seigniorage and other revenues, and wrecking the Venezuelan economy." (*Id.* ¶ 59.)  The wire fraud allegations meet Rule 9(b)'s requirements.

### d. The Amended Complaint Adequately Pleads RICO's Statutory Preconditions Of Injury And Causation.

Under 18 U.S.C. § 1964(c), a RICO plaintiff must show "(1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962." *Maio v. Aetna, Inc.*, 221 F. 3d 472, 473 (3d Cir. 2000).  The Amended Complaint expressly makes both showings, as the section above regarding Article III standing shows:  the Central Bank has suffered a concrete, monetary injury as a direct result of Defendants' conduct in the form of "diminished seigniorage" and the "depriv[ation] of capital that it would attract and retain" but for Defendants' conduct.  (D.I. 28 ¶¶ 15, 18.)  Defendants' unsupported allegations to the contrary fail.

### (1) The Amended Complaint Details How Defendants' Misconduct Has Caused Concrete Financial Losses.

Defendants contend that the Central Bank "has not suffered a RICO injury" because the diminution of its seigniorage and the deprivation of capital that it would otherwise attract and retain are not "concrete financial losses for which RICO provides a recovery." (D.I. 32 at 17.)  Defendants assert without support that the Central Bank's monetary injuries – diminution in seigniorage and deprivation of capital – are akin to losses to "goodwill and business reputation" and "intangible property rights." (*Id.*)  They are neither.

First, seigniorage is neither goodwill nor an intangible property right.  Seigniorage "is the profit calculated as the difference between the value of money issued and the cost incurred to produce and distribute it."  (D.I. 28 ¶ 3 n.1.)  By definition it is tangible property – revenue – that only a Central Bank is entitled to earn.

Second, the diminution of seigniorage and deprivation of capital are actual monetary losses to the Central Bank.  *See Maio*, 221 F. 3d, 483 ("the injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual monetary loss").

Defendants attempt to distort the Central Bank's injuries as the loss of the "right to make more sales" of bolívares.  The Central Bank nowhere alleges that Defendants' conduct somehow limits the Central Bank's ability to "sell" more bolívares.  Like the corporation in the hypothetical on page 1 that nets less money from selling its stock, Defendants' wrongdoing here causes the Central Bank to net less gain from its (now diminished) seigniorage.  And because of Defendants' scheme, the Central Bank is attracting less capital investment than it otherwise would, leading to increased costs of borrowing.  These are the financial harms at issue.

Third, the Third Circuit recently confirmed that realized or present economic losses are sufficiently concrete RICO injuries.  *See In re Avandia Mktg.*, 804 F.3d 633, 640 (3d Cir. 2015).  That decision is instructive here.  The putative class plaintiffs there sued GlaxoSmithKline LLC ("GSK") over its alleged failure to disclose significant heart-related risks regarding its pharmaceutical drug Avendia.  GSK moved to dismiss, arguing that because plaintiffs did not allege that they received unsafe or ineffective prescriptions, they got what they bargained for and had not suffered a concrete injury.  The district court denied the motion but certified the issue for interlocutory appeal.  The Third Circuit affirmed.  Plaintiffs' damages did not depend on Avendia's effectiveness, the court stated, "but rather on the inflationary effect that GSK's

allegedly fraudulent behavior had on the price of Avandia." *Id.* Such harm was sufficiently concrete to pass muster. *Id.* at 641. The parallel to the diminished seigniorage and capital investment alleged here further demonstrates the concrete nature of the Central Bank's injuries.

### (2)    The RICO Claim Pleads Requisite Proximate Cause.

Defendants contend that the RICO claim fails to plead proximate cause because the Central Bank was not directly harmed by Defendants' alleged wrongdoing. (D.I. 32 at 19.) Rather, they posit, such harms required intervening conduct by "unknown and unidentifiable individuals" – the many who rely on the DT Rate. (*Id.*) This argument fails under settled law.

Proximate cause is "lacking in RICO cases when the conduct directly causing the harm was distinct from the actions that gave rise to the fraud." *In re Avendia*, 804 F.3d at 642. For example, it was lacking where the Securities Investor Protection Corporation ("SIPC"), a subrogee, alleged that defendant engaged in a stock manipulation scheme, causing the insolvency of two broker-dealers and requiring SIPC to reimburse the broker-dealers' customers' losses. *Id.* (discussing *Holmes v. Securities Inv. Protection Corp.*, 503 U.S. 258, 261-63 (1992)).

By pleading that it nets less from seigniorage and incurs increased expense from diminished capital investment because of the DT Rate, the Central Bank has pled proximate cause for RICO purposes. Because the DT Rate sets the *de facto* unofficial exchange market rate, it directly diminishes seigniorage as soon as currency and coinage is released into circulation. The Central Bank's increased borrowing costs from diminished capital investment and its reputational harm do involve, to a limited extent, third parties:  investors do not invest or pull money out because they are misled by the DT Rate; the false DT Rate tarnishes the Central Bank's reputation for fiscal management with third parties. But "first-party reliance" is not required "to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in

*Holmes* and [*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006)]." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657-58 (2008); *In re Avandia Mktg.*, 804 F.3d at 643 ("if there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiffs' injury, the Court has held that *a RICO plaintiff who did not directly rely on a defendant's misrepresentation can still establish proximate causation*") (emphasis added). Potential investors' and other third parties' reliance on the DT Rate to the detriment of the Central Bank is both foreseeable and pled as the intended effect of Defendants' scheme.  (D.I. 28 ¶¶ 2-3, 63, 85.)

Defendants' other proximate-cause arguments fail, too.  They present no facts or argument why the Central Bank's alleged injuries present the "almost impossible task of attempting to separate the effect, if any, of the alleged RICO acts of Defendants from other independent factors."  (D.I. 32 at 19.)  The injuries alleged here are not beyond the capacity of expert analysis and discovery, and no allegation has been made in this respect.  And the mere fact that Defendants' wire fraud injures others, too, does not mean that others "more directly harmed by the alleged RICO acts could easily vindicate their claims."  (D.I. 32 at 20.)  No indication exists that others will come to this country to sue in vindication of their claims.  But even if they did, such actions would not redress the Central Bank's injuries.

C.  THE AMENDED COMPLAINT PLEADS A COGNIZABLE LANHAM ACT CLAIM.

Defendants challenge the Central Bank's Lanham Act claim on three grounds: (i) that this claim is solely premised on the "Defendants' hav[ing] falsely promoted the DT Rate as 'the' official bolivar-to-dollar exchange rate," and that the Amended Complaint does not "plead a single instance in which" that has taken place (D.I. 32 at 21); (ii) that the Amended Complaint does not meet the injury-to-a-commercial-interest standing requirement under the Lanham Act;

and (iii) that Defendants' complained-of conduct is not commercial advertisement or promotion of a product or service.  All three challenges fail.

### 1.   THE CENTRAL BANK EXPRESSLY PLEADS THE FALSITY OF DEFENDANTS' STATEMENTS.

Defendants again distort the Central Bank's factual allegations.  The Central Bank does not allege that Defendants are misrepresenting that the DT Rate is "the" official bolivar-to-dollar exchange rate.  Rather, it alleges that "Defendants have been deliberately misrepresenting the bolívar-dollar exchange rate since at least May 2012 through the daily posting of the DT Rate." (D.I. 28 ¶ 91.)  In other words, Defendants' false and misleading statements consist of the publication of the knowingly false DT Rate, not of any statement that the DT Rate is "the" official or unofficial bolivar-to-dollar exchange rate.  Notably, Defendants do not challenge the sufficiency of the actual false and misleading statements forming the basis of this claim – Defendants' daily publication of the false and misleading DT Rate.

### 2.   THE CENTRAL BANK ENJOYS STANDING AS A LANHAM ACT PLAINTIFF.

Defendants next argue that the Central Bank lacks standing under the Lanham Act because it pleads no injury to a "'commercial interest in sales or reputation' regarding a product or service it offers to 'the buying public.'"  (D.I. 32 at 21-22.)  Defendants' contend, without more, that the Amended Complaint fails to allege consumer deception resulting in "'withheld trade' from Plaintiff."  (D.I. 32 at 22.)  The contention is incorrect.

The Amended Complaint precisely alleges how consumers react to the ongoing publication of the false and misleading DT Rate:

- "Defendants' publication of phony black market rates sabotages Venezuela's tiered currency exchange rates, distorting and biasing expectations ***and directly diminishing the Central Bank's marginal seigniorage***."

- "Given the Central Bank's limited quantity of dollars available for foreign exchange, and given pressures to exchange bolívares for dollars in light of falsely

reported losses of the bolivar's value, ***Venezuelans trade dollars through parallel black market exchange houses and other sources*** instead of using government sanctioned procedures."

- "This reputational harm alone has in turn caused or contributed to the economic harm that ***trade has been withheld from the Central Bank, as capital that it would otherwise have retained or withheld has left***, with returns instead being sought from other world economies."

(D.I. 28 ¶¶ 49-50, 93) (emphases added.) Put simply, Defendants' publication of the false DT Rate deceives consumers into withholding trade from the Central Bank. The allegations track the requirements set forth by the Supreme Court in the very case on which Defendants purport to rely. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014) ("a plaintiff suing under §1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff").

Defendants' attempted reliance on *Accenture Global Servs. v. Guidewire Software, Inc.*, 581 F. Supp. 2d 654 (D. Del. 2008) likewise fails. There, in contrast to the specific facts averred by the Central Bank, the court found that the counterclaimant had failed to allege that "any of its customers or potential customers actually were misled by [the] sentiments" at issue. *Id.* at 667.

### 3. PUBLICATION OF THE DT RATE IS COMMERCIAL SPEECH.

Defendants seek to immunize their false and misleading publication of the DT Rate by contending that "the DT Rate is not actionable 'commercial speech.'" (D.I. 32 at 23-24.) And they disclaim any "purpose of influencing consumers to purchase DT's products or services or to divert customers away from the Central Bank." (*Id*. at 24.)

But Defendants do not parse the Amended Complaint's actual allegations to support these unfounded assertions. They instead ask the Court to credit their own self-serving disclaimers. (*Id*. at 23.) This is improper. *See Victaulic Co.*, 499 F.3d at 236.

- 21 -

Further, while Defendants identify factors that may serve as relevant guides in determining the commercial nature of speech, this Court "must be mindful of the 'difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.'" *In re Orthopedic*, 193 F.3d at 793 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993)).  Commercial speech extends far beyond traditional advertising for any particular transaction affecting the sale of a particular product or service.  *See, e.g.*, *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 & n.13 (1983) (discerning commercial speech in an otherwise "informational pamphlet" concerning venereal disease because "at the very bottom of the last page" it "identified . . . [a] distributor of Trojan-brand prophylactics").

The Amended Complaint contains ample allegations about the commercial nature of Defendants' publication of the DT Rate.  The Amended Complaint alleges that Defendants "deliberately fabricate" the actual, market-driven exchange rate, and their promotion of that falsehood is for, among other reasons, Defendants' "personal financial gain."  (D.I. 28 ¶¶ 40-48, 70-73, 90-95.)  Publishing the DT Rate encourages consumers to bypass government-sanctioned procedures to exchange currency on the parallel "black" market (including the DT Site itself) based on false information.[10]  (*Id.* ¶ 50.)  This harms the Central Bank in the variety of ways documented in the Amended Complaint.  (*Id.* ¶¶ 3 & 70.)

Defendants would lead the Court to error by disregarding these allegations of fact in favor of Defendants' contrary narrative that "the DT Rate is reported only to facilitate the access to information and to educate the public."  (D.I. 32 at 23); *see also, e.g., In re Orthopedic*, 193 F.3d at 793-94 (affirming denial of motion to dismiss when presented with a "factual dispute" about the nature of the speech at issue).

---

[10] The Facebook posting reproduced in the Amended Complaint even explicitly calls on consumers to "[b]uy and sell [their] dollars . . . through [the DT] website!"  (*Id.* ¶ 45.)

## D.     THE CENTRAL BANK ALLEGES A VIABLE CLAIM UNDER VENEZUELAN LAW.

Defendants contend that Delaware substantive law governs this controversy and has never recognized the legitimacy of a claim premised on a violation of Article 1185 of the Venezuelan Civil Code.  (D.I. 32 at 24.)  Defendants' assertion is misguided, as the Third Circuit explained while approving a party's assertion of claims under the laws of Switzerland:

> *Congress*, through 28 U.S.C. § 1332, *has instructed United States district courts to entertain "all civil actions"* (provided the matter in controversy is of sufficient value), as long as there is complete diversity of citizenship.  To be sure, Congress has the authority to counter-instruct district courts not to entertain particular categories of civil actions arising under foreign law, but we do not believe that we should readily imply such a result from statutory text that appears to direct otherwise.

*LaSala v. Bordier et Cie*, 519 F.3d 121, 139 (3d Cir. 2008) (emphasis added).  The Venezuela law underlying the Central Bank's claim may be treated no differently than the countless other foreign laws that have given rise to claims cognizable in district courts sitting in diversity.  *E.g.*, *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1088 (S.D. Fla. 1997) (denying motion to dismiss, finding "Kodak has stated a claim under Article 984 of the Bolivian Civil Code"); *Dominican Rep. v. AES Corp.*, 466 F. Supp. 2d 680, 693-94 (E.D. Va. 2006) (denying motion to dismiss "claims for nuisance, conspiracy, and aiding and abetting under the law of the Dominican Republic"); *Higgins v. SPX Corp.*, No. 1:05-CV-127, 2006 U.S. Dist. LEXIS 90280, at *15 (W.D. Mich. Dec. 14, 2006) (denying motion to dismiss "claim for moral damages under Brazilian law"); *see also, e.g., In re Petrobas Sec. Litig.*, No. 14-cv-9662 (JSR), 2015 U.S. Dist. LEXIS 99322, at *45-46 (S.D.N.Y. July 30, 2015) (noting in the context of a motion to compel arbitration that plaintiffs brought "Brazilian Law Claims"); *In re Nortel Networks, Inc.*, 469 B.R. 478, 498 (Bankr. D. Del. 2012) (observing that "[t]he majority of the claims that the Claimants assert arise under foreign law, i.e., English, Irish and French law.").

- 23 -

E.    THE AMENDED COMPLAINT PLEADS A COGNIZABLE CLAIM FOR UNJUST
      ENRICHMENT.

Defendants argue that the Central Bank's unjust enrichment claim fails because "the

Central Bank does not trade in the 'black market'" and therefore "any money made by

Defendants in the 'black market cannot possibly belong to" or "impoverish" the Central Bank.

(D.I. 32 at 25.)  But Defendants again ignore the factual predicate of the Central Bank's claims.

Defendants' actions, as the Amended Complaint plainly alleges, have resulted in the

diminution of the Central Bank's revenue through, among other things, seigniorage and the

investment capital that it would otherwise attract and retain.  (D.I. 28 ¶¶ 15, 49-59, 94.)  In other

words, Defendants' unjust enrichment, as a result of their arbitrage scheme, comes at the Central

Bank's expense.  That, according to Defendants' own cited authority, is enough under Delaware

law to state a valid claim for unjust enrichment.  *See Schock v. Nash*, 732 A.2d 217, 232 (Del.

1999 ("[u]njust enrichment is defined as the unjust retention of a benefit to the loss of another");

*U.S. Bank Nat'l Ass'n v. Gunn*, No. 11-cv-01155-RGA, 2015 U.S. Dist. LEXIS 102350, at *13

(D. Del. Aug. 5, 2015) (same).

Defendants also argue that the unjust enrichment claim fails because "while Delaware

law permits unjust enrichment claims in certain torts contexts, none of those contexts is present

or applicable in this case."  (D.I. 32 at 25.)  Defendants neglect to mention, much less analyze,

what the referenced "contexts" are and why the present claim fails under those "contexts."  More

important, Defendants provide no authority under Delaware law precluding an unjust enrichment

claim under the facts alleged in the Amended Complaint.

Defendants last argue that the claim fails because the Central Bank "has a remedy at law"

that precludes it from pursuing an equitable claim.  (D.I. 32 at 25.)  But the Central Bank is

allowed to plead an unjust enrichment claim as a possible alternative to its other claims.  *See*

*Cantor Fitzgerald, L.P. v. Cantor*, 1998 Del. Ch. LEXIS 97 (Del. Ch. June 16, 1998) ("Plaintiff

has properly stated a claim for unjust enrichment" in the alternative to other claims at law).

> ### F.   DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT ANY PLEADING DEFICIENCY CANNOT BE CURED BY AMENDMENT.

Dismissals with prejudice are drastic sanctions of last resort (*see Briscoe v. Klaus*, 538

F.3d 252, 258 (3d Cir. 2008); *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 869 (3d Cir.

1984)), reserved for only the most extreme cases, as "the policy of the law is to favor the hearing

of a litigant's claim on the merits." *Spain v. Gallegos*, 26 F.3d 439, 454 (3d Cir. 1994) (citation

omitted).  In the event that the Court determines that any aspect of the Amended Complaint is

not sufficiently pled, "leave to amend should be freely given." *U.S. v. Duffus*, 174 F.3d 333, 337

(3d Cir. 1999).

## VI.   CONCLUSION

For each of the foregoing reasons, Defendants' Motion should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*

_____

OF COUNSEL

David S. Elkins (*pro hac vice*)
Rafael M. Langer-Osuna (*pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, CA 94304
(650) 856-6500

Adam R. Fox (*pro hac vice*)
Marisol C. Mork
SQUIRE PATTON BOGGS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071
(213) 624-2500

April 7, 2016
9954651

Jack B. Blumenfeld (#1014)
Thomas C. Grimm (#1098)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
tgrimm@mnat.com
skraftschik@mnat.com

*Attorneys for Banco Central de Venezuela*

- 25 -